1    JOHN C. FISH, Jr., Bar No. 160620
     jfish@littler.com
2    ANDREW M. SPURCHISE, Bar No. 245998
     aspurchise@littler.com
3    EMILY E. O'CONNOR, Bar No. 279400
     eoconnor@littler.com
4    LITTLER MENDELSON, P.C.
     650 California Street, 20th Floor
5    San Francisco, California  94108.2693
     Telephone:    415.433.1940
6    Facsimile:    415.399.8490

7    Attorneys for Defendant
     UBER TECHNOLOGIES, INC.

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12   NATIONAL FEDERATION OF THE          Case No.  3:14-cv-04086-NC
     BLIND OF CALIFORNIA and MICHAEL
13   HINGSON,                            **REQUEST FOR JUDICIAL NOTICE IN
                                         SUPPORT OF DEFENDANT UBER
14              Plaintiffs,              TECHNOLOGIES, INC.'S MOTION TO
                                         DISMISS**
15        v.
                                         **[F.R.C.P. 12(b)(1) and 12(b)(6)]**
16   UBER TECHNOLOGIES, INC.,
                                         Date:      December 3, 2014
17              Defendant.               Time:      1:00 p.m.
                                         Location:  Courtroom A, 15th Floor
18                                                  San Francisco Federal Courthouse

19                                       Trial Date:  None set.
                                         Complaint Filed:  September 9, 2014
20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE ISO
UBER'S MOTION TO DISMISS                              Case No. 3:14-cv-04086-NC

Defendant UBER TECHNOLOGIES, INC. ("Uber") requests, pursuant to Federal Rule of Evidence 201, that the Court take judicial notice of the following documents in support of Uber's motion to dismiss Plaintiffs' Complaint:

1.      California Public Utilities Commission's "Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry," attached as **Exhibit A**.

A matter that is properly the subject of judicial notice may be considered along with the Complaint when deciding a motion to dismiss for failure to state a claim. *See generally Skilstaf, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1016 n. 9 (9th Cir. 2012).  Additionally, when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint," the Court may consider that document when deciding a motion to dismiss for failure to state a claim. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Dated: October 22, 2014

/s/*Andrew M. Sprchise*
ANDREW M. SPURCHISE
LITTLER MENDELSON, P.C.
Attorneys for Defendant
UBER TECHNOLOGIES, INC.

Firmwide:129679798.1 073208.1034

REQUEST FOR JUDICIAL NOTICE ISO
UBER'S MOTION TO DISMISS

Case No. 3:14-cv-04086-NC

*Exhibit A*

COM/MP1/avs                                    **Date of Issuance 9/23/2013**

Decision 13-09-045  September 19, 2013

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services. | Rulemaking 12-12-011 (Filed December 20, 2012) |

**DECISION ADOPTING RULES AND REGULATIONS TO
PROTECT PUBLIC SAFETY WHILE ALLOWING NEW ENTRANTS
TO THE TRANSPORTATION INDUSTRY**

R.12-12-011  COM/MP1/avs

# TABLE OF CONTENTS

**Title**                                                              **Page**

DECISION ADOPTING RULES AND REGULATIONS  TO PROTECT PUBLIC
SAFETY WHILE ALLOWING NEW ENTRANTS TO THE TRANSPORTATION
INDUSTRY ...................................................................................................... 2
  Summary ................................................................................................... 2
  1. Procedural History ............................................................................. 4
  2. Jurisdiction........................................................................................... 7
    2.1. Comments on the Rulemaking................................................... 8
    2.2. Discussion ................................................................................... 11
      2.2.1. Neither the Federal Telecommunications Act of 1996 nor Public
      Utilities Code Section 710  Exempts TNCs from State Jurisdiction ............ 12
      2.2.2. TNCs Transport Passengers for Compensation.................................... 18
      2.2.3. TNCs Operate on a Prearranged Basis .................................................. 20
      2.2.4. The Commission Has the Jurisdiction and the Duty to Establish
      Regulations Governing the Provision of TNC Services................................. 21
  3. Safety .................................................................................................... 35
    3.1. Comments on the Rulemaking................................................... 36
    3.2. Discussion ................................................................................... 39
  4. Ridesharing......................................................................................... 44
    4.1. Comments on the Rulemaking................................................... 44
    4.2. Discussion ................................................................................... 48
  5. Transportation Access ....................................................................... 52
    5.1. Comments on the Rulemaking................................................... 52
    5.2. Discussion ................................................................................... 54
  6. Insurance ............................................................................................. 56
    6.1. Comments on the Rulemaking................................................... 57
    6.2. Discussion ................................................................................... 58
  7. Workshop Report............................................................................... 59
    7.1. Discussion ................................................................................... 62
  8. Comments on Proposed Decision ................................................... 63
  9. Assignment of Proceeding ............................................................... 64
  Findings of Fact ...................................................................................... 64
  Conclusions of Law ............................................................................... 70
ORDER .......................................................................................................... 72

R.12-12-011  COM/MP1/avs

## DECISION ADOPTING RULES AND REGULATIONS
## TO PROTECT PUBLIC SAFETY WHILE ALLOWING NEW ENTRANTS
## TO THE TRANSPORTATION INDUSTRY

**Summary**

This decision adopts rules and regulations for New Online Enabled Transportation Services, referred to hereafter as a Transportation Network Company[1] (TNC), to ensure that public safety is not compromised by the operation of this new transportation business model.  TNCs are not just Lyft, SideCar, InstantCab, and UberX.[2]  This Commission defines a TNC as an organization whether a corporation, partnership, sole proprietor, or other form, operating in California that provides prearranged transportation services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles.[3]  Among other

---

[1]  In the Rulemaking, we referred to these companies as New Online-Enabled Transportation Services (NOETS).  We are changing the acronym to Transportation Network Company (TNC) for ease of use.

[2]  The Commission's Safety and Enforcement Division issued cease and desist letters and $20,000 citations against Uber, Lyft, and SideCar for operating without authority and other violations of state law.  However, in 2013, the Safety and Enforcement Division entered into settlement agreements intended to ensure the public safety of both riders and drivers with Uber, Lyft, and SideCar, allowing the companies to operate while the Commission's TNC rulemaking is underway. http://www.cpuc.ca.gov/PUC/transportation/Passengers/CarrierInvestigations/.

[3] There are eleven exemptions to the Passenger Charter-party Carriers' Act contained in Public Utilities Code § 5353.  Our definition of a TNC does not in any way usurp those existing exemptions.  For example, one of the exemptions is passenger vehicles carrying passengers on a non-commercial enterprise basis.  This exception has been defined by the Commission to mean non-profit organizations.  See D.91.-06-025 ("The term 'noncommercial enterprise basis' in PU Code Section 5353(f) includes operations conducted on a not-for-profit, tax-exempt basis, as authorized by federal or state law.").  Another exemption is the rideshare exemption itself, which exempts: Transportation of

*Footnote continued on next page*

R.12-12-011  COM/MP1/avs

requirements established in this decision, we require each TNC (not the individual drivers) to obtain a permit from the California Public Utilities Commission (Commission), require criminal background checks for each driver, establish a driver training program, implement a zero-tolerance policy on drugs and alcohol, and require insurance coverage as detailed below.

This decision orders a second phase to this proceeding to review the Commission's existing regulations over limousines and other charter-party carriers to ensure that the public safety rules are up to date, and that the rules are responsive to the needs of today's transportation market.  In addition, the second phase will consider the potential impact of any legislative changes that could affect our ability to regulate the TNC industry.  When the second phase is complete, the Commission will initiate the Commission's resolution process to update the General Order (GO) 115 and 157 series to include the new regulations relating to the charter-party carrier subclass of TNC.

Finally, the Commission is aware that TNCs are a nascent industry. Innovation does not, however, alter the Commission's obligation to protect public safety, especially where, as here, the core service being provided -- passenger transportation on public roadways -- has safety impacts for third parties and property.  The Commission is familiar with and confident in its ability to protect public safety in the face of rapid technological change. Consequently, while the Commission adopts these rules and regulations, it will

---

persons between home and work locations or of persons having a common work-related trip purpose in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in Section 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver.

R.12-12-011  COM/MP1/avs

also look for further guidance from the legislature should it decide that there is a need for  legislation to provide guidance in regulating this new industry.

## 1.  Procedural History

On December 20, 2012, the Commission opened this Rulemaking in order to determine whether and how TNC services arranged through online-enabled apps such as Uber, SideCar, and Lyft might affect public safety.[4]

In the Order Instituting Rulemaking (Rulemaking), the Commission stated that:

> We initiate this proceeding to protect public safety and encourage innovators to use technology to improve the lives of Californians.[5]  The purpose of this Rulemaking is not to stifle innovation and the provision of new services that consumers want, but rather to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of these business models.  The Commission invites all interested parties to participate in this proceeding to ensure that regulation is not a hindrance, but continues to be the safety net that the public can rely on for its protection.[6]

The Commission sought comment on issues including: how the Commission's existing jurisdiction should be applied to businesses such as Uber, SideCar, and Lyft; the consumer protection and safety implications of these new

---

[4]  The Commission's Safety and Enforcement Division issued cease and desist letters and $20,000 citations against Uber, Lyft, and SideCar for operating without authority and other violations of state law.  However, in 2013, the Safety and Enforcement Division entered into settlement agreements intended to ensure the public safety of both riders and drivers with Uber, Lyft, and SideCar, allowing the companies to operate while the Commission's TNC rulemaking is underway. http://www.cpuc.ca.gov/PUC/transportation/Passengers/CarrierInvestigations/.

[5]  R.12-12-011, Rulemaking at 1.

[6]  R.12-12-011, Rulemaking at 2.

R.12-12-011  COM/MP1/avs

methods for arranging transportation services; whether and how the new transportation business models differ from longstanding forms of ridesharing; and the new transportation business models' potential effect on insurance and transportation access.

On January 28, 2013, opening comments were filed by:  Willie L. Brown, Jr., Luxor Cab Company, Greater California Livery Association, San Francisco Airport Commission, International Association of Transportation Regulators, Uber Technologies, Personal Insurance Federation of California (PIFC), Center for Accessible Technology (CforAT), Zimride, TransForm, SideCar Technologies, San Francisco Municipal Transportation Agency, Ed Healy, United Taxicab Workers, San Francisco Cab Drivers Association, Taxicab Limousine and Paratransit Association, and Taxicab Paratransit Association of California.

On February 11, 2013, reply comments were filed by: Electronic Frontier Foundation, International Association of Transportation Regulators, United Taxicab Workers, Zimride, CforAT, Luxor Cab Company, San Francisco Municipal Transportation Agency, Transform, SideCar Technologies, Taxicab Paratransit Association of California, Ed Healy, Willie J. Brown, Jr., eRideshare, and San Francisco Cab Drivers Association.

On February 15, 2013, the Commission held a Prehearing Conference in order to, *inter alia*, establish the service list, determine the positions of the parties, identify issues for inclusion in the April 2, 2013 Assigned Commissioner and Administrative Law Judge's Scoping Memo and Ruling (Scoping Memo), and discuss the procedural schedule.  Prehearing Conference Statements were filed by:  United Taxicab Workers, International Association of Transportation Regulators, Willie J. Brown, Jr., Transform, Taxicab Paratransit Association of

R.12-12-011  COM/MP1/avs

California, San Francisco Municipal Transportation Agency, Zimride, Uber Technologies, CforAT, and San Francisco Airport Commission.

On March 7, 2013, the Administrative Law Judge (ALJ) issued a notice to the parties via e-mail, setting a workshop schedule and directing parties to file workshop statements answering specific questions about the following issues: TNC operations; jurisdiction; public safety; insurance; background checks; accessibility and equal access; and how Commission regulations may enhance or impede access to public roadways.

On April 2, 2013, the assigned Commissioner and ALJ issued the Scoping Memo which established the scope and schedule of the Rulemaking, categorized the Rulemaking as quasi-legislative, and determined that hearings were not necessary.

On April 3, 2013, workshop statements were filed by: Willie L. Brown, Jr., The Utility Reform Network, San Francisco Cab Drivers Association, Zimride, SideCar Technologies, TransForm, San Francisco Airport Commission and San Francisco Municipal Transportation Agency, Uber Technologies, Taxicab Paratransit Association of California, United Taxicab Workers, Luxor Cab Company, and CforAT.

On April 10 and 11, 2013, the Commission held a workshop to facilitate dialogue among the parties on issues including: jurisdiction, public safety, accessibility, insurance, and proposed modifications for California statutes or Commission regulations.  Two parties, TransForm and Taxicab Paratransit Association of California, took notes during the workshop and prepared a draft report summarizing all parties' positions as articulated during the workshop. Parties reviewed the draft report to ensure that their positions were captured

R.12-12-011  COM/MP1/avs

correctly, and on May 17, 2013, TransForm and Taxicab Paratransit Association of California filed the final workshop report with the Commission.

On April 25, 2013, CforAT filed a motion requesting an additional round of comments on the issues raised in the Scoping Memo.  On May 10, 2013, the ALJ granted the motion, determining that opening comments were due on June 3, 2013 and reply comments were due on June 10, 2013.  On July 17, 2013, the California Highway Patrol (CHP) filed its comments.[7]

The purpose of this Rulemaking is not to stifle innovation and the provision of new services that consumers want, but rather to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of these business models.  The Commission invited all interested parties to participate in this proceeding to ensure that regulation is not a hindrance, but continues to be the safety net that the public can rely on for its protection.[8]

## 2.  Jurisdiction

As noted in the Rulemaking,[9] the Commission's jurisdiction over charter-party carriers is clear.  Nevertheless, new technology and innovation require that the Commission continually review its regulations and policies to ensure that the law and the Commission's safety oversight reflect the current state of the industry and that these regulations are just and fair for all passenger carriers.

---

[7]  R.12-12-011, Rulemaking at 1.

[8]  R.12-12-011, Rulemaking at 2.

[9]  R.12-12-011, Rulemaking at 2-3.

R.12-12-011  COM/MP1/avs

The Commission sought comment on how the Commission's existing jurisdiction pursuant to the California Constitution and the Public Utilities Code (PU Code) should be applied to businesses like Uber, Sidecar, and Lyft and the drivers employed or utilized by these or similar entities.  The Commission also sought comment on whether any existing legislation should be modified or if new legislation should be enacted.

### 2.1. Comments on the Rulemaking

The parties that filed opening comments all addressed jurisdiction in varying degrees.  The summaries of the positions of parties below capture all the positions that have been voiced in this Rulemaking on the subject of jurisdiction.

The CHP asserts that TNCs fall under existing Commission jurisdiction, because the CHP views TNCs as for-hire passenger carriers.[10]  The CHP views a donation for transportation service equivalent to direct compensation, because the intent is to conduct a for-hire operation.[11]

Luxor Cab asserts that these businesses should be regulated the same as all other passenger carriers.  Furthermore, it asserts that the presence of new technology for summoning a car does not in any way change the nature of the business that they are engaged in.[12]

Greater California Livery Association (GCLA) asserts that, based on their experience, these transportation technology companies should be subject to the same Commission regulation and enforcement as charter party carriers.[13]

---

[10]  California Highway Patrol comments filed on 07/17/13 at 1-2.

[11]  California Highway Patrol comments filed on 07/17/13 at 1.

[12]  Luxor Cab Opening Comments filed on 01/28/13 at 1.

[13]  GCLA Opening Comments filed on 01/28/13 at 2.

R.12-12-011  COM/MP1/avs

Uber suggests that the Commission does not currently have jurisdiction over Uber because Uber is not a charter-party carrier within the meaning of PU Code § 5351 *et seq*.  Further, Uber advocates against extending the Commission's jurisdiction to companies like Uber because:  1) no public policy or public interest is advanced by such an extension of the law; 2) the Legislature has recently enacted new legislation exempting Internet Protocol-enabled (IP-enabled) services from regulation by the Commission; and 3) extending Commission regulation to Uber would conflict with Federal and State policies promoting further development of, and innovation in, information services provided over the Internet by prohibiting regulation of information services providers.[14]

TransForm acknowledges that the Commission has jurisdiction over charter-party carriers not meeting the statutory exemptions for taxicabs and work-related ridesharing, and has exercised this jurisdiction to ensure consumer protection and safety for traditional chartered transportation services.[15] TransForm further asserts that the Commission should exercise its jurisdiction carefully so that it is applied in a way that allows growth of technology-enabled ridesharing services rather than eliminating an innovative tool to help address transportation access and climate change.  The Commission should recommend to the legislature any necessary modifications to existing statutory exemptions to create a coherent regulatory framework that allows for ridesharing services to grow, while ensuring that consumer protection and safety is addressed.  At the same time it is important for high-volume services to consult and coordinate

---

[14]  Uber Opening Comments filed on 01/28/13 at 5.

[15]  TransForm Opening Comments filed on 01/28/13 at 2.

R.12-12-011  COM/MP1/avs

with local cities, counties, and public transit agencies to avoid potential impacts.[16]

The San Francisco Municipal Transportation Authority (SFMTA) says state law defines a charter-party carrier as any "person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state."[17]  Drivers affiliated with businesses like Lyft and Sidecar drive passengers to destinations of their choice in exchange for payment.  These businesses collect payments from passengers, share revenue with the drivers, and manage the exchange of information between passengers and drivers to facilitate interactions and commerce between drivers and passengers.  SFMTA goes on to say that although certain transportation providers that would otherwise meet the definition of a "charter-party carrier" are exempted by statute from the Commission's regulatory oversight, services like Lyft and SideCar do not fall within any of these exemptions.[18]

SideCar asserts that it is neither a charter-party carrier nor a transportation service, but rather it is a technology platform that facilitates exempt ridesharing and, to that extent, should be exempt from Commission jurisdiction under PU Code § 5353(f) and (h).[19]

---

[16]  TransForm Opening Comments filed on 01/28/13 at 4.

[17]  SFMTA Opening Comments filed on 01/28/13 at 2, citing PU Code § 5360.

[18]  SFMTA Opening Comments filed on 01/28/13 at 2.

[19]  SideCar Opening Comments filed on 01/28/13 at 9.

R.12-12-011  COM/MP1/avs

Lyft asserts that the Commission should solely focus on regulation necessary to fulfill its responsibility for public safety.[20]  Lyft cautions the Commission to not force-fit existing regulations onto such an emerging industry.

International Association of Transportation Regulators (IATR) recommends that the Commission should conduct further investigation to determine whether TNCs operate without a profit.  IATR believes that companies that operate for-profit, and that use on-line apps that directly connect passengers to drivers, clearly fall under the Commission's definition of a charter-party carrier, and should be subject to all the existing regulations.[21]

Taxicab Paratransit Association of California asserts that TNCs operate as on demand services and therefore fail to comply with the legal requirements for operation as a Transportation Charter Party (TCP).[22]

## 2.2. Discussion

California law currently recognizes and regulates three modes of passenger transportation for compensation:  taxi services, regulated by cities and/or counties; and charter-party carrier services, and passenger-stage companies, regulated by the Commission.  In recent years, the communications revolution in wireless service, smartphones, and on-line apps has further facilitated the development and adoption of passenger transportation for compensation to a point where passengers seeking rides can be readily connected with drivers willing to provide rides in private vehicles.  This

---

[20] Zimride (Lyft) Opening Comments filed on 01/28/13 at 4.

[21] IATR Opening Comments filed on 01/28/13 at 3.

[22] TPAC Opening Comments filed on 02/04/13 at 5. The term TCP is defined and discussed, *infra*, in this Decision.

R.12-12-011  COM/MP1/avs

development in passenger transportation for compensation, referred to in this proceeding as TNCs and associated with companies including UberX, Lyft, and Sidecar, does not fit neatly into the conventional understandings of either taxis or limousines, but that does not mean that this Commission's responsibility to public safety in the transportation industry should be ignored and/or left for individual companies or the market place to control.

### 2.2.1. Neither the Federal Telecommunications Act of 1996 nor Public Utilities Code Section 710 Exempts TNCs from State Jurisdiction

We reject Uber's assertion that TNCs are nothing more than an application on smart phones, rather than part of the transportation industry.  Uber is the means by which the transportation service is arranged, and performs essentially the same function as a limousine or shuttle company dispatch office.  Accordingly, Uber is not exempt from the Commission's jurisdiction over charter-party carriers.  Nonetheless, because of the novelty of these new services, we will address Uber's jurisdictional arguments here.

As Uber notes in its comments, the 1996 Federal Telecommunications Act[23] (FTA) distinguishes between "telecommunications" and "information services."  In so doing, Congress codified the Federal Communications Commission's (FCC) historical determination that "basic" services were to be treated differently from "enhanced" services.  Uber seeks to convince the Commission further with a detailed discussion of a Vonage case, in which the FCC concluded that nomadic Voice over Internet Protocol (VoIP) service is a purely interstate service, not subject to state jurisdiction.  Uber recounts a California Court of Appeal case

---

[23]  P.L. No. 104-104, 110 Stat. 56 (1996).

R.12-12-011  COM/MP1/avs

involving actions brought against eBay, where the court held eBay immune from state causes of action.

In addition, Uber notes passage of Senate Bill 1161 in 2011 codified §§ 239 and 710 of the PU Code.  Section 710 prohibits the Commission from "exercising any regulatory jurisdiction" over VoIP or IP-enabled services, subject to a delegation of federal authority, other express statutory authority, or exceptions contained in § 710.

Uber's citations are beside the point as none of the cited statutes or precedents prevent this Commission from regulating passenger transportation over public roadways.  Specifically, we reject the argument that TNCs are simply providers of IP-enabled services and therefore exempt from our jurisdiction.  We find this argument to be factually and legally flawed and, therefore, do not accept that the method by which information is communicated, or the transportation service arranged, changes the underlying nature of the transportation service being offered.

First, the Commission is not attempting to enact rules that would impose regulations on the smart phone applications used to connect passengers with drivers.  Instead, the Commission is promulgating rules that will govern the transportation service itself.  Second, we do not believe that this Commission loses its jurisdiction over transportation services simply because a smart phone application is used to facilitate the transportation service.  Nothing Uber has cited in California or federal law would mandate that result based on the facts here.  Indeed Uber and Sidecar's position would effectively obviate the Commission's authority under PU Code § 5371.6(a) to prevent TCPs from operating illegally in order to protect the public and prevent unfair competition:

R.12-12-011  COM/MP1/avs

> The Legislature finds and declares that advertising and use of telephone service is essential for charter-party carriers of passengers to obtain business and to conduct intrastate passenger transportation services.  Unlawful advertisements by unlicensed charter-party carriers of passengers has resulted in properly licensed and regulated charter-party carriers of passengers competing with unlicensed charter-party carriers of passengers using unfair business practices.  Unlicensed charter-party carriers of passengers have also exposed citizens of the state to unscrupulous persons who portray themselves as properly licensed, qualified, and insured charter-party carriers of passengers.  Many of these unlicensed charter-party carriers of passengers have been found to have operated their vehicles without insurance or in an unsafe manner, placing the citizens of the state at risk.

Similarly, the Legislature has created additional safeguards in Government Code § 53075.8(b)(1) that allow for the termination of a taxicab's telephone service if the taxi is operating without proper authority:

> The Legislature further finds and declares that the termination of telephone service utilized by taxicabs operating without proper authority is essential to ensure the public safety and welfare.  Therefore, local agencies should take enforcement action, as specified in this section, to disconnect telephone service of unauthorized taxicab operators who unlawfully advertise passenger transportation services in yellow page directories and other publications.  The enforcement actions provided for by this section are consistent with the decision of the California Supreme Court in Goldin v. Public Utilities Commission (1979) 23 Cal. 3d 638.

We deem it is inconsistent with our grant of authority over transportation services to be barred from regulating a transportation service provided by TNCs based on the means of communication used to arrange the service.

- 14 -

R.12-12-011  COM/MP1/avs

Moreover, to date neither the FCC, nor a court of higher jurisdiction, has ruled that this Commission, or any other state commission, is precluded by the FTA from regulating TNCs.  It is interesting to note that the Federal Trade Commission (FTC) has intervened in state proceedings by filing comments but has not, to date, gone so far as to claim that state-regulatory efforts to assert jurisdiction over TNCs is preempted by the FTA.  For instance, on June 7, 2013, the FTC sent a letter to  General Counsel of the District of Columbia Taxicab Commission that offered comments in the proposed TNC-related rulemaking.  Previously, the FTC filed comments in TNC-related rulemaking proceedings in Alaska[24] and Colorado.[25]  Tellingly, neither the FTC nor the FCC has claimed that the state regulatory bodies are preempted from promulgating regulations to deal with the growing TNC business.

In response to the proposed decision, Uber continued its argument by comparing itself to Google PowerMeter.  In its August 19, 2013 comments to this decision, Uber stated that in the same way that Google did not become an energy utility by developing the Google PowerMeter software application, Uber does not become a transportation company by developing the Uber Software Application.  The major difference between Uber and Google PowerMeter is that Uber controls the financial transaction between the customer and the company.  Uber receives the customer fare and then transfers those funds to the driver

---

[24]  FTC comments dated April 19, 2013 to the Honorable Debbie Ossiander Concerning AO NO. 2013-36 Regarding the Regulatory Framework for the Licensing and Permitting of Taxicabs, Limousines, and Other Vehicles for Hire in Anchorage, Alaska.

[25]  FTC comments dated March 6, 2013 to the Colorado Public Utilities Commission *In The Matter of the Proposed Rules Regulating Transportation by Motor Vehicle*, 4 Code of Colorado Regulations 723-6.

R.12-12-011  COM/MP1/avs

minus its share, while  Google PowerMeter does not take any money from the customer.  Google PowerMeter was a tool that allowed an electricity consumer to view his or her electricity usage.  The data displayed by Google PowerMeter was measured by a measurement device installed by the customer with his or her consent.  The goal of the Google PowerMeter was to inform the energy customers of their energy use, which could help the consumer identify ways to save energy.  The customer was not charged a fare, and Google did not generate other revenues from the tool.  If all Uber did was to show customers maps of available cars, without giving them a way to book a ride and without controlling or taking a share of the fare, then the analogy might be more appropriate.

The Commission elects to use a more appropriate analogy involving Google.  Google Search is an app and a software platform, and uses that software to provide a product: search listings.  In 2011, Google agreed to pay a settlement of $500 million for allowing fraudulent pharmaceutical advertisements.[26]  In the case of pharmaceutical listings, Google Search was connecting people with products that were harmful or fraudulent, and which represented a threat to public safety.  The people selling the illegal drugs had to be held accountable, but so did the software platform that connected people with the illegal drugs.  The same is true with Uber.  The Uber brand is now a known brand for car service.  It is expected that a passenger requesting an Uber car will get a black town car or something of similar stature.  It is expected that this service may cost more, but it is a higher service with professional drivers.  Passengers may call Uber more frequently because of its name recognition .  Uber by its name alone is selling a

---

[26]  *See* http://www.wired.com/threatlevel/2013/05/google-pharma-whitaker-sting/all/.

R.12-12-011  COM/MP1/avs

type of car service.  Because Uber is profiting from this service it should also be held responsible if the driver is negligent or not applying Uber safe practices. The same way Google was held responsible for allowing fraudulent advertisements is the same reason why Uber should be held responsible for its drivers.

Uber argues that the taxi cabs and limousines that arrange rides on the Uber platform are already regulated and insured, and that no additional regulation of Uber itself is necessary to protect the public interest.  Perversely, however, the fact that regulated forms of transportation arrange rides through the Uber platform injects a considerable degree of uncertainty into the question of whether a taxi cab or limousine's insurance coverage would cover a claim.  For example, if a limousine driver uses Uber's method of fare calculation and billing rather than the method otherwise required by TCP rules or limousine company policy, in the event of an incident the limousine's existing insurance policy may deny a claim on the grounds that the limousine had stopped operating, strictly speaking, and for insurance purposes, as a covered vehicle.  In this same hypothetical incident, based on Uber's comments in this proceeding, we anticipate that Uber would deny that it has any obligation to insure the parties injured in the accident, on the grounds that Uber is an app and the limousine driver was already insured.

Until this Decision becomes effective, there is a real possibility that parties suffering losses in an incident would find that there is no insurance available to cover their potential claim.

Due to the considerable uncertainty that exists concerning the insurance coverage applicable to rides (other than UberX rides) arranged through the Uber app, and the threat to public safety and well-being created by this uncertainty,

R.12-12-011  COM/MP1/avs

the Commission is strongly inclined to require Uber to obtain a TCP permit in order to continue operating in California.  As discussed elsewhere in this Decision, the Commission intends to open a second phase of this proceeding (Phase II) to consider the rules applicable to TCPs in California.  In order to ensure the greatest possible evidentiary record, the Commission would prefer to leave all non-TCN issues, including Uber's potential TCP status, to Phase II. However, the Commission will not allow the uncertainty regarding Uber's insurance to persist during the pendency of Phase II.  We require Uber to demonstrate to the Commission within 30 days of the issuance of this decision that it maintains commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers in transit to or during trips arranged through the Uber app, the Commission reserves the right to require Uber to obtain a TCP permit through Commission resolution. while they are providing Uber services.  The insurance coverage shall be available to cover claims regardless of whether an Uber driver maintains insurance adequate to cover any portion of the claim.

### 2.2.2. TNCs Transport Passengers for Compensation

Public Utilities Code § 5360 states in part:

> Subject to the exclusions of Section 5353, "charter-party carrier of passengers" means every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state.

We reject the arguments made by Lyft and SideCar that any payment for rides arranged through their apps is voluntary and find that current TNCs are engaged in the transportation of persons for compensation.  Although the phrase "for compensation" is not defined by PU Code § 5360, the plain-meaning

- 18 -

R.12-12-011  COM/MP1/avs

interpretation of PU Code § 5360 in D. 69231 (June 15, 1965) informs our decision in this proceeding.

In D.69231, a skate arena owner was ordered to cease and desist transporting passengers to his skate arena until he obtained his TCP certificate. While the record was unclear as to whether the owner would charge a fee for the proposed service, the Commission determined that even if the transportation was for free, "transportation furnished by business enterprises without charge is also 'for compensation' if the organization sponsoring the trip receives a business benefit."[27]  The Commission reiterated this interpretation in D.81805 (August 28, 1973) where we reasoned that "it was not necessary for the staff to prove that respondent actually received money consideration for the transportation in question.  It is enough that he received an economic benefit."[28]

Clearly each TNC is receiving either an economic benefit or a business benefit.  At a minimum, they are receiving increased patronage with the growth of their businesses.  This possibility was an important factor for the Commission in rendering its decision in D.69231 that the skate arena owner's status was a TCP:  "Applicant would receive a business benefit and compensation from the

---

[27]  D.69231 at 409.

[28]  D.69231 at 493.  The Commission has reached a similar conclusion with respect to free service provided by PSCs, finding that the service was for compensation.  (*See Peter J. Van Loben Sels (Valley Transit Lines) v. B.J. Smith et al., copartners (Cal. Transit Lines)*, 49 Cal. P.U.C. 290 (1950); and *Richard Chala v. Morris Gordon of Gordon's Outlet Store, et al.*, Decision No. 57356 in Case No. 6152 (1958), unreported. Our reasoning is also similar the Legislature's when it added Section 17510.1 to the Business and Professions Code:  "As used in this article, 'sale' shall include a gift made with the hope or expectation of monetary compensation."  Thus, a donation or a gift can still be considered a form of compensation.

R.12-12-011  COM/MP1/avs

increased patronage for his skate arena business resulting from the advertising."[29]

### 2.2.3. TNCs Operate on a Prearranged Basis

Unlike taxi cabs, which may pick up passengers via street hails, PU Code § 5360.5 requires that charter party carriers operate on a prearranged basis.

We find that TNCs operate on a prearranged basis.  PU Code § 5360.5 does not define "prearranged," and we are reluctant to impose a minimum time requirement as some other jurisdictions have done.[30]  Instead, we are guided by the plain meaning of "prearranged" as something arranged in advance, which has been our custom and practice in interpreting "prearranged" at the Commission.  For example, our information packet for prospective TCP applicants says that all transportation performed by TCPs must be arranged beforehand, and the driver must have a completed waybill in his or her possession at all times during the trip.[31]

We believe TNCs satisfy the "prearranged" requirement in two ways: first, before a passenger can request a ride, the passenger must download the app and agree to the TNC service agreement.  Examples can be found in the TNC written

---

[29] 409.

[30] For example, the Washington Administrative Code requires that for-hire vehicles must be prearranged for at least 15 minutes.  (Washington Rev. Code Section 308-83-200.)  The International Association of Transportation Regulators issued proposed model regulations for smartphone applications in the for-hire industry and suggested that the "prearranged or prearrangement" should require "a minimum of thirty (30) minutes between the request for transportation service and the arrival of the vehicle at the transportation origin location."

[31] Basic Information for passenger carriers and applicants (Rev. /28/11) issued by the Transportation License Section of the Commission.

R.12-12-011  COM/MP1/avs

terms of use.[32]  Uber makes our point clearly in its description of its service that "persons who use the Uber App to request *prearranged transportations* have sole discretion over whether or not to use the Uber App, if ever."[33]  Second, for a particular trip, the passenger must input information such as current location.  A TNC driver cannot be hailed like a cab where no information is exchanged until the passenger enters the vehicle.  As such, each TNC is offering transportation on a "prearranged" basis.

Prearrangement has typically been verified through the use of a waybill.  TCPs must possess a waybill for each ride that includes information on the driver's name, vehicle license plate number, and time and date when the charter was arranged, and similar information.[34]  Pursuant to more recent legislation, waybills may be kept in an electronic format beginning January 1, 2014.[35]  In order to comply with the applicable statutes and regulations, all TNC drivers must be able to prove that a ride was matched on the TNC software application as evidence of prearrangement.  In other words, information in the software application must be the equivalent of an electronic waybill.

### 2.2.4. The Commission Has the Jurisdiction and the Duty to Establish Regulations Governing the Provision of TNC Services

Based on the record in this proceeding, and as the Rulemaking originally made clear, this Commission regulates charter party passenger carriers pursuant

---

[32]  *See* Exhibits B (Uber), D (SideCar), F (Lyft), and H (Tickengo) to the Workshop brief, filed on April 3 by TPAC.

[33]  Pre-Workshop Statement, 4, filed on April 3, 2013 by Uber.  (*Italics* added.)

[34]  General Order 157-D, Part 3.01.

[35]  *See* PU Code § 5381.5.

R.12-12-011  COM/MP1/avs

to Article XII of the California Constitution and the Charter-party Carriers' Act, PU Code § 5351 *et seq.* (the Act).  Section 5360 states in part:

> Subject to the exclusions of Section 5353, "charter-party carrier of passengers" means every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state.

> Section 5381 states in part:

> …(t)he commission may supervise and regulate every charter-party carrier of passengers in the State and may do all things…necessary and convenient in the exercise of such power and jurisdiction.

We are persuaded by the comments made by the CHP, TransForm, and to a certain extent Lyft.  Our focus is public safety and secondarily ensuring that regulations reflect changing technology and ways of doing business to ensure that rules are in place to improve the lives of Californians.  We agree with the CHP that a "donation" for passenger transportation service is equivalent to direct compensation for the service provided, which falls under the jurisdiction of this Commission.  TransForm states in their comments in part:

> TransForm believes that all people deserve affordable, safe, and easy access to jobs, housing, services, and nature on foot, bicycle, or public transportation. TransForm envisions that in the future transportation will be redefined in terms of access and sustainability, and residents will be able to quickly get where they want to go in ways that fully meet their needs, whether these needs are health, happiness, saving time, or saving money. Our transportation system will provide the public with choices that amount to a system that is exceptional and state-of-the-art.

> TransForm believes that rideshare services have the potential to advance several California policy goals, including improving transportation access, reducing

R.12-12-011  COM/MP1/avs

> greenhouse gas emissions, reducing vehicle miles
> travelled, and reducing congestion. When the
> legislature passed the landmark transportation law
> SB 375 in 2008, the legislature found that "[w]ithout
> improved land use and transportation policy, California
> will not be able to achieve the goals of AB 32," the
> Global Warming Solutions Act.  The legislature also
> found that the transportation sector contributes over
> 40 percent of the greenhouse gas emissions in the State
> of California, the largest of any sector, with automobiles
> and light trucks alone contributing almost 30 percent.
> The California Air Resources Board, in setting regional
> greenhouse gas reduction targets, adopted targets
> requiring each region's Sustainable Communities
> Strategy and Regional Transportation Plan to achieve
> specified reductions in the transportation sector by the
> years 2020 and 2035.[36]

We agree with TransForm with respect to the above two points. Additionally, Lyft has been the only TNC that has acknowledged that safety is not only a priority, but there should also be some overarching rules and regulations.  We applaud Lyft for its leadership in this area and we certainly agree with Lyft in this area.

For the reasons discussed *supra*, we find that TNCs are charter-party passenger carriers, and therefore we will exercise our existing jurisdiction pursuant to Article XII of the California Constitution and the Passenger Charter-party Carriers' Act, PU Code §§ 5351, *et seq.* (the Act).  Additionally, the Commission has very broad powers under PU Code § 701 which gives the Commission the ability (via a rulemaking process) to develop new categories of regulation when a new technology is introduced into an existing industry.  In

---

[36] TransForm Opening Comments filed on 01/28/13 at 1.

R.12-12-011  COM/MP1/avs

this Decision, under the broad grant of authority pursuant to PU Code §§ 5381 and 701, we create the category of Transportation Network Company (TNC) to accompany the existing category of TCP.[37]  Again, a TNC is defined as an organization, whether a corporation, partnership, sole proprietor, or other form, operating in California that provides transportation services for compensation using an online-enabled app or platform to connect passengers with drivers using their personal vehicles.  The primary distinction between a TNC and other TCPs is that a TNC connects riders to drivers who drive their personal vehicle, not a vehicle such as a limousine purchased primarily for a commercial purpose. To that end, a TNC is not permitted to itself own vehicles used in its operation or own fleets of vehicles.

With this definition in mind, the Commission finds that Uber (in contrast to UberX) is not a TNC.  Uber connects riders with drivers who do not drive their own personal vehicle, but typically operate in town cars or limousines, which the driver may often as well use to transport customers for another limousine/town car company.  As such, Uber does not meet the definition of a TNC.  As discussed elsewhere in this Decision, the Commission intends to open a second phase of this proceeding (Phase II) to consider the rules applicable to TCPs in

---

[37]  The Commission has previously developed new types of transportation services with unique rules relevant to that specific form of transportation. Namely, in D.97-07-063, the Commission "adopt[ed] rules for a new niche form of passenger stage corporation (PSC) that specializes in the common carriage of infants and children . . ." The Commission required such carriers to apply for a PSC permit, but developed a special set of rules applicable to these forms of transportation. D.97-07-063 stated, "This is a restricted class of PSC carrier not previously designated by this Commission, and special requirements need to be imposed on these carriers." In creating these new rules, the Commission relied on its broad power under § 701, and the Passenger-Stage Corporation provisions of the Public Utilities Code § 5351.

R.12-12-011  COM/MP1/avs

California.  In order to ensure the greatest possible evidentiary record, the Commission would prefer to leave all non-TNC issues, including Uber's potential TCP status, to Phase II.  UberX, however, does meet the TNC definition and must apply for a TNC license.

A company or individual wishing to provide transportation or facilitate transportation of passengers can choose to either get a TCP certificate/permit or a TNC permit.[38]  Further, TNCs need not apply for a certificate of public convenience and necessity pursuant to PU Code § 5371.  TNCs are exempted from this requirement, as are many charter-party carriers regulated by the Commission, pursuant to PU Code § 5384(b), which authorizes the Commission to issue permits to passenger carrier operations who use only vehicles with seating capacities of under 15-passengers.  TNC permits will only be granted to companies utilizing smart phone technology applications to facilitate transportation of passengers in the driver's personal vehicle.

Within 45 days after the effective date of this Decision, the Commission's Safety Enforcement Division (SED) will post a TNC Application Packet on its website, and TNCs currently operating in California are required to file their TNC Applications with SED 60 days thereafter if they wish to continue operating.  The TCP requirements are already in place, although as suggested *supra* the Commission will open a second phase to this Rulemaking to update those rules and regulations to ensure that safety requirements are up to date.  Based on the record of this proceeding and the safety and other concerns expressed by parties, the settlement agreements that were entered into with Lyft,

---

[38]  There is also a third choice and that is to apply for a taxicab license.

R.12-12-011  COM/MP1/avs

SideCar, and Uber, and our existing TCP rules we have created the following rules and regulations for all TNCs.  The following rules and regulations shall be applied for all TNCs effective immediately:

### Safety Requirements

a)  TNCs shall maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services.  The insurance coverage shall be available to cover claims regardless of whether a TNC driver maintains insurance adequate to cover any portion of the claim.[39]

b)  TNC drivers shall be required to provide proof of both their personal insurance and the commercial insurance in the case of an accident.

c)  TNCs shall perform criminal background checks on each TNC driver before the driver begins offering service.  In order to protect public safety, any person who has been convicted, within the past seven years, of driving under the influence of drugs or alcohol, fraud, sexual offenses, use of a motor vehicle to commit a felony, a crime involving property damage, and/or theft, acts of violence, or acts of terror shall not be permitted to provide TNC services.

d)  TNCs shall institute a zero tolerance intoxicating substance policy with respect to drivers as follows:

1.  The TNC shall include on its website, mobile application and riders' receipts, notice/information on the TNC's zero-tolerance

---

[39]  TNCs must make their certificate of insurance public and the Commission will put this certificate on its website.

  policy and the methods to report a driver whom the rider reasonably suspects was under the influence of drugs or alcohol during the course of the ride.

2. The website and mobile application must include a phone number or in-app call function and email address to contact to report the zero-tolerance complaint.

3. Promptly after a zero-tolerance complaint is filed, the TNC shall suspend the driver for further investigation.

4. The website and mobile application must also include the phone number and email address of the Commission's Passenger Section:  1-800-894-9444 and CIU_intake@cpuc.ca.gov.

e) TNCs shall obtain each TNC driver's driving record before the driver begins providing service and quarterly thereafter.  Drivers with convictions for reckless driving, driving under the influence, hit and run, or driving with a suspended or revoked license shall not be permitted to be a TNC driver.  Drivers may have a maximum of two points on their driving records for lesser offenses, e.g., equipment problems, speeding, or child safety seat violations.

f) TNCs shall establish a driver training program to ensure that all drivers are safely operating the vehicle prior to the driver being able to offer service. This program must be filed with the Commission within 45 days of the adoption of this decision. TNCs must report to the Commission on an annual basis the number of drivers that became eligible and completed the course.

g) TNC drivers must possess a valid California driver's license, be at least 21 years of age, and must provide at least one year of driving history before providing TNC services.

R.12-12-011  COM/MP1/avs

h) TNCs may only use street-legal coupes, sedans, or light-duty vehicles including vans, minivans, sport utility vehicles (SUVs) and pickup trucks. Hatchbacks and convertibles are acceptable.

i) TNC drivers are prohibited from transporting more than 7 passengers on any given ride.[40]

j) The app used by a TNC to connect drivers and passengers must display for the passenger:  1) a picture of the driver, and 2) a picture of the vehicle the driver is approved to use, including the license plate number to identify the vehicle.

k) TNC vehicles shall not be significantly modified from factory specifications, e.g., no "stretch" vehicles.

l) Prior to allowing each TNC driver to operate a vehicle, and annually thereafter, a TNC must inspect the driver's vehicle, or have the vehicle inspected at a facility licensed by the California Bureau of Automotive Repair, and maintain complete documentation of such inspections.  A TNC driver's vehicle must, at a minimum, pass a 19 point inspection prior to allowing the driver to operate the vehicle under the TNC's platform:

   1. Foot brakes;

   2. Emergency brakes;

   3. Steering mechanism;

   4. Windshield;

---

[40]  If a TNC elects to carry insurance up to $1.5 million per incident for all of its drivers, then pursuant to PU Code § 5391 and General Order 115-F, the TNC vehicles can include up to 10 people including the driver.  However, no TNC driver is permitted to operate a bus, which is defined by California Vehicle Code § 233(b) as "a vehicle designed, used, or maintained for carrying more than 10 persons, including the driver, which is used to transport persons for compensation or profit . . ."

5. Rear window and other glass;

6. Windshield wipers;

7. Headlights;

8. Tail lights;

9. Turn indicator lights;

10. Stop lights;

11. Front seat adjustment mechanism;

12. Doors (open, close, lock);

13. Horn;

14. Speedometer;

15. Bumpers;

16. Muffler and exhaust system;

17. Condition of tires, including tread depth;

18. Interior and exterior rear view mirrors; and

19. Safety belts for driver and passenger(s).

**Regulatory Requirements**

For all reports identified below required to be provided by TNCs, the reports must be verified. Verification consists of provision of a signature of a corporate officer of the TNC verifying under penalty of perjury under the laws of the State of California that the report is accurate and contains no material omissions.

a. TNCs (not the drivers) must be permitted by this Commission before operating as a TNC.[41]

b. TNCs shall clearly disclose, on their app and website, that TNCs facilitate rides between

---

[41] There are six types of charter party carrier permits/certificates. TNCs shall apply for a class P permit.

R.12-12-011  COM/MP1/avs

passengers and private drivers using their own personal vehicles.  Additionally, the disclosure should state that each TNC is required to maintain insurance policies providing a minimum of $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services.

c.  TNC drivers may only transport passengers on a prearranged basis.  For the purpose of TNC services, a ride is considered prearranged if the ride is solicited and accepted via a TNC digital platform before the ride commences.  TNC drivers are strictly prohibited from accepting street hails.

d.  TNCs shall participate in the California Department of Motor Vehicle's Employer Pull Notice Program to obtain timely notice when any of the following are added to a TNC driver's driving record:

    i.  Convictions;

    ii.  Accidents;

    iii.  Failures to appear;

    iv.  Driver's license suspension or revocation; and

    v.  Any other action taken against the driving privilege.

e.  TNCs shall obtain proof of insurance from each TNC driver before the driver begins providing service and for as long as the driver remains available to provide service.

f.  TNCs shall allow passengers to indicate whether they require a wheelchair-accessible vehicle or a vehicle otherwise accessible to individuals with disabilities.

g.  One year from the effective date of these rules and annually thereafter, each TNC shall submit to the Safety and Enforcement Division a report detailing the number and percentage of their customers who

R.12-12-011  COM/MP1/avs

requested accessible vehicles, and how often the TNC was able to comply with requests for accessible vehicles.

h. TNC vehicles shall display consistent trade dress (i.e., distinctive signage or display on the vehicle) when providing TNC services that is sufficiently large and color contrasted as to be readable during daylight hours at a distance of at least 50 feet.  The trade dress shall be sufficient to allow a passenger, government official, or member of the public to associate a vehicle with a particular TNC (or licensed transportation provider).  Acceptable forms of trade dress include, but are not limited to, symbols or signs on vehicle doors, roofs, or grills.  Magnetic or removable trade dress is acceptable.  TNC shall file a photograph of their trade dress with the Safety and Enforcement Division.

i. Although TNCs may provide platforms allowing drivers and passengers to "rate" each other, TNCs shall ensure that such ratings are not based on unlawful discrimination, and that drivers do not discriminate against passengers or potential passengers on the basis of geographic endpoints of the ride, race, color, national origin, religion, sex, disability, age, or sexual orientation/identity.

j. One year from the effective date of these rules and annually thereafter, each TNC shall submit to the Safety and Enforcement Division a verified report detailing the number of rides requested and accepted by TNC drivers within each zip code where the TNC operates; and the number of rides that were requested but not accepted by TNC drivers within each zip code where the TNC operates.  The verified report provided by TNCs must contain the above ride information in electronic Excel or other spreadsheet format with information, separated by columns, of the date, time, and zip code of each request and the concomitant date, time, and zip code

R.12-12-011  COM/MP1/avs

of each ride that was subsequently accepted or not accepted.  In addition, for each ride that was requested and accepted, the information must also contain a column that displays the zip code of where the ride began, a column where the ride ended, the miles travelled, and the amount paid/donated. Also, each report must contain information aggregated by zip code and by total California of the number of rides requested and accepted by TNC drivers within each zip code where the TNC operates and the number of rides that were requested but not accepted by TNC drivers.

k. One year from the effective date of these rules and annually thereafter, each TNC shall submit to the Safety and Enforcement Division a verified report in electronic Excel or other spreadsheet format detailing the number of drivers that were found to have committed a violation and/or suspended, including a list of zero tolerance complaints and the outcome of the investigation into those complaints. Each TNC shall also provide a verified report, in electronic Excel or other spreadsheet format, of each accident or other incident that involved a TNC driver and was reported to the TNC, the cause of the incident, and the amount paid, if any, for compensation to any party in each incident.  The verified report will contain information of the date of the incident, the time of the incident, and the amount that was paid by the driver's insurance, the TNC's insurance, or any other source.  Also, the report will provide the total number of incidents during the year.

l. One year from the effective date of these rules and annually thereafter, each TNC shall submit to the Safety and Enforcement Division a verified report

R.12-12-011  COM/MP1/avs

detailing the average and mean number of hours and miles each TNC driver spent driving for the TNC. [42]

m. Upon request, drivers shall display to Commission or airport enforcement officers, law enforcement, or city or county officials a physical or electronic record of a ride in progress sufficient to establish that it was prearranged.  To the extent that trip records are contained on electronic devices, TNC drivers are not required to relinquish custody of the devices in order to make the required display.

n. If a passenger files a complaint against a TNC or TNC driver with the Commission, Commission staff shall have the right to inspect TNC records and vehicles as necessary to investigate and resolve the complaint to the same extent the Commission and Commission staff is permitted to inspect all other charter-party carriers.

o. Operations at Airports. TNCs shall not conduct any operations on the property of or into any airport unless such operations are authorized by the airport authority involved.

p. Similar to our regulations over limousines one-third of one percent of the total revenues from TNC services in California  shall be collected by this Commission on a quarterly basis as part of overall fees.

The Commission will convene a workshop one year after the issuance of this decision to hear from all stakeholders on the impacts of this new mode of transportation and the accompanying regulations.  Workshops topics will

---

[42]  For the requested reporting requirements, TNCs shall file these reports confidentially unless in Phase II of this decision we require public reporting from TCP companies as well.

R.12-12-011  COM/MP1/avs

include, but not necessarily be limited to, a consideration of safety, competition, innovation, accessibility, congestion, the California Environmental Quality Act, and other pollution related issues.  Specifically, the Commission will be interested to get an update on TNCs' commercial insurance policies and how these policies have performed.  The Commission may choose to open a new proceeding to update its rules based on the information learned in this workshop.

TNCs that fail to adhere to these requirements may have their permits revoked or be otherwise subject to sanctions by the Commission.  The Commission is authorized to conduct inspections of charter-party carriers including TNCs. For instance, PU Code § 5371.5 states that:  "Upon receipt of a complaint containing sufficient information to warrant conducting an investigation, the commission shall investigate any business that advertises limousine-for-hire or passenger charter transportation service for compensation in motor vehicles."  Therefore, each TNC must keep records of all trips made by its TNC drivers.  The Commission is also authorized to "cancel, revoke, or suspend any operating permit or certificate" if the carrier violates any of the provisions of the Act, provisions of the operating permit or certificate issued thereunder, or any order, decision, rule, regulation, direction, demand, or requirement established by the Commission.[43] The Commission is also authorized to issue fines.[44]

Sections 5411 to 5420 of the Act contain relevant provisions regarding issuing fines and penalties. In addition, the Commission has established a

---

[43]  PU Code § 5378.

[44]  *See e.g.,* PU Code § 5378(b).

R.12-12-011  COM/MP1/avs

citation program in Resolution ALJ-187, which provides a process by which the Commission may issue fines, carriers may appeal fines, and the Commission may hold a hearing pursuant to that appeal.

These provisions authorizing the Commission to inspect, investigate, and issue fines and other penalties apply in equal measure to all TNCs as they do to other charter-party carriers.  Therefore, the Commission must have access to a TNC's records whenever it requests them.

Parties have raised a number of concerns regarding the Terms & Conditions used by certain TNCs, which include general disclaimers of liability. No Term & Condition in a TNC's Terms of Service or elsewhere, can be inconsistent with this decision.  Nor can any Term & Condition in a TNC's Terms of Service be used or relied on by the TNC to deny insurance coverage, or otherwise evade the insurance requirements established in this decision. Moreover, the Terms of Service does not absolve the TNC of its responsibilities to comply with the stated regulations in this decision to ensure safety of the public. As stated earlier in this decision, the Commission will open a Phase II to consider updating its regulations over TCP certificate holders.  Phase II will also consider the standard and appropriate language for Terms & Conditions for both TCP and TNC certificate holders.

### 3.  Safety

The Commission opened this proceeding to protect public safety and secondarily encourage innovators to use technology to improve the lives of Californians.  The Commission has a responsibility for determining whether and how public safety might be affected by these TNCs.  In opening this Rulemaking,

the Commission wanted to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of TNCs.

### 3.1. Comments on the Rulemaking

As with the issue of jurisdiction a number of parties filed comments about the effect of TNC service on public safety.  In this section we will summarize all the positions filed.

The CHP asserts that it is too early to determine the effect of this type of service on both the passengers and public safety.  It goes on to caution, however, that passenger transportation left unregulated unnecessarily increases the potential for operation of unsafe vehicles, unqualified drivers, and uninsured transportation drivers.[45]

Luxor Cab's comments focus more on the need to keep drivers safe.  Luxor Cab asserts that taxicab drivers have the highest risk of occupational homicide of all US occupations, and that this is why taxi regulators require safety equipment such as bullet-resistant partitions and digital security cameras, as well as crime-prevention training for drivers.[46]

The GCLA believes that the transportation technology companies can put the public at risk of potential dangers arising from having unregulated and perhaps even unlicensed drivers and unsafe vehicles providing for-hire transportation services without oversight or enforcement.[47]

The San Francisco Airport Commission believes that lack of adequate liability insurance, criminal background checks, driver training and regular

---

[45]  CHP Comments filed on 7/17/13 at 2.

[46]  Luxor Cab Comments filed on 01/28/13 at 2.

[47]  GCLA Comments filed on 01/28/13 at 2.

R.12-12-011  COM/MP1/avs

vehicle inspections all decrease public safety, and although some TNCs represent that they do all of the above, the Airport Commission is asking for regulatory verification.[48]

The SFMTA asserts that TNCs have a negative effect on public safety because of a lack of regulatory oversight.  The SFMTA asserts that at the state and local level, California regulators of taxi and limousine service protect the public with the following kinds of requirements:

1. Criminal background checks of drivers;
2. Drug and alcohol testing of drivers;
3. DMV "pull notice" checks to enable suspension of drivers with new safety related moving violations;
4. Driver training for local geography, traffic safety and customer service values;
5. Vehicle age and mileage limitations;
6. Routine, professional vehicle inspections; and
7. Transparent pricing regulations.[49]

The San Francisco Cab Drivers Association asserts that the proliferation and acceptance of private vehicles and unlicensed public passenger drivers for hire creates a false sense of trust by the general public.  Furthermore, it asserts that they are witnessing private vehicles being flagged down and soliciting passengers on the street which will result in an assault or worse, on a passenger or a driver, unprotected by security cameras, dispatch or a shield, and no readily identifiable markings on the vehicle.[50]

---

[48] San Francisco Airport Commission Opening Comments filed on 01/28/13 at 2.

[49] SFMTA Opening Comments filed on 01/28/13 at 8.

[50] San Francisco Cab Association's Opening Comments filed on 01/29/13 at 2.

R.12-12-011  COM/MP1/avs

In their comments, Lyft notes that ridesharing is nothing new and has been occurring on a relatively large scale for many decades – from casual carpools and bulletin boards to more recent on-line forums  – without any regulation and with few if any institutional safety mechanisms.  Lyft goes on to say that rather than creating a new activity requiring scrutiny as a public safety concern, responsible peer-to-peer platforms such as Lyft have introduced innovative and highly effective institutional safety mechanisms that increase public safety over existing alternatives.  New tools made available by modern technologies – online criminal background checks, mobile application photo identification, and Global Positioning System (GPS) positioning – can advance public safety beyond existing measures.[51]

SideCar asserts that TNCs are mission-driven and have strong incentives to protect the trust and safety of their communities and the public.  SideCar goes on to claim that its safety program and rules aim to reduce and prevent accidents or other incidents, and it has implemented a 10-point safety program to create a safe experience for drivers and riders alike.  Under this safety program, all drivers are required to undergo thorough background checks and safety training.[52]

United Taxicab Workers assert that TNCs provide service through non-professional drivers of private vehicles, and since they claim that they are not regulated by the state or local authorities, the public can only take the word of the company.  United Taxicab Workers go on to note that safety is the paramount concern in the taxi regulation and that taxis are inspected regularly and are

---

[51]  Lyft Opening Comments filed on 01/28/13 at 4-5.

[52]  SideCar Opening Comments filed on 01/28/13 at 17.

R.12-12-011  COM/MP1/avs

subject to age and mileage requirements.  Furthermore, drivers receive training and must go through background checks prior to becoming a taxi driver.[53]

In its comments, TPAC asserts that the primary reason for regulation of the passenger transportation industry is the need to ensure safety.  It goes on to say that public safety is promoted through the screening of drivers, and by ensuring that those who take on the responsibility of transporting passengers can be held accountable for their actions.[54]

### 3.2. Discussion

We agree that protecting and enhancing public safety is the paramount purpose behind regulating this industry.  We initiated this Rulemaking for the sole purpose of determining how TNCs affect public safety.  We further agree with the CHP, the San Francisco Airport Commission, the SFMTA, and other parties who have urged us to adopt safety rules and regulations that will hold TNCs accountable for safety.  We also agree with Lyft that ridesharing is nothing new and has been occurring on a relatively large scale for many decades – from casual carpools and bulletin boards to more recent on-line forums.  We note, however, that there is a specific exemption for the true form of ridesharing in the PU Code.  PU Code § 5353(h) exempts:

> Transportation of persons between home and work locations or of persons having a common work-related trip in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in Section 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver.

---

[53]  United Taxicab Workers Opening Comments filed on 01/29/13 at 4-5.

[54]  TPAC Opening Comments filed on 02/04/13 at 6.

R.12-12-011  COM/MP1/avs

The section also states:

> This exemption does not apply if the primary purpose for the transportation of those persons is to make a profit. "Profit," as used in this subdivision does not include the recovery of actual costs incurred in owning and operating a vanpool vehicle, as defined in Section 668 of the Vehicle Code.

In our view the Commission firmly believes that TNCs do not meet the rideshare exemption and actually are providing transportation services for compensation.

Lyft and SideCar have both entered into settlement agreements with the Commission's Safety and Enforcement Division as stated above and have complied with the safety requirements in those agreements.  Therefore, it is not entirely correct to state (as some parties have in their comments) that the public must only rely on the company's word.  These agreements, however, are interim arrangements pending the conclusion of this Rulemaking.  Therefore, in this decision we adopt strict safety regulations and guidelines that are similar in nature and in some cases more stringent than current and past practice in the transportation industry as a whole.  The regulations for TNCs will require the company to conduct criminal background checks, establish a driver training program, maintain a zero-tolerance policy on drugs and alcohol, register in the Department of Motor Vehicle (DMV) Pull Notice program, conduct a 19-point car inspection, and require a one-year driving history from the driver.  These regulations along with other requirements are stated above in the summary section as well as the jurisdiction section.

Regarding the criminal background checks, we will require each TNC to conduct a criminal background check for each driver prior to that applicant becoming a TNC driver.  The criminal background check must be a national

R.12-12-011  COM/MP1/avs

criminal background check including the national sex offender database.  The criminal background check should be using the applicant's social security number and not just the applicant's name.  Any felony criminal conviction within seven years prior to the date of the background check for violent crime, a sexual offense, a crime involving property damage, and/or theft will make the applicant ineligible to be a TNC driver.

Regarding the 19-point vehicle inspection, we require the TNC or an authorized third party facility licensed by the California Bureau of Automotive Repair to conduct the car inspections and for the TNC to maintain the record of such inspections in case of an audit.

Regarding the DMV Pull Notice Program, we are aware that the California DMV does not currently permit TNCs to enroll non-employee drivers in the Employer Pull Notice Program.  We are also aware that it was established to provide employers and regulatory agencies with a means of promoting driver safety through the ongoing review of driver records.  An employer enrolled in the program is assigned a requester code.  The requester code is added to an employee's driver license (DL) record.  When an employee's DL is updated to record an action/activity, a check is made electronically to determine if a pull notice is on file.  If the action/activity is one that is specified to be reported under the program, a driver record is generated and mailed to that employer.  The DMV Pull Notice program allows a transportation company to monitor DL records of employees.  This monitoring accomplishes the following:

- Improves public safety;
- Determines if each driver has a valid DL;
- Reveals problem drivers or driving behavior; and
- Helps to minimize the transportation company's liability.

R.12-12-011  COM/MP1/avs

The Commission began enrolling owner operators into this program in 1990.  We are similarly hopeful that the DMV is able to amend the requirements of the program to allow TNCs to participate automatically in the program once they have completed the other requirements for the driver to begin providing service.  Specifically, we encourage the DMV to modify the language about employers being the only entity to qualify for this automatic service.  We understand that currently TNCs can manually enter into the program, but automatic enrollment improves public safety in that the notification to TNCs will be automatic and timely.  We are hoping to work with the DMV to find a solution that improves public safety as we have added new rules and regulations to allow TNCs to provide transportation services.  Until the DMV Employer Pull Notice Program is available for use by TNCs, TNCs shall perform, prior to allowing a driver on the platform and quarterly thereafter, driving record checks through the DMV in order to ensure that drivers meet applicable requirements. The DMV check criteria shall provide that a user may have no more than three points within the preceding three years, no "major violations" (reckless driving, hit and run, or driving with a suspended license conviction) within the preceding three years, and no driving under the influence conviction within the past seven years.

Regarding the accessibility plan which each TNC is required to file within 45 days of the issuance of this decision, each plan shall include the following:

a.  A timeline for modifying apps so that they allow passengers to indicate their access needs, including but not limited to the need for a wheelchair accessible vehicle. A passenger should be allowed to state other access needs, either from a drop-down menu with room for comments or through a field requesting information.

R.12-12-011  COM/MP1/avs

    b.  A plan for how the TNC will work to provide appropriate vehicles for passengers who specify access needs, including but not limited to a plan to provide incentive to individuals with accessible vehicles to become TNC drivers.

    c.  A timeline for modifying apps and TNC websites so that they meet accessibility standards. The relevant standard for web access is WCAG 2.0 AA. Guidance on accessibility standards for iPhone apps can be found at http://developer.apple.com/library/ios/documentation/ UserExperience/Conceptual/iPhone Accessibility and http://developer.apple.com/library/ios/documentation/ UserExperience/Conceptual/iPhone Accessibility/Making Application Accessible/Making Application Accessible.html.  Guidance on accessibility standards for Android apps can be found at http://developer.android.com/training/accessibility/acce ssible-app.html.

    d.  A timeline for modifying apps so that they allow passengers to indicate that they are accompanied by a service animal, and for adopting a policy that service animals will be accommodated.

    e.  A plan for ensuring that drivers' review of customers will not be used in a manner that results in discrimination, including any policies that will be adopted and any monitoring that will take place by the TNC to enforce this requirement.

Each aspect of the accessibility plan will be addressed in the annual reports required of each TNC regarding compliance, necessary improvements (if any) and additional steps to be taken by the TNC to ensure that there is no divide between service provided to the able and disabled communities. These reports will be served by SED on the service list for this proceeding, and input from interested parties will be invited. Based on SED's review of the annual reports as well as input from interested parties, the Commission will determine what, if

R.12-12-011  COM/MP1/avs

any, changes need to be made in the TNC business model, or new regulations adopted, in order to ensure that TNCs are accessible to, and do not discriminate against, persons with disabilities.

## 4.  Ridesharing

The definition of ridesharing does not permit transportation performed for profit.[55]  Recovery of actual costs incurred only applies to vanpool vehicles, which is defined by the Vehicle Code as seating more than 10 passengers, but less than 15 passengers, including the driver.  The Commission sought comment on whether the TNCs' business models qualify as ridesharing for the purpose of the PU Code § 5353(h) exemption and, with respect to its passenger carrier regulation, whether the Commission should recommend a broader or narrower definition of ridesharing than that contained in the California Vehicle Code.

### 4.1. Comments on the Rulemaking

Various parties filed comments in response to the questions asked in the Rulemaking.  This section will summarize all the various positions.  We may not cite every party that filed comments, but we will cite every position.

Opening comments filed by former San Francisco Mayor Willie L. Brown Jr. proposes a mandatory cap on TNC driver earnings and an updated definition that includes this cap in the PU Code § 5353 (f).[56]  These comments further state that the issue for sites such as Tickengo and 511.org is that there is no clear definition of vehicles carrying passengers on a noncommercial enterprise basis, and that a clear definition of ridesharing would help eliminate confusion with TCPs, fill empty seats in cars, and reduce pollution and congestion while

---

[55]  Rulemaking at 7.

[56]  Comments from Willie Brown filed on 01/18/13 at 1-2.

R.12-12-011  COM/MP1/avs

lowering the cost of door-to-door transportation.[57]  Tickengo proposes that we limit the maximum share-the-expense carpool amount drivers can collect on a yearly basis to the American Automobile Association's (AAA) official annual cost of vehicle ownership (currently $8,776 per year).[58]

Luxor Cab, on the other hand, asserts that the statutory definition of ridesharing is adequate, but what is lacking is compliance with regulations by unlicensed for-hire TNCs.[59]  Luxor Cab further comments that legitimate ridesharing does not include the transportation of a passenger on a trip the driver was not otherwise planning to take.  Luxor asserts that it is the very nature of taxicab service that the ride is offered on demand and in accordance with the passenger's desired location.  Finally, Luxor Cab comments that the amount of compensation should not determine the need for compliance with regulations, but rather it is the nature of the service that ought to be determinative.[60]

The SFMTA asserts that there is no reason for the Commission to change the definition of ridesharing under the Vehicle Code in order to accommodate for-profit transportation services delivered through smartphone applications.  It further asserts that there is nothing about the 'new business model' of offering for-hire transportation services through the mechanism of a smartphone application that justifies abandoning the fundamental regulatory infrastructure of the transportation for-hire industry, or that changes the level of regulatory concern when members of the public place themselves in the care and control of

---

[57]  Comments of Willie Brown filed on 01/18/13 at 2.

[58]  Comments of Willie Brown filed on 01/18/13 at 3.

[59]  Luxor Cab comments filed on 01/28/13 at 3.

[60]  Luxor Cab comments filed on 01/28/13 at 3.

R.12-12-011  COM/MP1/avs

a private individual who they pay to carry them safely to their destination in a motor vehicle over the public right of way.[61]

Lyft asserts that the Commission is reading the PU Code too narrowly and recommends that the Commission explicitly acknowledge and clarify that:  1) a voluntary donation, regardless of the amount, does not constitute "compensation" as the term is used in § 5360 and that 2) the "primary purpose" of any driver that only receives voluntary donations from riders and no other pay from the company operating the rideshare platform is not to make a "profit," as defined in § 5353(h).  Lyft also suggests that the Commission consider recommending that the Legislature clarify or broaden the definition of ridesharing.[62]

SideCar urges the Commission to clarify the rideshare exemption in PU Code § 5353(h) and establish a bright line "safe harbor" for ridesharing drivers and authentic peer-to-peer rideshare technology providers.  It goes on to say that while the Public Utilities Code currently has no provision for the recovery of the costs incurred in owning and operating a vehicle, except a vanpool vehicle, SideCar believes that a standard should be adopted for ridesharing in regular passenger vehicles.[63]

The San Francisco Cab Drivers Association asserts that businesses like Sidecar and Lyft clearly do not qualify for exemption from charter carrier laws under the definition of ridesharing as defined in § 522 of the Vehicle Code.  This transportation is not between home and work locations or of persons having a

---

[61]  SFMTA comments filed on 01/28/13 at 9.

[62]  Lyft comments filed on 01/28/13 at 7.

[63]  SideCar comments filed on 01/28/13 at 11.

R.12-12-011  COM/MP1/avs

common work-related trip.  The sole purpose of these trips is to convey passengers to their requested destination, for profit.[64]

IATR asserts that while the PU Code exempts from regulation passenger vehicles that carry passengers on a "noncommercial enterprise basis," this term is not defined.  It goes on to say that TNCs fail to meet the definition for ridesharing (as they operate outside of strictly work and home locations, and transport passengers on trips that are NOT incidental to the driver) and fail to qualify for the Commission exemption because they are operating for profit/compensation.[65]  IATR further suggests that the definition of ridesharing be narrowed whereas Lyft says that the Commission is reading the definition too narrowly.  IATR says that the Commission should act to clarify the regulatory exemption and to make clear that to qualify for the exemption, a driver is prohibited from making any profit and/or accepting compensation.[66]

The CHP asserts that the term "ridesharing" is a term-of-art within the lexicon of transportation – notwithstanding the vehicle used, ridesharing is essentially deemed to be reserved for like-minded individuals with a transportation motivation incidental to another purpose and not seated in profit-making derived from the transportation.[67]

---

[64]  San Francisco Cab Drivers Association comments filed on 01/28/13 at 3.

[65]  IATR Comments filed on 01/28/13 at 4.

[66]  IATR Comments filed on 01/28/13 at 5.

[67]  CHP comments filed on 7/17/13 at 4-5.

R.12-12-011  COM/MP1/avs

### 4.2. Discussion

We agree with the vast majority of the parties that filed comments that TNCs do not qualify for the rideshare exemption under PU Code § 5353(h).

PU Code § 5353(h) exempts from Commission regulation:

> Transportation of persons between home and work locations or of persons having a common work-related trip purpose in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in Section 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver. This exemption also applies to a vehicle having a seating capacity of more than 15 passengers if the driver files with the commission evidence of liability insurance protection in the same amount and in the same manner as required for a passenger stage corporation, and the vehicle undergoes and passes an annual safety inspection by the Department of the California Highway Patrol.  The insurance filing shall be accompanied by a one-time filing fee of seventy-five dollars ($75).  This exemption does not apply if the primary purpose for the transportation of those persons is to make a profit.  "Profit," as used in this subdivision, does not include the recovery of the actual costs incurred in owning and operating a vanpool vehicle, as defined in Section 668 of the Vehicle Code.[68]

---

[68]  Vehicle Code § 522 defines "ridesharing" as "two or more persons traveling by any mode, including, but not limited to, carpooling, vanpooling, bus pooling, taxi pooling, jitney, and public transit."

R.12-12-011  COM/MP1/avs

Section 5353(h) provides two opportunities to qualify for the rideshare exemption:

> Transportation of persons between home and work locations or of persons having a common work-related trip purpose in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in Section 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver.

> TNCs fail to satisfy either of these requirements.

In our review of the filings and supporting documents, there is no evidence that TNC drivers have a common work-related or incidental purpose with their passengers.  Instead, drivers transport passengers entirely at the convenience of the passenger:

> Lyft is recruiting drivers with the following language: "Be a Lyft Driver" material states that "drivers are making up to $35/hour + choosing their own hours!"[69]

> Uber's service is defined as "your on-demand private driver."[70]

> SideCar offers the following pitch to its prospective drivers: "Drive where you want, when you want, and who you want. You are your own boss. Some of our SideCar drivers are earning $30+ per hour."[71]

> InstantCab tells prospective drivers that it makes "it easy for customers and cab drivers to find each other. We're looking for drivers to help us launch and provide high quality service to anyone who needs a taxi. We're not a taxi company, you

---

[69] http://www.lyft.me/drivers.

[70] Exhibit A, 34, Workshop Brief, filed by TPAC on April 3, 2013.

[71] Exhibit C, 48, Workshop Brief, filed by TPAC on April 3, 2013.

R.12-12-011  COM/MP1/avs

> can work for any existing taxi company and use our app to
> find guaranteed customers."[72]

> Tickengo tells its prospective drivers that they can "accept any
> ride if you want to go to the same destination, *or if you just
> want to help.*"[73]

Services provided by TNCs are thus very different from traditional, longstanding forms of ridesharing.[74]  TNCs are clearly designed to provide a car service for compensation.  There is no requirement that there be a common purpose.  Instead, TNCs operate as an alternative to other traditional car services. Several parties in comments on the proposed decision expressed concern that the proposed decision would, as former San Francisco Mayor Brown described in his comments, limit the ability of "a regular citizen [to] request a ride from a family member who may wish to give them a ride to the airport for free."[75]  Similarly, eRideShare, which has provided an online carpool matching service since 1999, expressed concerns that the proposed decision would override existing statutory exemptions for ridesharing services.[76]  These concerns are ill founded.  We reiterate that our Decision in no way impacts the exemptions in Section 5353 of the Public Utilities Code.  To the extent that services such as Rideshare meet

---

[72] https://instantcab.wordpress.com/join/.

[73] https://tickengo.com/a/becomedriver/.  (Italics added.)

[74] The TNCs should be contrasted with http://www.511.org, a ridesharing service which is managed by a partnership of public agencies led by the Metropolitan Transportation Commission, the California Highway Patrol, and the California Department of Transportation. There are no references to Terms and Conditions, donations, and other forms of compensation.

[75] Comments on Proposed Decision – from former San Francisco Mayor Willie L. Brown Jr. on 8/12/2013.

[76] Final Opening Comments of eRideShare Inc. on 08/19/2013.

R.12-12-011  COM/MP1/avs

either the "non-commercial enterprise" or rideshare exemption under Section 5353, or other exemptions as applicable, such services would be exempt from Commission regulation.  The Commission has never regulated the ability of a "regular citizen [to] request a ride from a family member who may wish to give them a ride to the airport for free," and nothing in the Public Utilities Code or our Decision would extend the Commission's jurisdictional reach to such lengths.  Further, the Commission would again note that the basis for regulating TNCs is that they meet the definition of a charter-party carrier under the Public Utilities Code.  That is, they are "engaged in the transportation of persons by motor vehicle for compensation."[77]

We agree with SFMTA that there is no reason for the Commission to change the definition of ridesharing under the Vehicle Code in order to accommodate for-profit transportation services delivered through smartphone applications.  Furthermore, there is nothing about the 'new business model' of offering transportation services for compensation through the mechanism of a smartphone application that justifies abandoning the fundamental regulatory infrastructure of the transportation for compensation industry, or that changes the level of regulatory concern.  The underlying principal continues to be ensuring public safety.  Regulation is the safety net that the public should rely on for its protection.  We are not persuaded by the TNCs that would like us to create a regulatory gap because they are using a smartphone to facilitate transportation for compensation.  We are, however, encouraged by the TNC's embrace of

---

[77]  PU Code § 5360 (emphasis added).

R.12-12-011  COM/MP1/avs

technology and innovation to bring choice and convenience to the public in a safe manner.

## 5.  Transportation Access

The Commission's authority over passenger carriers is grounded in the need to protect the public's safe and reliable access to California's roadways. Section 5352 of the Act states:

> The use of the public highways for the transportation of passengers for compensation is a business affected with a public interest.  It is the purpose of this chapter to preserve for the public full benefit and use of public highways consistent with the needs of commerce without unnecessary congestion or wear and tear upon the highways; to secure to the people adequate and dependable transportation by carriers operating upon the highways; to secure full and unrestricted flow of traffic by motor carriers over the highways which will adequately meet reasonable public demands by providing for the regulation of all transportation agencies with respect to accident indemnity so that adequate and dependable service by all necessary transportation agencies shall be maintained and the full use of the highways preserved to the public; and to promote carrier and public safety through its safety enforcement regulations.

PU Code § 5352 places public safety as a key goal in ensuring that the public enjoys full access to the roadways.  In this Rulemaking the Commission sought comment on the ways that safety regulations may enhance or impede public access to the roadways.

### 5.1. Comments on the Rulemaking

Many parties filed comments in response to this issue and there were some that remained silent.  We will summarize those positions that were submitted in this section.

R.12-12-011  COM/MP1/avs

Luxor Cab asserts that unlicensed for-hire carriers such as Uber, Lyft, and SideCar do not invest in safety equipment and crime-prevention training for drivers.  It goes on to say that TNCs and their drivers try to compensate for the lack of professional safety measures by cherry-picking the customers whom they believe are safest to convey.  Luxor Cab then cautions that the result of this type of cherry-picking is de facto red-lining of low-income neighborhoods and discrimination against customers based on drivers' profiling that may be little more than stereotyping according to ethnicity or disability.  Luxor Cab also says that such practices are illegal for licensed operators because they have the effect of reducing public access to the roadways.[78]

The CHP asserts that the Commission's oversight responsibilities relative to transportation access are rooted in two essential areas.  First, the regulation of accident indemnity to ensure adequate and dependable service by transportation operators and preservation of full use of the highways; and secondly, to promote public and operator safety through enforcement regulations.[79]

Perhaps the most detailed and focused comments on this issue came from Center for Accessible Technology (CforAT).  CforAT rightly reminds us that any demand-response transit service must also comply with state and federal anti-discrimination statutes, including requirements that such services be accessible to people with disabilities.[80]

San Francisco Cab Drivers Association asserts that they have personally witnessed an abundance of Lyft and other private vehicles transporting people in

---

[78]  Luxor Cab opening comments filed on 01/28/13 at 3-4.

[79]  CHP comments filed on 07/17/13 at 3.

[80]  CforAT comments filed on 01/28/13 at 1-2.

R.12-12-011  COM/MP1/avs

the back seat, blocking up traffic and making illegal maneuvers, while legal taxicabs drive around empty.  They go on to say that this adds to traffic congestion.  Additionally, the assertion is made that a Lyft driver nearly ran into the individual head-on while making an illegal left turn across Van Ness Avenue in San Francisco onto California Street and a professional driver would not do that.[81]

### 5.2. Discussion

We agree with CforAT that TNCs must endeavor to provide equal access to all consumers.  Because TNCs are in their infancy we cannot determine at this point whether equal access is being hampered.  As a threshold matter, TNCs must do the following:

a. TNCs shall allow passengers to indicate whether they require a wheelchair-accessible vehicle or a vehicle otherwise accessible to individuals with disabilities.

b. One year from the effective date of these rules and annually thereafter, each TNC shall submit to the Safety and Enforcement Division a report detailing the number and percentage of their customers who requested accessible vehicles, and how often the TNC was able to comply with requests for accessible vehicles.  Upon receipt this report shall be made public by the Safety and Enforcement Division.  This report shall also contain a description of any instances or complaints of unfair treatment or discrimination of persons with disabilities.

The above information will be used by the Commission to determine what, if any, changes need to be made to the regulations  in order to ensure that TNCs are accessible to, and do not discriminate against, persons with disabilities.  The

---

[81] San Francisco Cab Drivers Association comments filed on 01/29/13 at 3-4.

R.12-12-011  COM/MP1/avs

Commission also notes it currently has few provisions or protections to ensure equal access for passengers with disabilities under its current TCP regulations.[82] Updating any regulations in this area, as found to be needed, may also be something the Commission should consider in Phase 2 of this rulemaking.

We also agree with the CHP that the Commission must regulate TNCs to ensure adequate and dependable service by transportation operators and to promote public and operator safety.  Consequently, we require TNCs to follow the safety and regulatory requirements stated above in section 3.2 of this decision.

And we also agree with Luxor Cab that discrimination against customers based on drivers' profiling that may be little more than stereotyping by ethnicity, disability, or economic class, will not be tolerated.  It is noteworthy that, although not a party to this proceeding, Homobiles was created to serve a community that may not have been adequately served by the existing transportation forms.  According to Homobiles' website, it was formed to serve underserved communities who experience stress or discrimination on various forms of transportation for hire due to their gender or sexual identity.[83]  The Commission notes that while some parties argue that TNCs such as Lyft, UberX, and SideCar must be regulated either as taxi cabs or limousines in order to ensure nondiscrimination and public safety, Homobiles was formed to meet the needs of consumers whose transportation needs are not being adequately met by

---

[82]  For instance, the Commission requires every carrier to maintain on file with the Commission an equipment list of all vehicles in use including whether each vehicle is handicap accessible.  (GO 157-D, Section 4.01.)

[83]  http://www.homobiles.org/terms/.

R.12-12-011  COM/MP1/avs

either taxi cabs or limousines.  We applaud the founders of Homobiles for establishing a non-profit 501(c)(3) volunteer organization that caters to the underserved communities of San Francisco.

We agree with CforAT that the Commission should be informed by the legacy of transit discrimination and should work to ensure that the new services mark a break from this problematic history.  Just as it would be unacceptable to allow any form of transit service to operate if it were to engage in racial discrimination, new forms of online-enabled transit services cannot be permitted to exclude people with disabilities.  We agree.  Therefore, we direct TNCs to submit a plan within 90 days of the effective date of this decision to tell us how they plan to ensure that TNCs will avoid creating a divide between the able and disabled communities.  TNCs must explain how they plan to provide incentives to individuals with accessible vehicles to become TNC drivers.  Furthermore, TNCs should ensure accessibility accommodations for their apps and websites to enable the disabled public access to the same services as clients who are not disabled.[84]

## 6.  Insurance

California Insurance Code § 11580.1(b) requires that non-commercial vehicles have a minimum liability coverage of $15,000 for injury/death to one person, $30,000 for injury/death to more than one person, and $5,000 for damage to property.  The Commission's GO 115-F requires that any charter party carrier vehicle with a seating capacity of seven passengers or fewer have a minimum

---

[84] Title III of the Americans with Disabilities Act (ADA) requires that businesses and nonprofit services providers make accessibility accommodations to enable the disabled public to access the same services as clients who are not disabled.

R.12-12-011  COM/MP1/avs

commercial coverage of $750,000.  In the Rulemaking, the Commission sought comments on, *inter alia*, the insurance aspects of this new transportation model. For instance, if a vehicle is insured as a private vehicle, but involved in an incident while transporting passengers for compensation, the Rulemaking asked what type of coverage would the insurance offer for injuries/damages to the driver, the paying passenger, and any other people or property involved in the incident, and whether the insurance industry had an opinion on the insurance coverage available for private vehicles used to transport passengers for compensation.

### 6.1. Comments on the Rulemaking

This Rulemaking has at least 18 parties who filed comments.  No party claimed that TNCs should not have insurance or that liability insurance in the transportation business was not a key component of their business model.  In this section we will note the PIFC's comments.[85]   We also note that many parties claimed either in their comments or during the workshop that TNCs are uninsured.

In its comments, PIFC asserts that it surveyed its member insurance companies, finding that "the industry standard for personal auto insurance policy contracts is to exempt from insurance coverage claims involving vehicles used for transporting passengers for a charge."[86]  PIFC goes on to say that in situations where a vehicle is insured as a private vehicle and is used to transport

---

[85]  According to comments filed by PIFC on 01/28/13, the PIFC members represent six of the nation's largest insurance companies (State Farm, Farmers, Liberty Mutual Group, Progressive, Allstate and Mercury) which collectively write a majority of the personal lines of auto insurance in California.

[86]  PIFC comments filed on 01/28/13 at 1-2.

R.12-12-011  COM/MP1/avs

passengers for a fee, no insurance coverage would exist.[87]  The Commission also inquired about the sufficiency of the minimum liability coverage required under California Insurance Code § 1158.1(b).  PIFC asserts that since there would be no coverage for the type of situations at issue, the minimum amount of coverage would be irrelevant.[88]  Finally, with respect to California Insurance Code § 11580.24, PIFC notes that the legislature encouraged car sharing programs (i.e., renting out one's personal vehicle to another driver), as long as the owner does not earn more than the annual cost of owning the vehicle from the car sharing program.  PIFC goes on to say that in doing so, it shields private passenger car insurers from any liability by shifting the responsibility for coverage to the private vehicle ridesharing program.  The PIFC notes that the issue before the Commission is not ridesharing, but instead it is one of using a private passenger vehicle in a livery service.  This is clearly not covered under a standard policy; if an incident occurs, coverage would not exist.[89]

### 6.2. Discussion

We will require TNCs to maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services.  The insurance coverage shall be available to cover claims regardless of whether a TNC driver maintains insurance adequate to cover any portion of the claim.  This level of liability insurance is above what the Commission currently requires of

---

[87] PIFC comments filed on 01/28/13 at 1-2.

[88] *Id.*

[89] *Id.*

R.12-12-011  COM/MP1/avs

TCP drivers.  It is equal to the insurance that the SFMTA requires of taxicab companies.

　　We reject the claim that Lyft, SideCar, and Uber/UberX do not have insurance.  The Commission's Safety & Enforcement Division, in entering into settlement agreements with these entities, made sure that each of these companies maintained excess liability insurance policies providing a minimum of $1 million per incident.  We note PIFC's comments in this Rulemaking, and note that, even if a TNC driver's personal insurance does not apply in the event of an accident, the insurance required by the Commission will apply.

　　We require that each TNC file their insurance policies under seal with the Commission as part of applying for a license.  Furthermore, the license for the TNC will automatically expire upon expiration of the insurance policy unless and until the TNC provides an updated insurance policy and applies to renew its license.  In Phase II of this proceeding we will consider whether these policies for both TCP as well as TNC certificate holders should be made public and included in the Commission's website.

## 7.  Workshop Report

　　As part of the Scoping Memo, parties were invited to attend a workshop to consider issues including but not limited to jurisdiction, safety, transportation access, and proposed modifications to existing rules and regulations.  On April 10 and 11, 2013, the parties attended the Commission's workshop in San Francisco at the Commission's offices.  The workshop sessions were publicly noticed and open to the public.

　　Two parties that we'd like to thank and extend our appreciation to for drafting the workshop report are TPAC and TransForm.  On May 17th these two parties filed the Workshop Report on behalf of those parties who attended

R.12-12-011  COM/MP1/avs

the workshop.[90]  The Workshop Report summarizes party positions as articulated during the workshop.

Most of the issues such as jurisdiction, safety, access, and the definition of ridesharing have already been discussed in the above sections of this decision. There are, however, two issues not addressed above that we will address in this section.

During the workshop, Commission staff asked whether there was a third way to regulate TNCs that protected public safety, but also allowed innovation and technology to bring choice and convenience to the public.  The SFMTA/IATR stated that the idea that there is some third way to regulate these TNCs is offensive to the men and women who work as regulators to protect public safety and access.  The SFMTA/IATR pointed out that the taxi industry is a highly managed transportation network that requires regulations to ensure universal access to door to door transportation in an urban environment.[91]  TPAC stated that it believed that the Commission had inappropriately provided preapproval to a third-way regulatory approach via its settlement agreements with companies such as Uber and Lyft.  TPAC stated that the third-way regulatory approach affected by the TNCs' settlement agreements amounted to the deregulation of the taxicab industry, and as such violated state law.[92] Counsel for the SFMTA and the San Francisco Airport Commission stated that

---

[90]  TPAC, TransForm, CforAT, GCLA, Luxor Cab, IATR, PIFC, the San Francisco Cab Drivers Association, the San Francisco Limo Union, the San Francisco Medallion Association, SFMTA, The San Francisco Airport Commission, SideCar, Tickengo, Uber, The United Taxicab Workers, TURN, and Lyft.

[91]  Workshop Report at 14.

[92]  *Id.*

R.12-12-011  COM/MP1/avs

TNCs have presented no credible argument for a third way.  The SFMTA and San Francisco Airport Commission stated that there are two possible regulatory schemes, the local system for taxicabs and the state system for charter-party carriers, but there is no justification for subjecting TNCs to lesser standards than those applicable to all other charter party carriers.[93]  Luxor Cab stated that the topic of a third way to regulate TNCs is misleading because it assumes that there is something new about the TNCs, when taxi companies have been using similar technological services for several years before the inception of Uber, Lyft, and SideCar.[94]  SideCar asserted the need for regulatory recognition of the innovative combination of services offered by communications platforms such as SideCar, in combination with noncommercial ridesharing.[95]  Lyft stated that, to the extent the Commission finds that it should regulate to protect public safety interests, it is supportive of a third way regulatory approach because, if applied to TNCs, the current regulatory scheme would create unreasonable barriers for ridesharing services to enter the market.[96]

A second issue that was discussed during the workshops and does not neatly fit into any of the discussion above is the notion of fair competition among regulated and unregulated entities.  TPAC commented that the goal of the Commission should be to create a fair system.  They argue that where both a regulated system and an unregulated system exist, the natural inclination of the industry will be to move towards deregulation in order to avoid all of the costs of

---

[93] Workshop Report at 15.

[94] *Id*.

[95] *Id*.

[96] *Id*.

R.12-12-011  COM/MP1/avs

regulatory compliance.  Consequently there will be no room left for a regulated industry.[97]

Several parties including the SFMTA, San Francisco Airport Commission, TPAC, United Taxicab Workers, and the SF Cab Drivers Association contend that regulated taxis cannot compete with TNCs.  United Taxicab Workers argue that to allow TNCs to exist in their current unregulated form or subject to minimal regulation essentially creates a race towards the bottom with negative impact on safety and service.  These groups contended that professional drivers will be pushed towards the TNC business model because of lower operational costs.  The representative from the SFMTA/IATR states that when this unregulated system devastates the regulated environment, no one will be left to provide safe and accessible door to door service to city residents and visitors.[98]

### 7.1. Discussion

We are not persuaded by the position taken by the SFMTA that updating regulation is offensive to those currently working to regulate public safety and access.  Regulatory bodies must always look to update their rules and regulations in order to keep pace with time and technology.  The Commission's goal in this Rulemaking is to strike the proper balance between safety and innovation, so that regulation provides a safety net that the public can rely on for its protection while new businesses innovate and use technology to better the lives of Californians.   The regulations that we are adopting for TNCs are similar to what the SFMTA requires of taxicab drivers.  Namely, we require a license for each TNC, require a criminal background check to be completed for each driver,

---

[97]  Workshop Report at 26.

[98]  *Id.*

R.12-12-011  COM/MP1/avs

require that each TNC establish a driver training program, and require liability insurance that is equal to what the SFMTA requires of taxicab drivers.  We will not, however, meddle into their business model by forcing TNCs to designate each driver an employee or contractor.  Again, our role is to protect public safety, not to dictate the business models of these companies.

We reject TPAC's allegation that a third way of regulation is the same as deregulation.  The settlement agreements that SED entered into with three of the companies were a first step toward regulation.  The regulations that we establish in this decision will ensure that safety is foundational to a TNC's business.  Additionally, we support choice not only for passengers, but also drivers.  Going forward, a company may either apply for a TNC license or a TCP license with the Commission.

We accept those party's comments calling for regulation of TNCs.  As such, in this decision we exercise our existing jurisdiction pursuant to Article XII of the California Constitution and the Act.  In this decision under the broad grant of authority pursuant to PU Code § 5381, we create the category of TNC to accompany the existing category of TCP. A company or individual wishing to provide transportation or facilitate transportation of passengers can choose to either get a TCP license or a TNC license.  The TCP requirements are already in place, although as indicated, *supra,* the Commission will open a second phase to this Rulemaking to update those rules and regulations to ensure that safety requirements are up to date.

## 8.  Comments on Proposed Decision

The proposed decision of Commissioner Michael R. Peevey in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of

R.12-12-011  COM/MP1/avs

Practice and Procedure.  Comments were filed on August 19, 2013 by Tickengo, CforAT, SideCar, Lyft, Uber, TPAC, IATR, Los Angeles Department of Transportation, GCLA, TransForm, Luxor Cab, eRideshare, SFMTA, California Airports Council, TLPA, San Francisco Cab Drivers Association (SFCDA), United Taxicab Workers, SFMTA/SFO, PIFC and Consumer Attorneys of California, and reply comments were filed on August 26, 2013 by TPAC, Luxor Cab, United Taxicab Workers, Lyft, IATR, CforAT, TLPA, SFMTA/SFO, SideCar, Uber, PIFC and SFCDA.

In response to comments, the proposed decision has been revised to further explain the definition of what constitutes a TNC.  It is further noted that the existing exemptions under the Commission's Charter Party Carrier authority are not usurped by the creation of this new category.  All of the existing eleven exemptions still apply.  The proposed decision has also been revised to clarify what kind of a criminal background check is expected, the insurance requirements and  what specifics should be included in the TNC plans to ensure accessibility.  Other revisions in response to comments have been made as appropriate.

## 9.  Assignment of Proceeding

Michael R. Peevey is the assigned Commissioner and Robert Mason III is the assigned ALJ in this proceeding.

## Findings of Fact

1.  The Commission opened this Rulemaking on December 20, 2012, to protect public safety and to encourage innovators to use technology to improve the lives of Californians.

2.  The Commission has a responsibility for determining whether and how public safety might be affected by these TNCs.

R.12-12-011  COM/MP1/avs

3.  Parties filed comments in this proceeding on January 28, 2013 and reply comments were filed on February 11, 2013.

4.  On February 15, 2013, the Commission held a Prehearing Conference and on April 2, 2013, the assigned Commissioner and ALJ issued a Scoping Memo.

5.  Workshops were held on April 11 and 12, 2013, at the Commission's auditorium.

6.  In the Rulemaking we referred to these companies as New Online-Enabled Transportation Services.  We are changing the abbreviation to TNC for ease of use.

7.  TNCs are not just Lyft, SideCar, InstantCab, and UberX.

8.  A TNC is defined as an organization whether a corporation, partnership, sole proprietor, or other form, operating in California that provides prearranged transportation services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles.

9.  California law currently recognizes and regulates three modes of passenger transportation for compensation: taxi services, regulated by cities and/or counties; and charter party carrier services, and passenger stage companies, regulated by the California Public Utilities Commission.

10.  It is reasonable to conclude that in recent years, the communications revolution in wireless service, smartphones and apps has further facilitated the development and adoption of passenger transportation for compensation, to a point where passengers seeking rides are readily connected with drivers willing to provide rides in private vehicles.

11.  It is reasonable to conclude that current TNCs are providing passenger transportation for compensation.

R.12-12-011  COM/MP1/avs

12.  TNCs do not fit neatly into the conventional understandings or statutory definitions of either taxis or limousines, but that does not mean that this Commission's responsibility to public safety in the transportation industry should be ignored and/or left for individual companies to dictate.

13.  TNCs operate on a prearranged basis because 1) before a passenger can request a ride, the passenger must download the software application, provide identification information and agree to the TNC service agreement, and 2) for a particular trip, the passenger must input information regarding current location, and finally 3) a TNC driver cannot be hailed on the street similar to a taxicab where no information is shared until the passenger enters the vehicle.

14.  In order to comply with the applicable statutes and regulations, all TNC drivers must be able to prove that a ride was matched on the TNC software application as evidence of prearrangement.

15.  The California DMV does not currently permit TNCs to enroll non-employee drivers in the Employer Pull Notice Program.  Until the DMV Employer Pull Notice Program is available for use by TNCs, TNCs should perform, prior to allowing a driver on the platform and quarterly thereafter, driving record checks through DMV in order to ensure that drivers meet applicable requirements.  The DMV check criteria shall provide that a user may have no more than 3 points within the preceding 3 years, no "major violations" (reckless driving, hit and run, or driving with a suspended license conviction) within the preceding 3 years, and no driving under the influence conviction within the past 7 years.

16.  It is reasonable to conclude that TNCs are charter party passenger carriers, and therefore we will exercise our existing jurisdiction over these services

R.12-12-011  COM/MP1/avs

pursuant to Article XII of the California Constitution and the Passenger Charter-party Carriers' Act, PU Code § 5351 *et seq.*

17.  It is reasonable to exercise this Commission's broad grant of authority pursuant to PU Codes §§ 5381 and 701 to create the category of TNC to accompany the existing category of TCP.   A company or individual wishing to provide transportation or facilitate transportation of passengers can choose to either get a TCP license or a TNC permit.

18.  The definition of ridesharing does not permit transportation performed for profit.

19.  Recovery of actual costs incurred only applies to vanpool vehicles, which is defined by the Vehicle Code as seating more than 10 passengers, but less than 15 passengers, including the driver.

20.  It is reasonable to conclude that TNCs do not qualify for the rideshare exemption under PU Code § 5353(h), because § 5353(h) provides two opportunities to qualify for the rideshare exemption:  either the transportation must have a common work-related purpose; or the transportation must be incidental to another purpose of the driver.  TNCs fail to satisfy either of these requirements.

21.  Pursuant to PU Code § 5352 the Commission's authority over passenger carriers is grounded in the need to protect the public's safe and reliable access to California's roadways.

22.  PU Code § 5352 positions public safety as a key goal in ensuring that the public enjoys full access to the roadways.

23.  The primary distinction between a TNC and other TCPs is that a TNC connects riders to drivers who drive their personal vehicle, not a vehicle such as a limousine purchased primarily for a commercial purpose.

R.12-12-011  COM/MP1/avs

24.  A TNC shall not be permitted to accept street hails.

25.  A TNC is not permitted to itself own vehicles used in its operation or own fleets of vehicles.  With this definition in mind, the Commission finds that Uber (in contrast to UberX) is not a TNC.

26.  Uber connects riders with drivers who do not drive their own personal vehicle, but typically operate in town cars or limousines, which the driver may often as well use to transport customers for another limousine/town car company.

27.  In order to ensure the greatest possible evidentiary record, the Commission would prefer to leave all non-TNC issues, including Uber's potential TCP status, to Phase II.

28.  The Commission will not allow the uncertainty regarding Uber's insurance to persist during the pendency of Phase II.Uber should be required to demonstrate to the Commission within 30 days of the issuance of this decision that it maintains commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing Uber services.  The insurance coverage shall be available to cover claims regardless of whether an Uber driver maintains insurance adequate to cover any portion of the claim.

29.  UberX does meet the TNC definition and should apply for a TNC license.

30.  In this decision we will require TNCs to maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services.  The insurance coverage shall be available to cover claims regardless of whether a TNC driver maintains insurance adequate to cover any portion of the claim.

R.12-12-011  COM/MP1/avs

31.  The criminal background check must be a national criminal background check including the national sex offender database.  The criminal background check should be using the applicant's social security number and not just the applicant's name.  Any felony criminal conviction within seven years prior to the date of the background check for violent crime, a sexual offense, a crime involving property damage, and/or theft will make the applicant ineligible to be a TNC driver.

32.  The Commission is authorized to conduct inspections of charter-party carriers which will now include TNCs.  For instance, § 5371.5 of the Act states that: "Upon receipt of a complaint containing sufficient information to warrant conducting an investigation, the commission shall investigate any business that advertises limousine-for-hire or passenger charter transportation service for compensation in motor vehicles."

33.  The Commission is also authorized to issue fines pursuant to PU Code § 5378(b).

34.  PU Code § 5411 to 5420 of the Act contain relevant provisions regarding issuing fines and penalties.  These provisions allow the Commission to issue fines to carriers who have violated one or more provisions of the California Public Utilities Code.  In addition, the Commission has established a citation program in Resolution ALJ-187.

35.  The Commission's purpose in this Rulemaking is to ensure that regulation is the safety net that the public relies on for its protection and secondarily encouraging innovation and utilization of technology to better the lives of Californians.

36.  No Term and Condition in a TNC's Terms of Service or elsewhere, can be inconsistent with this decision's commercial liability insurance requirements for

R.12-12-011  COM/MP1/avs

TNCs.  Nor can any Term and Condition in a TNC's Terms of Service be used or relied on by the TNC to deny insurance coverage, or otherwise evade the insurance requirements established in this decision.

37.   The Commission will open a Phase II to consider updating its regulations over TCP certificate holders.  Phase II will also consider the standard and appropriate language for Terms & Conditions for both TCP and TNC certificate holders.

**Conclusions of Law**

1.   The Federal Telecommunications Act of 1996 and recently adopted California legislation (Senate Bill 1161 authored by Senator Alex Padilla) limit California's ability to regulate IP-enabled services, but they do not prevent California from regulating passenger transportation over public roadways.

2.   TNCs are not providers of IP-enabled services and are not exempt from our jurisdiction.

3.   To date neither the FCC, nor a court of higher jurisdiction, has ruled that this Commission, or any other state commission, is precluded by the Federal Telecommunication Act of 1996 from regulating TNCs.

4.   The Commission regulates charter party passenger carriers pursuant to Article XII of the California Constitution and the Passenger Charter-party Carriers' Act, PU Code, §§ 5351, *et seq.*  Section 5360 states in part:

> Subject to the exclusions of Section 5353, "charter-party carrier of passengers" means every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state.

> Section 5381 states in part:

> …(t)he commission may supervise and regulate every charter-party carrier of passengers in the State and may do all

R.12-12-011  COM/MP1/avs

> things…necessary and convenient in the exercise of such
> power and jurisdiction.

5.  The Commission has very broad powers under PU Code § 701 which suggests that the Commission has the ability (via a rulemaking process) to develop new categories of regulation when a new technology disrupts an existing industry.

6.  We find that TNCs are charter party passenger carriers, and therefore we will exercise our existing jurisdiction pursuant to Article XII of the California Constitution and the Passenger Charter-party Carriers' Act, PU Code § 5351 *et seq.* (the Act).  In this decision, under the broad grant of authority pursuant to PU Codes § 5381 and 701, we create the category of TNC to accompany the existing category of TCP.

7.  Section 5353(h) provides two opportunities to qualify for the rideshare exemption:  Transportation of persons between home and work locations or of persons having a common work-related trip purpose in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in § 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver.

8.  PU Code § 5353(h) exempts transportation of persons between home and work locations or of persons having a common work-related trip in a vehicle having a seating capacity of 15 passengers or less, including the driver, which are used for the purpose of ridesharing, as defined in § 522 of the Vehicle Code, when the ridesharing is incidental to another purpose of the driver.

9.  The section also states the exemption does not apply if the primary purpose for the transportation of those persons is to make a profit.  "Profit," as

R.12-12-011  COM/MP1/avs

used in this subdivision does not include the recovery of actual costs incurred in owning and operating a vanpool vehicle, as defined in § 668 of the Vehicle Code.

10.  Current TNCs do not fulfill the rideshare exemption and actually are providing transportation services for compensation.

11.  PU Code § 5352 positions public safety as a key goal in ensuring that the public enjoys full access to the roadways.

## O R D E R

**IT IS ORDERED** that:

1.  Transportation Network Companies shall follow the safety and regulatory requirements as detailed in Section 2.2.4 of this decision.

2.  All reports required by this decision to be submitted by Transportation Network Companies must be verified by the provision of a signature of an officer of the corporation stating under penalty of perjury under the laws of the State of California that the report is accurate and contains no material omissions.

3.  Each Transportation Network Company (TNC) (not the driver) must have a license with this Commission.  There are six types of charter party carrier permits/certificates.  TNCs shall apply for a class P permit.

4.  Each Transportation Network Company (TNC) is required to conduct a criminal background check for each driver prior to that applicant becoming a TNC driver.  The criminal background check must be a national criminal background check including the national sex offender database.  The criminal background check must use the applicant's social security number and not just the applicant's name.  Any felony criminal conviction within seven years prior to the date of the background check for driving under the influence of drugs or alcohol, fraud, use of a motor vehicle to commit a felony, a violent crime or act of

R.12-12-011  COM/MP1/avs

terror, a sexual offense, a crime involving property damage, and/or theft will make the applicant ineligible to be a TNC driver.

5.   We require the Transportation Network Company (TNC) or an authorized third party facility licensed by the California Bureau of Automotive Repair to conduct and ensure that each vehicle passes a 19-point vehicle inspection prior to allowing a vehicle to be driven as part of the TNC's service, and annually thereafter, and for the TNC to maintain the record of such inspections in case of an audit.

6.   We require TNCs to maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services. The insurance coverage shall be available to cover claims regardless of whether a TNC driver maintains insurance adequate to cover any portion of the claim. This insurance requirement shall be disclosed on each TNC's app and website.

7.   Until the Department of Motor Vehicle (DMV) Employer Pull Notice Program is available for use by Transportation Network Companies (TNC), TNCs shall perform, prior to allowing a driver on the platform and quarterly thereafter, driving record checks through the DMV in order to ensure that drivers meet applicable requirements.  The DMV check criteria shall provide that a user may have no more than 3 points within the preceding 3 years, no "major violations" (reckless driving, hit and run, or driving with a suspended license conviction) within the preceding 3 years, and no driving under the influence conviction within the past 7 years.

8.   Drivers for Transportation Network Companies are prohibited from accepting street hails from potential passengers.

R.12-12-011  COM/MP1/avs

9.  This decision orders a second phase to this proceeding to review the Commission's existing regulations over limousines and other charter party carriers in order to ensure that these rules have kept pace with the needs of today's transportation market, and that the public safety rules are up to date.  In addition, the second phase will consider the potential impact of any legislative changes that could affect our ability to regulate the Transportation Network Company industry.

10.  The Commission will convene a workshop one year after the issuance of this decision to hear from all stakeholders on the impacts of this new mode of transportation and accompanying regulations.  Workshops topics will include, but not necessarily be limited to, a consideration of safety, competition, innovation, accessibility, congestion, the California Environmental Quality Act, and other pollution related issues.

11.  Transportation Network Companies must submit a plan within 90 days of the issuance of this decision to the Safety and Enforcement Division to explain how they plan to ensure that this new form of transportation service does not create a divide between the able and disabled communities.

12.  Within 45 days after the effective date of this Decision, the Commission will post a Transportation Network Company Application Packet on its website, and Transportation Network Companies currently operating in California must file their Transportation Network Company Applications with the Safety and Enforcement Division 60 days thereafter if they wish to continue operating.

13.  Uber is required to demonstrate to the Commission within 30 days of the issuance of this decision that it maintains commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing Uber services.

R.12-12-011  COM/MP1/avs

The insurance coverage shall be available to cover claims regardless of whether an Uber driver maintains insurance adequate to cover any portion of the claim.

14.  UberX meets the Transportation Network Company (TNC) definition and must apply for a TNC license.

15.  No Term and Condition in a TNC's Terms of Service or elsewhere, can be inconsistent with this decision.  Nor can any Term and Condition in a TNC's Terms of Service be used or relied on by the TNC to deny insurance coverage, or otherwise evade the insurance requirements established in this decision.

16.  Taxicab Paratransit Association of California's motion to compel discovery is denied without prejudice.

17.  Rulemaking 12-12-011 remains open.

This order is effective today.

Dated September 19, 2013, at San Francisco, California.


MICHAEL R. PEEVEY
President
MICHEL PETER FLORIO
CATHERINE J.K. SANDOVAL
MARK J. FERRON
CARLA J. PETERMAN
Commissioners