# EXHIBIT 1

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  NATIONAL FEDERATION OF THE            Case No. 3:14-cv-04086-NC
    BLIND OF CALIFORNIA, NATIONAL
12  FEDERATION OF THE BLIND,              **MONITOR'S REPORT RE UBER
    MICHAEL KELLY, MICHAEL                TECHNOLOGIES, INC.'S COMPLIANCE
13  HINGSON, and MICHAEL PEDERSEN,        WITH SETTLEMENT AGREEMENT
                                          DURING YEAR ONE**
14              Plaintiffs,
                                          Judge:    Hon. Nathanael M. Cousins
15       v.

16  UBER TECHNOLOGIES, INC.,

17              Defendant.

18
19
20
21
22
23
24
25
26
27
28

Pursuant to the Parties' Settlement Agreement ("Agreement") [ECF 85-1] and the Court's Order appointing me as the neutral Monitor in this case [ECF 156], I submit the following report regarding compliance by Uber Technologies, Inc. ("Uber") with the terms of the Agreement during the first year of the Agreement Term.

## Overview

1. With respect to settlement compliance reporting, the Agreement provides as follows:

> The Parties have agreed that a third-party monitor ("Monitor") will review and analyze the data that Uber reports pursuant to Section 6.B of this Agreement as well as any other information provided to the Monitor by the Parties … The Monitor will report to the Parties within two months after the end of each year during the Agreement Term whether Uber has substantially complied with its obligations under the Agreement during the prior year.

(Agreement ¶ 8.A.) Consistently with the foregoing, I reviewed Uber's quarterly data reports as well as additional reports and information submitted to me by the Parties throughout the first year of the Agreement Term (*i.e.* February 15, 2017–December 31, 2017]). I conferred with counsel for the Parties telephonically on multiple occasions and met with them once in person. The Parties also engaged in numerous independent efforts to address and narrow issues regarding, *inter alia*, Uber's reporting, on-going complaints received by Plaintiffs' Counsel from Settlement Class Members regarding service animal issues, Uber's responses to such complaints, and modifications to the Agreement sought by Plaintiffs' Counsel. To permit the Parties time to prepare and submit additional analysis regarding Uber's settlement compliance and negotiate issues that have arisen regarding the Agreement, it was agreed by all that this report to the Parties would be submitted beyond the two-month deadline set forth in the Agreement.

2. The Agreement has detailed provisions governing data collection and reporting. Pursuant to those provisions, Uber is required to collect and report to Plaintiffs' Counsel certain data related to (a) every trip cancellation for which Uber receives a report that an independent third-party transportation provider ("Driver") refused service to a rider with a service animal because of the service animal and (b) every report of discrimination against a rider with a service animal other than a refusal of service. (Agreement ¶ 6.A-B.)

3. The Agreement requires Uber to investigate rider complaints related to service animals and deactivate the Driver accounts of Drivers who are determined, in Uber's "sole discretion" following its investigation, to have "knowingly refused" service to a rider with a service animal because of the service animal (the "automatic deactivation policy"). (Agreement ¶ 5.A.1, Addendum 2 at § IV.B, Addendum 4 at pp. 1-2.) The Agreement further requires Uber to deactivate a Driver's account when a Driver is the subject of two service animal denial complaints that Uber, in its "sole discretion," deems "plausible" following its investigation (the "two strike policy"). (Agreement ¶ 5.A.4, Addendum 2 at § IV.C, Addendum 4 at p. 2.)

4. The Agreement required Uber to implement a number of enhancements and changes to its business practices, including adopting and publishing a Service Animal Policy (*see* Addendum 4), adding in-app notifications and acknowledgements regarding transporting riders with service animals, sending quarterly emails reminding Drivers of their independent obligation to transport riders with service animals, and creating a special "Report a Service Animal Issue" form both on the website and in the Uber App. (Agreement ¶¶ 4.A, 4.B, 5.B.) Uber has complied with these terms.

5. In addition to reporting whether Uber has substantially complied with the Agreement during the prior year, the Agreement provides that if my analysis of the data "reveals that Uber's practices, policies, and procedures are insufficient to address discrimination because of Service Animals, [I] shall propose to the Parties further modifications to Uber's policies, practices, and procedures." (Agreement ¶ 8.A.) As I believe that the first-year of the Agreement Term was a "getting started" period in which Uber was required to develop and refine critical systems to ensure compliance with the Agreement and train personnel regarding Driver education, data reporting, complaint investigation, the delivery of prompt and appropriate responses to complaints, and other issues arising under or related to the Agreement, I will be more cautious about proposing such modifications in this reporting period than in subsequent reporting periods, if perceived problems persist.

6. This report will primarily address: Uber's efforts to appropriately and timely comply with the requirements of the Agreement regarding data reporting; the investigation of complaints related to service animals and the deactivation of Drivers' accounts; what the data reporting suggests as to the efficacy of the Agreement in abating discrimination against Settlement Class Members who

secure or attempt to secure transportation with their service animals through the Uber app; and the three principal issues that have caused disagreements between the Parties.

### The Quarterly Data Reports

7. Uber created a database that contains certain enumerated categories of data related to every trip nationwide for which Uber receives a report that a Driver refused service to a rider with a service animal because of the service animal. The database also tracks every report of discrimination against a rider with a service animal other than a refusal of service. (Agreement ¶ 6.A (list of required data).)

8. For the first year of the Agreement Term, Uber was required to report the data enumerated in Paragraph 6.A to Plaintiffs' Counsel and me on a quarterly basis. (Agreement ¶ 6.B.1.) Uber produced four quarterly reports (including revised versions of certain reports) during the first year of the Agreement Term. In response to formatting changes requested by Plaintiffs' Counsel and me, Uber agreed to implement a number of changes. In its current form, the data report contains all required categories of data listed in Paragraph 6.A of the Agreement. The format of the report also satisfies the formatting requirements described in Paragraph 6.B.3 of the Agreement.

9. Over the first year of the Agreement Term, Plaintiffs' Counsel identified numerous data errors in Uber's quarterly data reports and raised questions with regard to actions taken by Uber in response to certain complaints. Uber provided explanations, additional data, and/or updated reports on a number of occasions. As should be anticipated with the roll-out of a new, national reporting system, particularly in view of the nature and amount of data to be reported, some errors and issues with the timeliness of reporting were foreseeable, especially in connection with early reporting. As Uber's tracking mechanisms and report-generating team came up to speed over the first year, the level of errors found in the data reports has declined and the timeliness of the reporting has improved.[1] I expect that the error rate will continue to decline in future reports, and Uber's voluntary implementation of an audit process should assist in that regard. None of the data errors amount to

---

[1] For the most part, Uber reported that the errors were caused by data entry issues and/or technical problems, which resulted in reports that contained data that did not accurately represent the actions taken by Uber in response to service animal complaints, but did not reflect a fundamental issue of non-compliance. For example, one report contained entries that indicated Uber applied a "first strike" to several Driver accounts when, in fact, Uber had deactivated the Driver accounts.

1 material non-compliance with the Agreement. Thus, I find that, during the first year of reporting, Uber substantially complied with the data reporting requirements set forth in Paragraph 6.B.1 of the Agreement.

### Uber's Investigation Of Service Animal Denial Complaints

10. The Agreement requires Uber to investigate each service animal denial complaint and to follow up with both the rider and the Driver regarding the results of the investigation. (Agreement ¶ 5, Addendum 2 at § IV.) Specifically, Uber is required to temporarily deactivate the Driver's account during the investigation process, contact the rider and Driver, review other available data/information, determine in its sole discretion what action to take with respect to the Driver's account, and follow up with the rider about the action taken. (*Id.*) Uber is to endeavor in good faith to complete its review of each complaint within one week of the service animal denial complaint submission. (*Id.* at ¶ 5.B.3.)

11. Plaintiffs' Counsel has received reports that indicate lapses on Uber's part with respect to Uber's investigation process, such as failing to contact a witness to the reported incident (which the Addendum 2 at § IV.A.1(d) provides Uber "should" do) or failing to notify the rider about the outcome of the investigation. However, there is no indication that these incidents represent anything other than isolated instances of human error on the part of Uber employees investigating service animal denial complaints.

12. With the caution that, in the future, Uber should diligently endeavor to interview witnesses (if it has not consistently done so in the past) whose names and contact numbers are provided to it, I find that Uber has substantially complied with the investigation procedures required by the Agreement.

### Uber's Response To Service Animal Denial Complaints

13. Pursuant to the Agreement, Uber "shall" deactivate the accounts of Drivers who have "knowingly refused" service to a rider with a service animal because of the service animal (Agreement ¶ 5.A.1) or have been the subject of two "plausible" service animal denial complaints (Agreement ¶ 5.A.4). With respect to Paragraph 5.A.4 *only*, the Agreement states that "Uber will rigorously enforce this contractual provision."

14. During the first year, Uber's quarterly data reports demonstrate that it has taken actions

that conform with the below-referenced key provisions of the Agreement:

    a. Uber is deactivating the Driver accounts of Drivers who are determined by Uber "in its sole discretion" following its investigation to have "knowingly refused" service to a rider with a service animal (Agreement ¶ 5.A.1, Addendum 2 at § IV.B, Addendum 4 at pp. 1-2);

    b. Uber is applying "in its sole discretion" following its investigation a "first strike" to Driver accounts if Uber receives a "first plausible complaint" that a Driver refused service to a rider with a service animal (Agreement ¶ 5.A.4, Addendum 2 at § IV.C);

    c. Uber is deactivating the Driver accounts of Drivers who in "its sole discretion" following its investigation are the subject of two "plausible" service animal denial complaints (Agreement ¶ 5.A.4, Addendum 2 at § IV.B);

    d. Uber is temporarily deactivating Driver accounts during the duration of the investigation process (Addendum 2 at § IV.A);

    e. over time, Uber has increased the speed at which it is completing its review of service animal denial complaints in an effort to consistently meet or exceed the one-week goal set forth in the Agreement (Agreement ¶ 5.B.3); and

    f. if trip cancellation charges or other charges are imposed on a rider who submits a complaint that a Driver denied service due to the presence of a service animal, Uber is reimbursing those charges (Agreement ¶ 5.B.4).

15. Uber's exercise of its "contractually guaranteed discretion" has been the subject of continuing disagreement between the Parties. This disagreement is the first, and perhaps most difficult, of the three issues that remain the subject of on-going dispute.

16. Uber emphasizes that, under the Agreement, it reserved for itself the "sole discretion" to determine whether each reported service animal denial was "knowing," not "knowing" but "plausible," or neither "knowing" nor "plausible." (Addendum 4 at p. 2.) Uber adamantly asserts that it is appropriately applying the Driver account deactivation provisions set forth in the Agreement and that a more rigorous exercise of its discretion to determine that first service animal denial complaints

arise from "knowing refusals" to transport a rider with a service animal because of that service animal is not warranted. Uber highlights the fact that the number of Drivers who have lost access to their Driver accounts due to receiving two plausible service animal denial complaints is extremely low, *i.e.,* less than 1% of the total number of service animal denial complaints reported during the first year of the Agreement Term.

Uber takes the position, which appears to be reasonable, that the lack of repeat offenders strongly suggests Uber's enhanced policies and practices are having a positive effect. Drivers who understand their independent legal obligations and Uber's Service Animal Policy -- whether that understanding is immediate or comes after receiving additional information from Uber in connection with a first service animal denial complaint -- retain the right to access their Driver accounts. According to Uber, this ultimately benefits riders who travel with service animals, because those Drivers who understand and are willing to abide by the law and Uber's Service Animal Policy remain available on the Uber app.

17.  In contrast, Plaintiffs' Counsel believes Uber is applying too many "first-strikes" and should instead -- in accordance with Paragraph 5.A.1 of the Agreement -- be deactivating more Driver accounts for "knowing refusals" of service to Settlement Class Members. During the first reporting year, Plaintiffs' Counsel cited a number of instances in which they vigorously contend Uber should have reached a different result – that is, Uber should have immediately deactivated a Driver's account, rather than recording a "first strike" or "plausible" service animal denial complaint in the Driver's account -- following its investigation into a specific service animal denial complaint.

Indeed, Plaintiffs' Counsel report receipt of 166 service animal denial complaints during the first-year reporting period, for which the riders know the outcome of Uber's investigation, in which the complainant asserts that the Driver "knowingly refused" to transport the him or her and, in some cases, expressly stated that the service animal was the reason for the service denial. Of these 166 complaints, 91 (roughly 55%) did not result in the deactivation of the Driver's Account. Plaintiffs' Counsel assert that their ability, as well as mine, to assess Uber's compliance with the Agreement in acting on these complaints is substantially impaired by Uber's refusal to provide -- with respect to all

complaints, or at least an agreed number of complaints on a sampling basis -- more detail than the Agreement mandates regarding the bases for Uber's action on the complaints. Plaintiffs' Counsel thus seek greater transparency as to "how and why" Uber concludes that certain complaints are "plausible" but not "knowing" or "implausible." To remedy this "black box" scenario, Plaintiffs' Counsel request modification and expansion of the Uber reporting requirements set forth in the Agreement.

Responding to this contention and request, Uber argues that Plaintiffs' Counsel lacks all of the information available to Uber during its investigation process, which Uber is not required to divulge to Plaintiffs' Counsel under the Agreement. Uber maintains that, notwithstanding Plaintiffs' Counsel's frustration regarding this, the provisions that only Uber will participate in the investigation process and only Uber will make the requisite determination at the conclusion of each investigation are "core component[s]" of the Agreement carefully negotiated by the Parties.

18. The circumstances -- as reported by the complaining riders -- of certain of the cases brought to my attention by Plaintiffs' Counsel are troubling and suggest that Uber may not be enforcing the immediate deactivation provision of Paragraph 5.A.1 as rigorously as it is enforcing the "two strikes [and you're out]" provision of Paragraph 5.A.4. Nevertheless, nothing presented to me with respect to the first-year reporting period establishes a widespread, deliberate, or significant misapplication of the Driver account deactivation provisions by Uber. Rather, these disconcerting reports not only appear to have been limited in number, both in terms of absolute numbers and percentages of service animal denial complaints, but also do not establish the existence of a widespread enforcement problem. Moreover, the data reports I have reviewed show that Uber has deactivated hundreds of Driver accounts after receiving one service animal denial complaint. Accordingly, I find that, during the first-year reporting period, Uber has substantially complied with the Driver account deactivation provisions of the Agreement. However, Uber is cautioned that if, in subsequent reporting periods, more than a *de minimus* number of reports persist of seemingly "knowing," if not outrageous, refusals by Drivers to transport Settlement Class Members, this finding will be reconsidered, and modification of the Agreement may be recommended.

**Effectiveness Of The Agreement**

19.   The effectiveness of the Agreement in abating discrimination against Settlement Class Members who secure or attempt to secure transportation with their service animals through the Uber app is the second issue about which the Parties disagreed during the first reporting year. This is a difficult issue to address in view of Uber's legitimate concern with providing unduly broad access to its confidential business information, especially with regard to the number of rides booked through its app, and the Agreement's narrow focus on "the *number* of reported instances where a Driver refused to transport a Rider with a Service Animal during the reporting period." (Agreement ¶ 6.B.1 (emphasis added).)

Plaintiffs' Counsel, focusing simply on the number of complaints, asserts that during the first-year reporting period: "There is no clear indication that reports of discrimination against riders with service animals have decreased. The most recent [first year] data reports actually reflect a 13.2% increase from Q[uarter] 3 to Q[uarter] 4."

Uber contends that such a focus on absolute numbers, without regard to upward trends in ridership, paints a misleading picture that does reflect the effectiveness of the Agreement. Specifically, Uber asserts that, while the data reports show that the raw number of service animal denial complaints fluctuated from quarter to quarter and may not have decreased in number during the first reporting year, these raw numbers fail to practically account for the increase in the total number of trips taken. When viewed in the light of its increased ridership numbers, Uber asserts that the percentage of service animal denial complaints declined in the first year of the Agreement Term.

20.   I am mildly encouraged by Uber's proffer of data to establish that service animal denial complaints, as a percentage of total trips booked through the Uber app, declined. I find, notwithstanding the contrary argument of Plaintiffs' Counsel, that the percentage of denials vis-à-vis total ridership is a critical metric. To demonstrate the asserted decline in service animal denial complaints, Uber produced the below chart, which reflects the declining percentage of total trips that result in a service animal denial complaint. The chart tracks the generally declining rate -- although with periodic and troublingly sharp upward spikes along the way -- of Drivers' refusals to transport service animal incidents from early 2017 into 2018 (*i.e.*, the beginning of the first quarter of the second

year of the Agreement Term). The number of trips booked through the Uber app that result in service animal denial complaints started as less than half of 1% and that percentage figure is generally declining,[2] although not in a steady or dramatic fashion.



21.  With regard to the effectiveness of the Agreement in combating the targeted discrimination, I find that some progress has been made. However, I am deeply concerned about the frequent and persistent spikes in service animal denial complaints that are obvious from the above chart prepared by Uber. In future reporting periods, I hope to see a more consistent and noteworthy decline in the incidence of service animal denial complaints. If this does not occur, it may be necessary to address what further steps can be taken to enhance the effectiveness of the Agreement.

### UberPool Issue

22.  The third issue that has remained in dispute between the parties relates to riders with service dogs who wish to utilize the UberPool service. The Parties have discussed this issue numerous times with each other and with me. Proposed drafts of policy statements have been circulated, but agreement was not reached during the first year of the Agreement Term. This issue will be addressed in greater depth in my second-year Monitor's Report.

### Settlement Modification

23.  With respect to settlement modification, the Agreement provides as follows:

> The Parties have agreed that a third-party monitor ("Monitor") will review and analyze the data that Uber reports pursuant to Section 6.B of this Agreement as well as any

---

[2] Given the highly confidential nature of ridership information, Uber's counsel offered to produce an unredacted version of this chart to Plaintiffs' Counsel, but only pursuant to an "attorneys' eyes only" stipulation, and me. Despite my encouragement, both telephonically and during a meeting with counsel, no agreement as to such a stipulation was reached.

other information provided to the Monitor by the Parties. Beginning twelve months after the Effective Date, if the Monitor's analysis of this data reveals that Uber's practices, policies, and procedures are insufficient to address discrimination because of Service Animals, the Monitor shall propose to the Parties further modifications to Uber's policies, practices, and procedures to improve access to transportation available through the Rider App.

(Agreement ¶ 8.A.)

24. I do not find that, in the first reporting year, Uber's policies and procedures were inadequate to address discrimination by Drivers against riders with service animals because of the service animals. Therefore, I do not recommend any settlement modifications *at this time*, although Uber should carefully consider and act on the cautions and concerns that I have noted above. While the targeted discrimination has not been entirely eliminated (a goal which is not demanded by the Agreement and is not realistic for a variety of reasons), it appears that Uber is working diligently to address discrimination both before and after it occurs and has processes in place to do so, if properly and diligently followed.

Dated: March 21, 2019

_____
Hon. Margaret A. Nagle (Ret.)
Settlement Monitor

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: National Federation of the Blind vs. Uber Technologies, Inc.
Reference No. 1220056090

I, Lulu Santos, not a party to the within action, hereby declare that on March 21, 2019, I served the attached MONITOR'S REPORT RE UBER TECHNOLOGIES, INC.'S COMPLIANCE WITH SETTLEMENT AGREEMENT DURING YEAR ONE on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Michael S. Nunez Esq.
Michael W. Bien Esq.
Ernest Galvan Esq.
Rosen, Bien, Galvan & Grunfeld, LLP
50 Freemont Street
19th Floor
San Francisco, CA   94105
Phone: 415-433-6830
mnunez@rbgg.com
mbien@rbalaw.com
EGalvan@rbgg.com
   Parties Represented:
   Michael Hingson
   Michael Kelly
   Michael Pedersen
   National Federation of the Blind
   National Federation of the Blind of Californ

Timothy R. Elder Esq.
TRE Legal Practice
4226 Castanos St.
Fremont, CA   94536
Phone: 410-415-3493
telder@trelegal.com
   Parties Represented:
   Michael Hingson
   Michael Kelly
   Michael Pedersen
   National Federation of the Blind
   National Federation of the Blind of Californ

John C. Fish Jr. Esq.
Emily O'Connor Esq.
Littler Mendelson
333 Bush St.
34th Floor
San Francisco, CA   94104
Phone: 415-433-1940
jfish@littler.com
EOConnor@littler.com
   Parties Represented:
   Rasier, LLC
   Rasier-CA, LLC
   Uber Technologies, Inc.

Andrew M. Spurchise Esq.
Littler Mendelson
900 Third Ave.
8th Floor
New York, NY   10022
Phone: 212-583-9600
aspurchise@littler.com
   Parties Represented:
   Rasier, LLC
   Rasier-CA, LLC
   Uber Technologies, Inc.

| | |
|---|---|
| Melissa Riess Esq.<br>Stuart J. Seaborn Esq.<br>Disability Rights Advocates<br>2001 Center St.<br>4th Floor<br>Berkeley, CA   94704-1204<br>Phone: 510-665-8644<br>mriess@dralegal.org<br>sseaborn@dralegal.org<br>    Parties Represented:<br>    Michael Hingson<br>    Michael Kelly<br>    Michael Pedersen<br>    National Federation of the Blind<br>    National Federation of the Blind of Californ | Cara Trapani Esq.<br>Rosen, Bien, Galvan & Grunfeld, LLP<br>50 Fremont Street<br>19th Floor<br>San Francisco, CA   94105<br>Phone: 415-433-6830<br>CTrapani@rbgg.com<br>    Parties Represented:<br>    Michael Hingson<br>    Michael Kelly<br>    Michael Pedersen<br>    National Federation of the Blind<br>    National Federation of the Blind of Californ |

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on March 21, 2019.

_____
Lulu Santos
lsantos@jamsadr.com