STUART SEABORN – Cal. Bar No. 198590
MELISSA RIESS – Cal. Bar No. 295959
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone:     (510) 665-8644
Facsimile:     (510) 665-8511
TTY:           (510) 665-8716
Email:         sseaborn@dralegal.org
               mriess@dralegal.org

TIMOTHY ELDER – Cal. Bar No. 277152
TRE LEGAL PRACTICE
4226 Castanos Street
Fremont, California 94536
Telephone:     (410) 415-3493
Facsimile:     (888) 718-0617
Email:         telder@trelegal.com

MICHAEL W. BIEN – Cal. Bar No. 096891
ERNEST GALVAN – Cal. Bar No. 196065
MICHAEL S. NUNEZ – Cal. Bar No. 280535
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:         mbien@rbgg.com
               egalvan@rbgg.com
               mnunez@rbgg.com

Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

NATIONAL FEDERATION OF THE
BLIND, NATIONAL FEDERATION OF
THE BLIND OF CALIFORNIA, MICHAEL
HINGSON, and MICHAEL PEDERSON,

    Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,

    Defendant.

**Case No. 3:14-cv-04086-NC**

**PLAINTIFFS' MOTION FOR
EXTENSION OF THE COURT'S
JURISDICTION AND MODIFICATION
OF POLICIES, PRACTICES, AND
PROCEDURES PURSUANT TO
SECTION 8**

Judge:     Hon. Nathanael Cousins
Date:      July 15, 2020
Time:      1:00 p.m.
Location:  Courtroom 5

[3541039.3]

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         Please take notice that on July 15, 2020 at 1:00 p.m., or as soon thereafter as the matter

3    may be heard by Hon. Magistrate Judge Nathanael Cousins, in the United States District Court,

4    Northern District of California, San Jose Division, Courtroom 5, located at 280 South 1st Street,

5    San Jose, CA 95113, Plaintiffs National Federation of the Blind, Michael Hingson, and Michael

6    Peterson will and hereby move this Court for additional relief for the Class as contemplated by

7    the Parties' Settlement Agreement.

8         As set forth fully in Plaintiffs' memorandum, discrimination by Uber drivers against

9    people who use Uber with their service animals remains pervasive. The court-approved

10   Settlement Agreement agreed to by the Parties in 2016 contemplates that in such a situation, the

11   Parties may negotiate additional relief for the Class, yet Defendant Uber has refused to do so in

12   good faith. In light of the inadequacy of the existing policies and procedures to protect the Class

13   from discrimination, Plaintiffs move this Court for an Order requiring the following relief:

14   1. Extend the Settlement term by 18 months, to January 16, 2022 and extend the Court's
15       jurisdiction thereover.

16   2. Order the Parties to meet and confer in good faith regarding further relief for the Class.

17   3. Require Uber to adopt the following policies and practices to provide additional
18       protections to the Class:

19         a. Improve Driver Education: Translate driver educational materials already required
20             by the Settlement into languages other than English that are commonly spoken by
21             drivers and make those translated documents widely available to Uber drivers;

22         b. Improve Service Animal Policy Enforcement: Provide copies of written training
23             materials used to train Uber's customer support staff concerning identifying and
24             responding to service animal discrimination complaints that warrant immediate
25             driver termination and allow Plaintiffs to observe how Uber trains customer
26             support staff to identify and respond to service animal discrimination complaints
27             that warrant immediate driver termination; provide additional information
28             regarding Uber's investigation of a limited subset of incidents per quarter, as

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

identified by Class Counsel.

4. Produce the data requested by Plaintiffs, outlined in Riess Decl., Exhibit 12, to facilitate an empirical analysis of trends in service-animal-related discrimination on the Uber platform.

This motion is based on this notice; the accompanying memorandum of points and authorities; the concurrently filed declarations of Melissa Riess, Kristopher Nelson, Jack Gleiberman, Valerie Yingling, John Albarran, Jessica Beecham, Bonnie Bomer, Tracy Carcione, Melissa Carney, Kristina Constant, Marianne Denning, James Gump, Leslie Hamric, McClain Hermes, Amanda Hillebran, Jodi Jainchill, Dimitrios Kouniaris, Ronnie Leeth, Briley O'Connor, Erica Rodman, Dishon Spears, Georgie Sydnor, Tina Thomas, Lupin Thurrott, Stephanie Valdez, James Walton, Jodi Witthaus and attached exhibits; the pleadings and records on file with this Court in this action; and any additional argument or evidence that may be requested by the Court. Given the large amount of evidence submitted in connection with this motion, Plaintiffs respectfully request that the Court hold a hearing.

DATED: June 10, 2020                    Respectfully submitted,

                                        DISABILITY RIGHTS ADVOCATES


                                        */s/ Melissa Riess*
                                        Melissa Riess
                                        Attorneys for Plaintiffs

[3541039.3]

1

**TABLE OF CONTENTS**

2   I.     Introduction ................................................................................................................. 1

3   II.    Factual and Procedural Background ............................................................................ 4

4          A.     Service Animal Discrimination Remains Pervasive. ............................................. 4

5          B.     The Settlement contemplates modifications in the event of ongoing
                discrimination, but Uber has refused to engage in this process. ........................... 10

6

7   III.   Argument ................................................................................................................... 14

8          A.     This Court Has Jurisdiction to Enforce the Settlement Agreement
                and Grant Plaintiffs' Motion for Additional Relief ............................................ 14

9          B.     Good cause exists for additional policies and practices. ...................................... 15

10                1.     Improving Driver Education. ................................................................... 16

11                2.     Improving Service Animal Policy Enforcement. ..................................... 19

12                3.     Additional Data. ...................................................................................... 22

13                4.     Extension of the Settlement Term. .......................................................... 25

14   IV.   CONCLUSION .......................................................................................................... 25

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*[3541039.3]*

# TABLE OF AUTHORITIES

**Cases**

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445 (1998) ............................................................................................. 21

*Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251 (2002) ............................................................................................................ 11

*Cranshire Capital, L.P. v. CBTV-Star, LW, Inc.*, 70 F. App'x 434 (9th Cir. 2003) ................................................................................... 15

*Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092 (9th Cir. 2016) ................................................................................................ 4

*Flanagan v. Arnaiz*, 143 F.3d 540 (9th Cir. 1998) ................... 14

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ............................................................................................................ 14

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968) ............................................................................................................ 15

*United States. v. Western Elec. Co., Inc.*, 46 F.3d 1198 (D.C. Cir. 1995) ................................................................................................. 15

**Statutes**

Cal. Civ. Code § 1641 ........................................................................... 21

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## I.    INTRODUCTION

Plaintiffs filed this action in 2014 to challenge widespread discrimination experienced by blind riders with service animals when attempting to use Uber's transportation services. Without reliable, equal, and affordable transportation, blind people with service animals cannot go to school, work, medical appointments, or participate in society on an equal basis with their sighted peers.

In December 2016, the Court approved and the parties entered a groundbreaking nationwide class settlement to achieve "the *mutual* goal… with the *cooperation of both Parties*… [to] enhance Uber's policies, practices, and procedures to ensure that, *to the maximum extent feasible*, Plaintiffs and other blind and visually disabled individuals with service animals receive full and equal access to Uber's services." Settlement Agreement and Release at 4, ECF No. 95-1 ("Settlement") (emphasis added). The class settlement embodies a process-based solution: a base set of policies and practices designed to prevent and redress discrimination, monitoring, and *a framework to negotiate additional relief where the base set of policies and practices are insufficient to comprehensively address discrimination*.

Since the Settlement term began in January 2017, Uber has reported that it has received over 21,000 complaints of service animal-related discrimination. Uber's data shows no material decrease in the number of complaints during the Settlement term. Meanwhile, Class Counsel have received a steady stream of complaints from Class Members of incidents of service animal discrimination. The base set of policies and procedures implemented has not resulted in a material decrease in reports of service animal discrimination.

Plaintiffs raised concerns about the effectiveness of the Settlement early in the Settlement term, and began proposing additional policies and practices which could address the ongoing discrimination, but Uber has continually rejected these proposals, generally refused to engage in meaningful discussions about further policies and practices, and argued, contrary to the Settlement's provisions allowing additional policies and procedures, that the Settlement does not require them to do anything further to address the discrimination. Uber's on-going resistance to adopting any policies or procedures to strengthen protections for the class and ensure that the

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  Settlement is achieving its stated goal of reducing service animal discrimination calls into

2  question its commitment to the parties' supposedly "mutual goal" of providing full and equal

3  access to Uber's service to individuals with service animals.

4      Specifically, Plaintiffs have raised concerns about how Uber communicates the service

5  animal policy to drivers, and whether it does so in a manner which is understandable by Uber's

6  driver population. For example, many drivers have limited proficiency in English. To address

7  this, Plaintiffs proposed that the service animal policy materials for drivers be translated into

8  other languages. Uber has refused to do this. Additionally, Uber has not submitted evidence

9  demonstrating it is in substantial compliance with the enforcement procedures set out in the

10  Settlement; meanwhile, Class Counsel have received numerous reports from Class Members

11  indicating that Uber's customer support representatives are not following the Settlement's

12  procedures. Plaintiffs have asked to review the training materials Uber uses, but Uber has refused

13  to provide these.

14      Additionally, Plaintiffs have requested, numerous times, that Uber provide additional

15  information about certain incidents it has investigated and the rationale for the outcomes it has

16  reached; although Uber has provided information for a few limited incidents, it has refused to

17  incorporate this into the relief provided by the Settlement. Finally, Plaintiffs have significant

18  concerns about the extent to which the data Uber produces under the Settlement reflects the

19  efficacy of the Settlement at decreasing the amount of discrimination against riders with service

20  animals. Uber reports the number of complaints it receives of service animal discrimination and

21  uses this as a proxy for the total amount of discrimination. However, this data relies on self-

22  reporting by Class Members, and Plaintiffs have gathered significant evidence that Class

23  Members substantially under-report incidents of discrimination to Uber because the reporting

24  process is burdensome, or simply use Uber less often.

25      Plaintiffs have identified data that Uber possesses which would be able to measure the

26  effectiveness of the existing policies in the Settlement and help the parties identify additional

27  modifications needed to effectively reduce service animal discrimination. With input from a

28  statistician, Plaintiffs proposed a modified data reporting plan that would achieve that purpose.

[3541039.3]

1   Uber rejected this plan.

2       Uber's constant refrain in response to Plaintiffs' concerns that the Settlement is not

3   working has been that the Settlement does not require it to adopt further policies and practices.

4   Uber has not disputed its ability to implement at least some of these policies and practices but

5   has asserted that it is unwilling to do so in part because it contends that the Settlement is

6   reducing service animal discrimination. *See, e.g.*, Declaration of Melissa Riess ("Riess Decl."),

7   Exhibit 8, Uber's Year 2 Compliance Statement (Oct. 7, 2019) at 5-11; *id.*, Ex. 13, Uber's May

8   24, 2019 Letter at 1-3; *id.*, Ex. 19, Uber's Compliance Statement (Mar. 9, 2018) at 10-17.

9       The parties are at an impasse, both as to the specific modifications requested by

10  Plaintiffs, and as to the settlement modification process anticipated in the Settlement. Plaintiffs

11  therefore move this Court for the following relief:

12    1. Extend the Settlement term by 18 months, to January 16, 2022 and extend this Court's

13       jurisdiction thereover.

14    2. Order the Parties to meet and confer in good faith regarding further relief for the Class.

15    3. Require Uber to adopt the following policies and practices to provide additional

16       protections to the Class:

17        a. Improve Driver Education: Translate driver educational materials already required

18           by the Settlement into languages other than English that are commonly spoken by

19           drivers and make those translated documents widely available to Uber drivers;

20        b. Improve Service Animal Policy Enforcement: Provide copies of written training

21           materials used to train Uber's customer support staff concerning identifying and

22           responding to service animal discrimination complaints that warrant immediate

23           driver termination and allow Plaintiffs to observe how Uber trains customer

24           support staff to identify and respond to service animal discrimination complaints

25           that warrant immediate driver termination; provide additional information

26           regarding Uber's investigation of a limited subset of incidents per quarter, as

27           identified by Class Counsel.

28    4. Produce the data requested by Plaintiffs, outlined in Riess Decl., Exhibit 12, to facilitate

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

an empirical analysis of trends in service-animal-related discrimination on the Uber platform.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Service Animal Discrimination Remains Pervasive.

Uber riders continue to face pervasive discrimination by drivers relating to their service animals. The National Federation of the Blind (NFB) has conducted a testing program through which Uber riders with service animals can report both successful, discrimination-free rides, and incidents of discrimination.

The NFB data show that the rate of discrimination has not improved since the testing began. During the first two months of the NFB testing program—May and June of 2017—nearly one in ten Uber trip requests from a rider with a service animal resulted in a discriminatory service denial. During the second and third years of the Settlement's term discriminatory service denials were more frequent, increasing to an all-time high of 17.4% (or more than one in six) of reported trips resulting in a discriminatory service denial during the last quarter of 2019. A summary chart of NFB testing reports and a line graph depicting the quarterly cancellation rate found through NFB testing over time are provided below. *See* Declaration of Jack Gleiberman.

**NFB Tests, Reported Cancellations, And Cancellation Rates By Quarter[1]**

| Time period | Number of reported service denials | Total number of reports | Percentage of trip requests resulting in service denials |
|---|---|---|---|
| May 8, 2017 – Jun. 31, 2017 | 34 | 351 | 9.7% |

---

[1] This Court denied Uber's application to file under seal tabulations of service animal discrimination data it had designated "confidential" under the Protective Order in this action (ECF 63). *See* Order Denying Defendants' Administrative Motion To Seal, ECF 196. The Court noted, "the mere fact that the exhibits were derived from reports that may contain customer or employee information or trade secrets does not constitute good cause to seal when the exhibits themselves do not [contain] that information." ECF 196 at 3. Plaintiffs here produce tabulations of NFB test results and updated versions of the charts considered by the Court in its Order on the basis that none of these charts reveals trade secrets or confidential personal information of the type covered by the Protective Order. Further, whereas the Court found that this information was only tangentially related to the substance of Plaintiffs' Fee Motion and thus applied the lower "good cause" standard when it denied Defendant's Motion to Seal, here the information is directly related to the substance of Plaintiffs' instant motion. Thus, there must be a "compelling reason" for sealing these documents. ECF 196 at 1-2, *citing Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101–02 (9th Cir. 2016).

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

| Time period | Number of reported service denials | Total number of reports | Percentage of trip requests resulting in service denials |
|---|---|---|---|
| Jul. 1, 2017 – Sep. 30, 2017 | 27 | 365 | 7.4% |
| Oct. 1, 2017 – Dec. 31, 2017 | 47 | 378 | 12.4% |
| Jan. 1, 2018 – Mar. 31, 2018 | 29 | 279 | 10.4% |
| Apr. 1, 2018 – Jun. 31, 2018 | 66 | 472 | 14.0% |
| Jul. 1, 2018 – Sep. 30, 2018 | 50 | 333 | 15.0% |
| Oct. 1, 2018 – Dec. 31, 2018 | 64 | 417 | 15.4% |
| Jan. 1, 2019 – Mar. 31, 2019 | 36 | 235 | 15.3% |
| Apr. 1, 2019 – Jun. 31, 2019 | 43 | 305 | 14.1% |
| Jul. 1, 2019 – Sep. 30, 2019 | 41 | 324 | 12.7% |
| Oct. 1, 2019 – Dec. 31, 2019 | 51 | 293 | 17.4% |

The cancellation rate is a key measure of access for the class because it shows the likelihood that a class member with a service animal will experience a ride denial after requesting a trip. As the graph below shows, the cancellation rate identified through NFB testing has been consistently higher starting with the second quarter of 2018 through the end of 2019 than it was in 2017, the first year of the Settlement's term.



[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Comparing NFB data for the same period across years also shows that the rate of discriminatory denials increased during three out of four quarters for 2019 compared with previous years.

**Percentage change in Service Denial Reports from NFB Data**

| Time period | 2017 | 2018 | 2019 |
|---|---|---|---|
| Jan. 1 – Mar. 30 | Not available.[2] | 10.4% | 15.3% (increase) |
| Apr. 1 – Jun. 30 | 9.7% | 14% | 14.1% (increase) |
| Jul. 1 – Sep. 30 | 7.4% | 15% | 12.7% (decrease) |
| Oct. 1 – Dec. 31 | 12.4% | 15.4% | 17.4% (increase) |

Uber has also produced data, as required by the Settlement, about the number of reports of discrimination it has received during the Settlement Term. Uber itself reports that it receives an average of between 400 and 600 reports of discrimination per month. Since Uber began reporting service animal discrimination complaints in February 2017, it has reported receiving over 21,000 reports of incidents of discrimination, over 16,000 of which involved denial of service.

**Q1-Q12: Service Denial Reports and Outcomes[3]**

| | Service Denial Reports | Avg. Service Denial Reports per Day | % Reports Resulting in Driver Deactivation (Total No.) | % Reports Resulting in First Strikes (Total No.) | % Reports Deemed Implausible (Total No.) | Number of Unresponsive Drivers | Number of Drivers Receiving a Second Service Denial Complaint |
|---|---|---|---|---|---|---|---|
| **Totals** | 16,754 | 15.97 | 25.36% (4,248) | 58.86% (9,862) | 15.42% (2,583) | 61 | 179 |

[2] The NFB testing program began in May 2017.

[3] These charts are based on Uber's quarterly data reports, which it provides pursuant to Section 6.B of the Settlement. These data reports show, for each trip cancellation for which Uber receives a service animal ride denial complaint, the date, location, and anonymized driver and rider information, along with whether Uber responded to the complaint by giving the driver a "strike," terminating the driver, or doing nothing. See Settlement Section 6.A. Class Counsel produced an analysis of this data each quarter and submitted it to Uber and the Monitor.

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Q1** | 824 | 18.73 | 24.64% (203) | 75.24% (620) | 0.12% (1) | 0 | 2 |
| **Q2** | 1,639 | 18.01 | 42.64% (699) | 57.35% (940) | 0% (0) | 0 | 10 |
| **Q3** | 1,391 | 15.12 | 32.64% (454) | 43.71% (608) | 23.65% (329) | 0 | 14 |
| **Q4** | 1,575 | 17.12 | 23.37% (368) | 60.19% (948) | 16.44% (259) | 0 | 20 |
| **Q5** | 1,321 | 14.68 | 24.22% (320) | 63.89% (844) | 11.20% (148) | 9 | 2 |
| **Q6** | 1,492 | 16.40 | 22.32% (333) | 62.01% (926) | 15.35% (229) | 4 | 3 |
| **Q7** | 1,530 | 16.63 | 20.33% (311) | 61.31% (938) | 17.84% (273) | 8 | 8 |
| **Q8** | 1,523 | 16.55 | 22.72% (346) | 57.72% (879) | 19.11% (291) | 7 | 19 |
| **Q9** | 1,290 | 14.33 | 20.85% (269) | 53.26% (687) | 25.27% (326) | 8 | 25 |
| **Q10** | 1,431 | 15.73 | 23.90% (342) | 56.74% (812) | 18.94% (271) | 6 | 19 |
| **Q11** | 1,295 | 14.08 | 22.32% (289) | 60.08% (778) | 16.83% (218) | 10 | 19 |
| **Q12** | 1,443 | 15.68 | 21.76% (314) | 61.12% (882) | 16.49% (238) | 9 | 38 |

**Average Service Denial Reports per Day**



[3541039.3]

*NFB, et al. v. Uber Techs. Inc.*, Case No. 3:14-cv-04086-NC
**Plaintiffs' Motion for Extension of the Court's Jurisdiction and Modifications of Policies**   7

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Uber's complaint data reports show a small decline in the number of total discrimination reports that Uber received in 2019 compared against prior years. The number of service denial complaints that Uber reported receiving in 2019 is 6.9% lower than the 5,866 complaints that it reported receiving in 2018. For 2017, Uber reported service denial complaints that it received only from February 16, 2017 up through and including December 31, 2017, not for the entire calendar year of 2017. Comparing complaints reported during the same period in 2019, 2018, and 2017 shows an 11.3% reduction in the number of service denial complaints that it received from February 16, through December 31, 2019 (4,825 complaints) compared against the same period in 2017 (5,429 complaints).

Comparing complaints from the same quarter across years reveals that the number of complaints only decreased by small amounts from 2017 through 2019 for the three quarters for which complete data is available.

**Percentage Change by Quarter in Service Denial Complaints, 2017-2019**

| Quarter | 2017 | 2018 | 2019 |
| --- | --- | --- | --- |
| Q1 (Jan. 1 – Mar. 30) | 824 | 1,321 | 1,290 (2.3% decrease from 2018)[4] |
| Q2 (Apr. 1 – Jun. 30) | 1,639 | 1,492 | 1,431 (12.7% decrease from 2017) |
| Q3 (Jul. 1 – Sep. 30) | 1,391 | 1,530 | 1,295 (6.9% decrease from 2017) |
| Q4 (Oct. 1 – Dec. 30) | 1,575 | 1,523 | 1,444 (8.3% decrease from 2017) |

The small decrease in the number of complaints that Uber reported receiving annually does not prove that service-animal-related discrimination on the Uber platform has actually decreased. Plaintiffs submit with this motion substantial evidence—declarations from twenty-one class members—showing that many class members have not reported all service-animal-related service denials to Uber during the Settlement's term and that, during the Settlement's term, other class members take fewer Uber trips with their service animals in response to ongoing service animal discrimination.[5] The process of reporting service animal discrimination is time

---

[4] Because Uber reported the complaints that it received only for half of the first quarter of 2017, comparing complaints from Q1 2019 and Q1 2017 would be inappropriate.

[5] *See* Declaration of Dimitrios Kouniaris ¶ 6; Declaration of Amanda Hillebran ¶ 6; Declaration of Jodi Jainchill ¶¶ 2, 5; Declaration of James Walton ¶ 2; Declaration of Tina Thomas ¶ 4;

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   consuming and burdensome. For example, Class Member Erica Rodman noted that "reporting

2   these incidents to Uber is time consuming and cumbersome. Whenever I take an Uber, I am

3   forced to be hyper-vigilant. I always have to meticulously document my encounter with the

4   driver, including capturing and saving screenshots on my phone, in case the driver eventually

5   refuses to transport me and I must provide evidence of the denial to Uber." Rodman Decl. ¶ 10.

6   This evidence demonstrates that small changes in the number of complaints that Uber

7   receives are not a reliable measure of changes in the level of service-animal-related

8   discrimination on the Uber platform. Uber has offered no evidence demonstrating that small

9   changes in total complaints that it receives reflect changes in the level of service-animal-related

10  discrimination committed by drivers as opposed to some other factor. As such, the 11.3%

11  decrease in service denial complaints from 2017 to 2019 may reflect "complaint fatigue" by

12  riders, a reduction or change in usage of Uber by riders with service animals, a small decrease in

13  the rate of discriminatory service denials, some combination of these factors, or something else.

14  Additionally, throughout the Settlement term, Class Counsel have received a steady

15  stream of complaints from class members who report experiencing these discriminatory ride

16  denials. Class members report missing college exams, being made late to job interviews, losing

17  medical treatment, missing airline flights, and being harmed in very substantial ways as a result

18  of ongoing service denial discrimination. In support of this motion, Plaintiffs submit declarations

19  of 35 Class Members detailing a total of 80 incidents of service animal discrimination, including

20  68 ride denials. Riess Decl. ¶ 26.[6] These declarations, which are a small sample of the nearly 500

21  individual complaints Class Counsel have received from Class Members reporting discrimination

22  since the beginning of the Settlement term, illustrate both the extent of the problem and the toll

23  this ongoing discrimination takes on individual Class Members. *See* Riess Decl. ¶ 3. The

24  _____

25  Declaration of Jodi Witthaus ¶¶ 8-9; Declaration of Dishon Spears ¶¶ 8-9; Declaration of Erica Rodman ¶ 9; Declaration of McClain Hermes ¶¶ 6, 9; Declaration of Stephanie Valdez ¶ 8;

26  Declaration of Melissa Carney ¶¶ 6-9; Declaration of Kristina Constant ¶¶ 7; Declaration of Ronnie Leeth ¶¶ 7, 10; Declaration of Georgie Sydnor ¶7; Declaration of John Albarran ¶ 8;

27  Declaration of Jessica Beecham ¶¶ 7-8; Declaration of Bonnie Bomer ¶ 8.

28  [6] Plaintiffs submit declarations of 23 Class Members in support of their motion, along with the declarations of twelve other Class Members which were previously submitted to the Monitor. See Riess Decl. ¶¶ 25-26; Ex. 20.

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   declarants estimate that they are denied a ride because of their service animal an average of 36

2   percent of the time when they use Uber. Riess Decl. ¶ 4. These estimates do not include "drive

3   by" incidents where the driver simply drove by the declarant without stopping and then cancelled

4   the ride, so the declarant could not confirm that the driver was denying them a ride based on their

5   service animal.

6       **B.       The Settlement contemplates modifications in the event of ongoing
                    discrimination, but Uber has refused to engage in this process.**

7

8           Given the novelty of Uber's ridesharing service and the complexity of the problem the

    Parties sought to address, the Parties contemplated that the Settlement's base set of policies and

9

    procedures might need to be adjusted to provide relief to the Class. They included a unique

10
    provision creating a process for modifying the initial base set of policies and procedures. Section

11
    8 of the Settlement provides that

12

13              "relevant issues may arise during the term of this Agreement that were not anticipated
                when this Agreement was executed, and that data that Uber provides to Plaintiffs'
14              Counsel pursuant to Section 6 of this Agreement may show that the policies, practices,
                and procedures adopted by this Agreement have unintended consequences or are
15              insufficient to comprehensively address discrimination because of Service Animals."

16          Settlement Agreement § 8.A. The Parties agreed that "if there is good cause to believe

17   there is need for further modifications to Uber's policies and practices," they would meet and

18   confer to negotiate such modifications "to more effectively address alleged Driver discrimination

19   against Riders with Service Animals." Settlement Agreement § 8.B. In their Joint Motion for

20   Preliminary Approval, the Parties noted that they had included this provision "to provide the

21   flexibility to further enhance the injunctive relief if monitoring reveals it necessary, and to

22   address unintended consequences of the relief or unforeseen service animal access issues that

23   arise during the Agreement's term. . . ." Joint Mot. for Prelim. Approval at 18 (Apr. 29, 2016),

24   ECF No. 84.

25          Section 8 requires the parties to meet and confer regarding proposed modifications to the

26   base set of policies and procedures, and, if the parties are unable to reach agreement concerning

27   additional measures, they may resolve the dispute through the dispute resolution process set out

28   in Section 10, which culminates in review of the dispute by this Court.. Section 10 provides a

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    three-step dispute resolution process. Settlement Agreement § 10.A. "Step One" of the dispute

2    resolution process requires Plaintiffs' Counsel to meet and confer with Uber's Counsel in a good

3    faith effort to resolve any dispute. *Id.* If Step One fails, "Step Two" requires the Parties to

4    attempt to resolve the dispute before a JAMS mediator. *Id.* Finally, if Step One and Step Two fail

5    to result in the resolution of the dispute, then the Parties "shall submit the dispute for binding

6    resolution by the Federal District Court for the Northern District of California under the Court's

7    continuing jurisdiction over this case." *Id.*

8         This framework is a court-enforceable agreement to negotiate. *See Copeland v. Baskin*

9    *Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1253, 12 (2002) (contract with provision to negotiate

10   further "can be formed and breached just like any other contract" and "when the parties are under

11   a contractual compulsion to negotiate … the covenant of good faith and fair dealing attach[es], as

12   it does in every contract.").

13        Plaintiffs noted apparent problems in the enforcement of the Settlement early on, and

14   proposed modifications to Uber's policies and practices, specifically that Uber provide additional

15   transparency and training for its customer service representatives regarding enforcement of and

16   implementation of the service animal policy, as well as measures that would provide greater

17   transparency to the class regarding Uber's investigation of service animal complaints and its

18   determinations regarding discriminatory drivers. The parties completed the steps laid out in the

19   dispute resolution process as to these modifications and ultimately attended a mediation at JAMS

20   before Judge Jamie Jacobs-May on October 16, 2017. Uber refused to implement the proposals

21   regarding transparency and driver training. Although it indicated that it was open to further data

22   sharing, Uber ultimately did not agree to that additional relief.[7]

23        When the first complete year of data from Uber indicated that there had been no

24   meaningful decline in the number of service animal-related discrimination complaints during the

25   Settlement Term's first year, Plaintiffs submitted a series of proposals to Uber and the third party

26

27   ───────────────────────────

28   [7] As discussed below in section A.2, Uber has provided additional information regarding several
     incidents on an ad hoc basis. This information, while helpful, does not address Plaintiffs'
     concerns regarding compliance.

     [3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    monitor, Judge Margaret Nagle, to address the ongoing discrimination. At that point, and

2    throughout the Settlement term, Plaintiffs suggested a variety of changes to address the problem,

3    including translating materials into other languages, communicating the service animal policy to

4    drivers using different methods, providing incentives to drivers to transport riders with service

5    animals, rather than punishing them for discriminating, sharing more detailed information about

6    certain individual service animal complaints, addressing issues with UberPool[8], and streamlining

7    the complaint submission and investigation process. *See, e.g.*, Riess Decl., Ex 2, Plaintiffs'

8    Statement Regarding Compliance (February 27, 2018); Riess Decl., Ex. 10, Plaintiffs' April 16,

9    2018 Letter; Riess Decl., Ex. 3, Plaintiffs' Proposed Report And Recommendations Of Monitor

10   (June 7, 2018); Riess Decl., Ex. 5, Plaintiffs' Year Two Compliance Statement (Oct. 2, 2019).

11          Throughout this process, Uber has consistently rejected these proposals, arguing that it is

12   complying with the Settlement terms and that, Section 8 notwithstanding, "it discourages

13   settlements when they do not bring finality," so it need not do anything further to address service

14   animal discrimination. Riess Decl., Exhibit 17, Uber's October 9, 2019 Letter, at 2. Additionally,

15   Uber claims that additional relief is unnecessary because the Settlement is improving access.

16   Uber asserts that access has improved during the Settlement's term because the number of

17   reported discriminatory service denials has not grown as quickly as the total number of trips that

18   it provides to all of its riders, most of whom do not travel with service animals. *See* Riess Decl.,

19   Ex. 11, Uber's June 7, 2018 Letter. However, comparing service denial complaints against total

20   rides is not a valid measure of whether service animal discrimination has decreased because it

21   assumes, without proof, that the number of trips taken by riders with service animals has grown

22   at the same rate as Uber's overall trip volume and that riders consistently report discrimination.

23   *See* Riess Decl., Exhibit 5, Plaintiffs' Proposed Year Two Monitor's Report (Oct. 2, 2019); Riess

24

25   ───────────────
     [8] Class Members reported that they were being asked to request and pay for two seats when
26   using Uber's shared service, UberPool, when riding with their service animal. Class Counsel
     raised this issue with Uber in January 2018. See Riess Decl., Ex. 9. In May 2019, Uber stated
27   that it would adopt a policy of providing 40% refunds to riders with service animals who had had
     to pay for two seats and provide a mechanism for requesting a refund. Riess Decl., Ex. 13 at 4.
28   Uber has not provided information about whether they have issued refunds, nor has it agreed to
     provide information clarifying that riders are not required to ask for two seats. Riess Decl., ¶ 6.

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  Decl., Ex. 6, Schwarz Decl. at ¶¶ 19-22. Furthermore, Uber has refused to provide data to

2  support its assertion.[9]

3          Plaintiffs submitted their request for additional data to Uber on April 19, 2019. Riess

4  Decl., Ex. 12, Plaintiffs' April 19, 2019 Letter. Uber rejected Plaintiffs' proposal in a letter dated

5  May 24, 2019. Riess Decl., Exhibit 13, Uber's May 24, 2019 Letter at 1. The parties met and

6  conferred on October 3, 2019 and were unable to reach agreement regarding Plaintiffs' data

7  sharing proposal.[10] Plaintiffs then initiated Step One of the dispute resolution process by sending

8  a letter to Uber on October 4, 2019, in which Plaintiffs requested to meet and confer to discuss

9  Plaintiffs' concerns regarding the shortfalls of the base set of policies and procedures, and the

10  necessary modifications. Riess Decl., Exhibit 16, Plaintiffs' October 4, 2019 Letter. The parties

11  continued to meet and confer, both telephonically and in writing. See Riess Decl., Exhibit 17,

12  Uber's October 9, 2019 Letter, Exhibit 18, Plaintiffs October 29, 2019 Letter. Additionally,

13  starting in May 2019, the Parties discussed Plaintiffs' proposed data sharing modification on

14  multiple calls with the Monitor. At every turn, Uber failed to acknowledge the continued

15  discrimination against riders with service animals outlined in Argument Section II.A above, and

16  they refused to turn over additional data necessary in negotiating measures that would effectively

17  address such discrimination.

18          Because meeting and conferring with Uber failed to resolve Plaintiffs' dispute, the Parties

19  brought the dispute before a JAMS mediator in accordance with Step Two of the dispute

20  resolution process. On December 17, 2019, the Parties met with Judge Rebecca Westerfield of

21  JAMS to discuss the dispute, but the mediation was unsuccessful.

22

23  [9] Uber has refused to produce data that supports its assertions regarding the growth of its
24  ridership during the Settlement term, even at the request of the Monitor. Uber insists that
    Plaintiffs agree to a protective order restricting Plaintiffs' ability to use the data which go far
25  beyond the protective order already in place here, ECF 63, which is based on the standard
    protective order used in the Northern District of California. The Plaintiffs did agree to a more
26  restrictive protective order in November of 2019, but as of May 2020, Uber still had not provided
    the data, even after the Monitor indicated that she would not issue her report on Uber's
27  compliance in Year 2 without the data. Riess Decl. ¶ 5.

28  [10] Uber disputed that the plaintiffs had properly raised the data sharing proposal through Section
    8 of the Settlement and claimed that they were first notified of the proposed policy and procedure
    modification on August 2, 2019. Riess Decl., Ex. 15, Uber's August 21, 2019 Letter.

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Since the JAMS mediation, and throughout the entire dispute resolution process, Uber

2    has refused to provide Plaintiffs any of the data they request under Section 8 of the Settlement

3    Agreement. Because neither Step One nor Step Two resulted in the resolution of this dispute,

4    Plaintiffs' only recourse is to bring this motion before the Court under Step Three of the dispute

5    resolution process outlined in Section 10 of the Settlement Agreement.

6    The Settlement provides another avenue for seeking modifications to the policies and

7    practices. The Settlement provides for the appointment of a third-party Monitor, who is to review

8    and analyze the information submitted to her by the parties regarding the Settlement. The

9    Monitor is to "report to the Parties within two months after the end of each year during the

10   Agreement Term whether Uber has substantially complied with its obligations under the

11   Agreement during the prior year." Settlement at 19, ECF No. 95-1. Plaintiffs have submitted

12   proposed modifications to existing policies and practices in annual reports to the Monitor to

13   address the on-going discrimination evidenced in their analysis of the quarterly data reports Uber

14   produces. The Monitor noted in her Report covering the first year of the Settlement (2017),

15   which she issued in March of 2019, that she considered the first year of the three-and-a-half year

16   settlement term a "'getting started' period" and did not propose any modifications to the

17   Settlement. Riess Decl., Ex. 4 at 2. The Monitor has not issued her reports on year 2 (2018) and

18   year 3 (2019) of the Settlement and has not committed to issue either of those reports by a date

19   certain.

20   **III.   ARGUMENT**

21   **A.   This Court Has Jurisdiction to Enforce the Settlement Agreement and Grant Plaintiffs' Motion for Additional Relief**

22   The Supreme Court has made clear that the Court may enforce a settlement agreement

23   following a dismissal of the action if the district judge expressly in the dismissal order, retains

24   jurisdiction over the settlement agreement. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

25   375, 378 (1994); *see also Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

26   The Court expressly retained jurisdiction to enforce the Settlement Agreement "for the

27   duration of the settlement agreement" under *Kokkonen*. Judgement at 1 (Dec. 15, 2016), ECF

28

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   No. 145. Because the Court has made its intent to retain jurisdiction over the Agreement explicit

2   in its dismissal order, there is no question that the Court has the power to enforce the Settlement

3   Agreement and each of its terms.

4        The parties also agreed that the Court had the "jurisdiction to fully resolve" disputes over

5   whether Uber should implement additional relief proposed by Plaintiffs. Settlement Agreement

6   §§ 8(b) (process for Plaintiffs to propose additional relief); 8(d)); 10 ("[a]"ll disputes concerning.

7   . . modifications to Uber's policies and procedures pursuant to Section 8 of this Agreement. . .

8   shall be resolved through a three-step process" that concludes with "submit[ing] the dispute for

9   binding resolution by the Federal District Court for the Northern District of California[.]"). The

10   class has already received notice of, and been given an opportunity to object to all parts of the

11   Settlement, including the process for negotiating and securing additional relief through Section 8.

12   Class Notice, ECF 115-1.

13        In response to a motion, courts enjoy wide discretion to modify court-approved

14   settlements necessary to "accomplish [their] intended result." *United States. v. Western Elec.*

15   *Co., Inc.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995); *see also United States v. United Shoe Machinery*

16   *Corp.*, 391 U.S. 244, 252 (1968) (reversing District Court's refusal to modify consent decree

17   under anti-trust laws pursuant to changed circumstances).

18        The Settlement Agreement's term currently ends on July 16, 2020. If the Court

19   communicates to the parties that it has determined that granting Plaintiffs' requested relief is

20   appropriate by that date—even if its judgement comes later—that judgement will stand.

21   *Cranshire Capital, L.P. v. CBTV-Star, LW, Inc.*, 70 F. App'x 434, 436 (9th Cir. 2003).

22       **B.**   **Good cause exists for additional policies and practices.**

23        Under Section 8 of the Settlement Agreement, the Parties agreed that if Plaintiffs have

24   good cause to believe that the base set of policies and procedures fails to comprehensively

25   address discrimination against riders with service animals, then the Parties are to negotiate

26   further modifications to Uber's policies, practices, and procedures and/or further modifications

27   to the measures adopted in the Agreement. This unique framework, not found in most Settlement

28   Agreements, demonstrates a recognition of the novelty of the enumerated remedies and the need

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    that such remedies be revisited if discrimination persisted. It also provides the Parties with a

2    relatively straightforward mechanism by which to modify the Settlement Agreement in such a

3    situation without having to reopen litigation.

4         Plaintiffs have demonstrated good cause to doubt the effectiveness of the base set of

5    policies and procedures, as contemplated by Section 8, because all available evidence shows that

6    service-animal-related discrimination remains pervasive. The thousands of reports of service

7    animal discrimination Uber receives every quarter demonstrate that further policies and practices

8    are necessary to reduce discrimination. The data collected by NFB and the anecdotal experiences

9    of class member declarants corroborate this need for change.

10        Further, Plaintiffs have used the dispute resolution mechanisms of the Settlement to

11   propose specific additional policies and practices. Throughout the Settlement term, Plaintiffs

12   have identified policies which could address both how the policies are communicated to Uber's

13   drivers, as well as how Uber approaches the existing policies and practices. Additionally,

14   Plaintiffs have proposed further data sharing, which would give the parties more information

15   about the severity of the ineffectiveness of the existing policies at reducing discrimination and

16   the magnitude of further changes that might be required. Notably, even after having exchanged

17   dozens of letters and hours of telephone and in-person conferences and mediations, Uber has not

18   agreed to incorporate any further relief for the class into the Settlement.

19        Plaintiffs therefore respectfully request that this Court extend its jurisdiction over the

20   Settlement Agreement, along with the Settlement Term, and order the parties to settlement

21   discussions regarding further relief for the class in order to effectuate the purpose of the

22   Settlement Agreement of reducing service animal discrimination.

23        Additionally, Plaintiffs request the following additional policies and procedures which

24   are justified by the present evidence of ongoing discrimination in the NFB testing data, Uber's

25   data of self-reporting complaints and the voluminous anecdotal declarations of class members:

26        1.   Improving Driver Education.

27        Class Members have reported that some drivers appear not to understand the Service

28   Animal Policy based in part on language barriers. *See, e.g.*, Declaration of Briley O'Connor ¶ 8

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    ("I believed that limited English proficiency was at play because the drivers repeated the same

2    things over and over again, did not respond to what I was saying, and could not verbally explain

3    why they were denying me."); Spears Decl. ¶ 5 ("The driver kept insisting that he could not let

4    me in his car, saying, "No dog!" over and over again . . . I believe the driver's limited English

5    proficiency contributed to his not being aware of what a service animal is and Uber's service

6    animal policies.") Class Members report that often, once they explain the service animal policy

7    to the driver, the driver is willing to transport them, further underscoring that driver

8    comprehension of the policy is an issue. Rodman Decl. ¶ 8 ("Oftentimes, when I educate drivers

9    with limited English proficiency on the difference between pets and service animals, I am able to

10   convince drivers to provide me service. This suggests to me that Uber does not sufficiently

11   educate drivers with limited English proficiency about the differences between service animals

12   and pets, particularly regarding the differences between how service animals and pets behave in

13   public."); *see also* Albarran Decl. ¶ 7; Carney Decl. ¶ 5; Constant Decl. ¶ 6; Valdez Decl. ¶ 7;

14   Thurrott Decl. ¶¶ 4-5.

15         To address this problem, Plaintiffs requested that Uber translate its service animal policy

16   materials for drivers into languages other than English to ensure that its drivers understand the

17   policy. See Riess Decl., Ex. 5 at 19. Providing the material in different formats could also help

18   drivers who are not culturally familiar with service animals could improve driver compliance

19   with the service animal policy. Examples include videos, adding a paper Q&A pamphlet

20   regarding service animals and Uber's service animal policy to the mailing packet containing

21   Uber's trade dress stickers, providing a brief notice stating that "Uber accepts service animals"

22   with a URL and QR code to the service animal policy to be adhered next to the trade dress

23   sticker, and pushing pop-ups in the driver app reminding drivers more frequently about the

24   service animal policy. *See, e.g.*, Riess Decl., Ex. 9, Plaintiffs' January 29, 2018 Letter at 10-11;

25   id., Ex. 10, Plaintiffs' April 16, 2018 Letter, at 6-9. Uber has refused to take any of these steps.

26         Uber objects to translating these driver materials. Uber does not contend that translating

27   driver materials is infeasible. Instead, Uber objects to this relief because it contends that: (1)

28   drivers who are not proficient in English remain responsible for understanding Uber's driver

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   agreements and policies, (2) the benefit from translating driver materials is "entirely

2   speculative," and (3) translating materials will entail unspecified "practical challenges." Riess

3   Decl., Ex. 8, Uber's Year Two Compliance Statement, at 10-11. These objections lack merit.

4        First, for years, Uber has tried the strategy of placing the onus on drivers to understand

5   Uber's service animal policy. As Plaintiffs' evidence demonstrates, service denials resulting

6   from language barriers persist under this approach. The relevant question within the Settlement's

7   modification framework is a practical one–whether translating driver materials concerning

8   service animals would improve access for the class by improving drivers' understanding

9   regarding their obligations to transport riders with service animals. Whether drivers with limited

10   English proficiency have any legal responsibility to understand these documents does not address

11   this question and is therefore irrelevant here.

12        Second, making translated versions of the Policy and other relevant educational materials

13   available is an obvious and logical first step toward ensuring that class members are not denied

14   access to Uber's transportation services due to language barriers. Before this Settlement, a

15   systematic effort to ensure equal access for riders with service animals on a nationwide

16   transportation service like Uber had not been attempted. Therefore, it is unremarkable that the

17   evidence does not prove that translating materials will reduce or eliminate service-animal-related

18   discrimination due to language barriers on a transportation service like Uber. Plaintiffs need not

19   provide evidence proving the obvious fact that providing these drivers with meaningful access to

20   Uber's Service Animal Policy and information about service animals for the first time will

21   benefit the class and other riders with service animals.

22        Third, the claimed difficulties that Uber identified with translating materials are either

23   insubstantial or implausible. Uber claims that "it would be difficult for Uber to translate only

24   service animal related materials without also translating all driver-facing materials." *Id.*

25   However, Uber did not explain why translating only the driver educational materials required by

26   the Settlement would be difficult, and it is difficult to fathom a reason that translating the three-

27   page Service Animal Policy, a five-screen interactive popup, and a few emails would pose any

28   difficulty for a multi-billion dollar corporation with tens of thousands of employees. Uber also

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   asserted that it would be difficult to determine to which languages the driver materials should be

2   translated. *Id.* However, Uber could easily identify at least some languages commonly spoken by

3   drivers with limited English proficiency by surveying drivers using a survey available in multiple

4   languages, and Uber could prioritize languages for translation based on how commonly drivers

5   with limited English proficiency read those other languages.

6        Plaintiffs have good cause to request that the Court order that Uber translate driver

7   educational materials, including Uber's Service Animal Policy, quarterly emails to drivers, and

8   the in-app popup, into other languages commonly spoken by Uber drivers with limited English

9   proficiency. Translating these materials is needed to ensure that all drivers have access to Service

10   Animal Policy information and requirements.

11                    2.    Improving Service Animal Policy Enforcement.

12        The Settlement requires that Uber designate each service denial complaint, in a manner

13   consistent with the evidence, as a report of knowing service animal discrimination, a plausible

14   complaint of service animal discrimination, or a non-plausible complaint and apply the required

15   corresponding enforcement practice. Settlement § 5(A) and Settlement Addendum 2 § IV(B)-

16   (C), ECF No. 95-1. The Service Animal Policy appended to and incorporated into the Settlement

17   provides detailed instructions for the implementation of the policy, laying out steps Uber

18   committed to take to investigate and determine whether reports of discrimination reflected

19   violations of the Settlement, or whether such complaints were plausible. Settlement Addendum

20   4, ECF No. 95-1.

21        Reports by class members indicate that Uber may not be consistently enforcing the

22   service animal policy. This may be another reason why service animal discrimination is on-

23   going. For example, Class Members report that when they complain to Uber about an incident of

24   service animal discrimination, Uber often does not follow up with witnesses (which it should do

25   under the guidance for enforcing the service animal policy, *see* Settlement Agreement,

26   Addendum 2, § IV.A.1.d, ECF 95-1 at 44) or accept other evidence they submit, such as videos.

27   Additionally, Class Members have reported incidents in which the driver refused them a ride

28   because of their service animal where Uber designated the complaint as merely "plausible" and

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  gave the driver a warning rather than terminating them, in violation of the Service Animal

2  Policy. *See* O'Connor Decl. ¶ 6 (Ms. O'Connor and her sighted son were denied a ride after the

3  driver saw she had a service animal, and Uber did not interview her son, designating the

4  complaint as "plausible" and permitting the driver to continue driving for Uber); Spears Decl. ¶ 4

5  (Driver refused to transport Mr. Spears, stating that he was "too afraid" of the dog; after

6  reporting the incident to Uber, Mr. Spears found out that Uber had given the driver a warning).

7      Having received a number of such reports early in the Settlement term, Plaintiffs

8  requested that Uber share the materials it uses to train the customer support representatives who

9  investigate complaints of discrimination and allow Plaintiffs to observe a training. Uber refused

10  to do this.

11      Moreover, Uber has not proven that it has complied with the Settlement by appropriately

12  designated complaints as either knowing, plausible, or not plausible in a manner consistent with

13  the evidence, and has resisted attempts by Plaintiffs to gather more information about its

14  compliance with the Settlement's enforcement requirements. To prove that Uber has

15  substantially complied with these requirements, Uber would need to share details regarding its

16  investigation of a reasonably-sized sample of the service denial complaints, and the information

17  would need to show that Uber appropriately designated most or all of those complaints,

18  consistent with the evidence, as either knowing, plausible, or not plausible and then applied the

19  required corresponding enforcement practice.

20      The complaint data that Uber provides in its quarterly reports does not include any details

21  about the investigations, but only the final results, such as whether the driver was terminated,

22  given a strike, or excused on the grounds of "non-plausibility." Plaintiffs noted early on that

23  Uber was not providing information sufficient for the Parties to determine whether Uber was

24  complying with the enforcement procedures and proposed that Uber begin sharing additional

25  information about particular incidents. Uber never agreed to further data sharing, although it has

26  provided additional information in response to certain requests by Plaintiffs. Uber has informally

27  and voluntarily provided additional information about its review in response to sixteen

28  complaints in 2018 and two complaints in 2019. The eighteen-complaint sample that Uber

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   produced in response to Plaintiffs' requests for additional information is far too small to draw

2   any useful conclusions regarding Uber's compliance with Settlement provisions requiring Uber

3   to categorize complaints and impose the required corresponding enforcement practice.

4          In resisting Plaintiffs' advocacy on the issue of compliance with the Settlement

5   enforcement requirements, Uber has suggested that the Settlement provides it with unfettered

6   discretion to determine whether complaints are knowing denials warranting driver termination,

7   referencing the "Service Animal Policy" attached to the Settlement Agreement as Addendum 4,

8   ECF No. 95-1. *See, e.g.*, Riess Decl., Ex. 7, Uber's Analysis Of First Biannual Data Report (Oct.

9   20, 2018) at 8, 10. The Service Animal Policy provides that Uber will determine whether a driver

10  "knowingly refused to transport a rider with a service animal because of the service animal ... in

11  its sole discretion." Settlement Addendum 4, ECF No. 95-1. The words "sole discretion" appear

12  nowhere else in the Settlement or its addenda. *Id.*

13         But "sole" discretion is not unfettered discretion. The language of the Settlement limits

14  Uber's discretion in determining whether the driver "knowingly" refused to transport the rider by

15  providing detailed instructions regarding the investigation and review of complaints. *See*

16  Settlement Addendum 2 § IV(B)-(C), ECF 95-1. Interpreting the Settlement as providing Uber

17  with unfettered discretion to determine whether or not the driver engaged in knowing

18  discrimination would render these instructions for making such determinations effectively

19  superfluous, which runs contrary to governing principles of contract interpretation. *See also* Cal.

20  Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every

21  part, if reasonably practicable, each clause helping to interpret the other."); *City of Atascadero v.*

22  *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998) ("Courts must

23  interpret contractual language in a manner which gives force and effect to every provision, and

24  not in a way which renders some clauses nugatory, inoperative or meaningless.").

25         Uber's "unfettered discretion" argument shows that it is not even trying to comply with

26  this Settlement Agreement requirement, but rather with a far less protective measure of its own

27  invention. Settlement § 5(A) and Settlement Addendum 2 § IV(B)-(C), ECF No. 95-1.

28         Plaintiffs therefore have good cause to request further transparency regarding Uber's

[3541039.3]

1  training of its customer service staff handling service animal complaints, as well as information

2  demonstrating how it investigates and makes determinations regarding those complaints.

3            3.   <u>Additional Data.</u>

4        Uber has mostly complied with providing the data required under the Settlement

5  Agreement. While this data shows that the settlement has not been effective, this data has proven

6  insufficient to determine the severity of the ineffectiveness of the base set of policies and

7  procedures in addressing driver discrimination and the appropriateness of enhancements to

8  policies and practices, whether extensive or modest, that are required. All available evidence

9  makes clear that widespread service-animal-related discrimination will persist in Uber's

10  provision of transportation even after the term of the Settlement expires. While the evidence

11  demonstrates more likely than not that the settlement has not been effective, further data is

12  required to help the parties assess the degree of additional policy and practices that are required

13  to remediate the problem: should they be extensive changes or more modest alterations.

14        As noted above, Class Members report that they are under-reporting incidents of service

15  animal discrimination because doing so is burdensome, and they are skeptical that doing so will

16  result in any improvement in service, by either persuading drivers to comply with the Policy or

17  preventing drivers from continuing to discriminate. Moreover, the data Uber provides does not

18  enable the Parties to compare levels of service animal discrimination before and after

19  implementation of the Settlement's policies and practices.

20        The Monitor acknowledged the limitations of the data in her report, stating that the

21  effectiveness of the Agreement "is a difficult issue to address" given the "narrow focus" of the

22  data. *See* Riess Decl., Ex. 4, Monitor's Year One Report Re Uber's Compliance (Mar. 21, 2019)

23  at 8. The Monitor's reports have not yet addressed Plaintiffs trip history data request because,

24  despite the Settlement's directive for the Monitor to annually issue reports concerning the

25  Settlement, the Monitor has not issued any other reports since Plaintiffs first requested the data

26  on April 19, 2019. Settlement § 8(a) ("[t]he Monitor will report to the Parties within two months

27  after the end of each year during the Agreement Term"); Riess Decl. ¶ 5.

28        Working with a statistical expert, Plaintiffs developed a proposal for data sharing and

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

data analysis to objectively measure whether service animal discrimination has changed since the Settlement was implemented, based on information Uber gathers. The analysis would evaluate changes in the rate at which Uber riders with service animals had their rides cancelled before and during implementation of the Settlement Agreement. The analysis would also compare the ride cancellation rate for service animal users with the cancellation rate for the general population of Uber riders and other relevant groups. *See* Riess Decl., Ex. 12, Plaintiffs' April 19, 2019 Letter (describing data sharing proposal); *see also* Riess Decl., Ex. 6, Declaration of Andrew Schwarz.

In particular, Plaintiffs propose that Uber share trip histories spanning a three-year period for a sample of class members, blind Uber riders who travel with canes, a sample of riders who have submitted service animal-related discrimination complaints to Uber, and a sample of Uber's overall ridership in the United States as well as the cancellation rate for all Uber riders in the United States during that same period. Riess Decl., Ex. 12, Plaintiffs' April 19, 2019 Letter at 3. Plaintiffs crafted this proposal with assistance from their statistician consultant Andrew Schwarz. *Id.* at 2 n.1. With the requested information, Plaintiffs could better evaluate the severity of the ineffectiveness of the base set of policies and procedures by analyzing driver ride cancellation rates experienced by Class Members. *Id.* at 1-3. The driver cancellation rate ("cancellation rate") refers to the number of trip requests made by a specific group of riders over a specific time period where a driver accepts the request but then subsequently cancels the trip, divided by the total number of trip requests made by that same group of riders accepted by a driver over that same time period.

Comparing cancellation rates experienced by class members before and after the Settlement Term began against the cancellation rates experienced by other Uber riders over the same period would allow the parties, the Monitor, and the Court to make objective conclusions about whether service animal discrimination has declined in any meaningful way—and better assist the parties in identifying additional policy and practice changes needed to reduce discrimination. The cancellation data enables this to be done without reliance on class member's taking action, which is inherent in the NFB data and Uber's complaint data. Finding that the cancellation rate experienced by class members has decreased relative to the cancellation rate

[3541039.3]

1   experienced by other riders would indicate that the Current Process has reduced discrimination.

2   *Id.* at 3. Finding that the cancellation rate experienced by the class has not decreased relative to

3   the cancellation rate experienced by other riders would indicate that the Current Process has been

4   ineffective at reducing discrimination. *Id.*

5        Uber has refused to share any of the requested information. Uber has objected to the

6   proposed data request, raising objections based on rider privacy, confidentiality of Uber's data,

7   burden, and the validity of Plaintiffs' proposed cancellation rate analysis. Riess Decl., Ex. 17,

8   October 9, 2019 Letter at 2-3; Riess Decl., Ex. 13, May 24, 2019 Letter at 1, 4 n.1. Plaintiffs

9   offered to negotiate the details of their trip history data request to address Uber's concerns. For

10  example, Plaintiffs are willing to negotiate the number of riders for whom Uber produces trip

11  histories and the level of detail regarding each trip and trip cancellation that Uber produces.

12  Plaintiffs are also willing to negotiate limitations to address privacy concerns, such as identifying

13  trip locations with only zip codes instead of complete addresses. There is an operative Protective

14  Order in this case, and Uber has offered no reason why that Protective Order is inadequate to

15  protect any trip history data that Uber produces. Stipulated Protective Order and FRE 502(d) and

16  (e) Clawback Order (Nov. 19, 2015), ECF No. 63; *see also* Riess Decl., Ex. 17, October 9, 2019

17  Letter at 3.

18       Plaintiffs' proposed analysis is designed to address any possible sampling bias, and could

19  be adjusted to accommodate other available steps to ensure that the proposed cancellation rate

20  analysis is sound. However, Uber refused to meaningfully engage with Plaintiffs in an effort to

21  work through its stated concerns. Riess Decl., Ex. 13, Uber's May 24, 2019 Letter at 1; *see also*

22  Riess Decl., Ex. 15, Uber's August 21, 2019 Letter; Riess Decl, Ex. 17, Uber's October 9, 2019

23  Letter. Uber also suggests that Plaintiffs' data proposal is unnecessary because Plaintiffs can use

24  the settlement compliance testing program that NFB conducts to evaluate the Current Process's

25  efficacy at comprehensively addressing service animal discrimination. Riess Decl., Ex. 17,

26  October 9, 2019 Letter at 3; Ex. 13, May 24, 2019 Letter at 1. However, this NFB testing data

27  indicates just the opposite. It shows that service-animal-related discrimination remains common

28  and that, as a result there is need for the Parties to conduct a systematic, empirically sound

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  assessment of the efficacy of the base set of policies and procedures to address service animal

2  discrimination—which would be greatly assisted by this cancellation rate analysis. To conduct

3  the analysis, Plaintiffs need trip history data from before the NFB testing program was

4  established, details regarding each trip that Uber does not make publicly available, and trip

5  histories for random samples of Uber riders. Riess Decl., Ex. 18, Plaintiffs' October 29, 2019

6  Letter at 4; Ex. 12, Plaintiffs' April 19, 2019 Letter at 1-4. NFB's testing program does not have

7  access to any of this information. *Id.* at 4.

8                  4.     <u>Extension of the Settlement Term.</u>

9         The Settlement provides for extension of the Settlement term by eighteen months if

10  "there has not been substantial compliance by Uber with the terms of the Agreement for years

11  two and/or three." Settlement § 7, ECF No. 95-1. "Any disputes concerning substantial

12  compliance" are to be resolved through the dispute resolution process, culminating in a motion in

13  this court. *Id.* § 10. As noted above, Uber has continued to refuse to produce information

14  demonstrating that it has complied with important provisions of the Settlement, including

15  appropriate investigation of service animal complaints and enforcement of the service animal

16  policy. Extension of the Settlement Term to January 16, 2022, five years from the Settlement

17  Effective Date, is therefore appropriate, to effectuate needed protections for the Class, given the

18  lack of evidence of Uber's compliance with key obligations under the Settlement.

19         Extending the Settlement's term is also a necessary corrective measure to address Uber's

20  failure to meaningfully participate in negotiations over additional relief under Section 8(a) of the

21  Settlement. An additional eighteen months will provide the parties time to negotiate, and Uber to

22  implement, additional policies and practices to address ongoing service-animal discrimination.

23  **IV.**    **CONCLUSION**

24         Further policies are necessary to combat pervasive ongoing discrimination. Plaintiffs

25  therefore respectfully request that the Court extend the Settlement Term, require those policy

26  modifications set out above, and order the parties to further Settlement discussions regarding

27  additional protections for the class.

28  DATED: June 10, 2020                     Respectfully submitted,
[3541039.3]

1

2                        DISABILITY RIGHTS ADVOCATES

3

4             */s/ Melissa Riess*
            Melissa Riess
            Attorneys for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

[3541039.3]