1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANDREW M. SPURCHISE, Bar No. 5360847
aspurchise@littler.com
ALICE HSIU-WEN WANG, Bar No. 289631
awang@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, New York  10022.3298
Telephone:    212.583.9600
Facsimile:    212.832.2719

Attorneys for Defendant
UBER TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, MICHAEL KELLY, MICHAEL HINGSON, and MICHAEL PEDERSEN,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC,<br><br>Defendant. | Case No.  3:14-cv-04086-NC<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR EXTENSION OF THE COURT'S JURISDICTION AND MODIFICATION OF POLICIES, PRACTICES, AND PROCEDURES PURSUANT TO SECTION 8**<br><br>Date:        July 15, 2020<br>Time:        1:00 PM<br>Judge:       Hon. Magistrate Nathanael Cousins<br>Courtroom: 5, 4th Floor<br>                  280 South First Street<br>                  San Jose, CA 95113 |

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................. 2

     A.   The Lawsuit ................................................................................................ 2

     B.   The Settlement Agreement, Which Plaintiffs Touted As A "Best Possible
          Result."...................................................................................................... 3

     C.   There Is No Real Dispute That Uber Performed Its Obligations Under The
          Settlement, Which The Independent Third-Party Monitor Has Recognized ............. 4

III. ARGUMENT ......................................................................................................... 5

     A.   There Is No Basis For Extending The Settlement's Term Beyond The
          Negotiated Expiration Date.......................................................................... 5

          1.   The Settlement Expressly Precludes Plaintiffs' Requested Term
               Extension ........................................................................................... 6

          2.   Uber Is Not Responsible For The Monitor Not Issuing Reports For
               Years 2 And 3 And Strongly Disputes Plaintiffs' Assertion .......................... 7

          3.   The Dispute Resolution Process Does Not Allow An Extension But
               Even If It Did Plaintiffs Did Not Exhaust The Process ................................. 9

          4.   Plaintiffs' Allegation That Uber Did Not Meet And Confer In Good
               Faith Is Baseless .............................................................................. 11

     B.   Even If The Term Was Not Practically Over, Plaintiffs' "Modifications" Are
          Unwarranted And Inappropriate ................................................................ 12

          1.   The Agreement Does Not Permit The Court To Require The
               Modifications Sought ....................................................................... 12

          2.   There Is No "Good Cause" To Modify The Agreement............................... 13

          3.   Plaintiffs' Anecdotal Evidence And Supposed Testing Data Is
               Unreliable And Inadmissible ................................................................ 16

          4.   Plaintiffs' Requested Modifications Are Improper And Infeasible............... 19

IV.  CONCLUSION.................................................................................................... 22

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

i.

CASE NO. 3:14-CV-04086-NC

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Kai Peng v. Uber Techs., Inc.,*
237 F. Supp. 3d 36 (E.D.N.Y. 2017) ...........................................................................21

*McDonald v. Harding,*
57 F.2d 119 (9th Cir. 1932) ......................................................................................10

*Mohamed v. Uber Techs., Inc.,*
109 F.Supp. 3d 1185 (N.D. Cal. 2015) ........................................................................21

*Morongo Band of Mission Indians v. California State Bd. of Equalization,*
858 F.2d 1376 (9th Cir. 1988) ...................................................................................13

*Namisnak et al. v. Uber Technologies, Inc., et al.,*
Case No. 17-cv-06124-RS (N.D. Cal. October 3, 2018) ....................................................2

*Parsons v. Ryan,*
949 F.3d 443 (9th Cir. 2020) ....................................................................................10

*In re Premier Golf Properties, LP,*
564 B.R. 660 (Bankr. S.D. Cal. 2016) ...........................................................................6

*Scottish Air Int'l, Inc. v. British Calendonian Grp.,*
81 F.3d 1224 (2d Cir.1996) .......................................................................................6

*United States v. United Shoe Mach. Corp.,*
391 U.S. 244 (1968) ..............................................................................................13

*United States v. W. Elec. Co.,*
46 F.3d 1198 (D.C. Cir. 1995) ..................................................................................13

**Statutes**

42 U.S.C. § 12182 ...................................................................................................2

42 U.S.C. § 12184 ...................................................................................................2

ADA ..............................................................................................................2, 13

Sherman Antitrust Act ............................................................................................13

**Other Authorities**

Federal Rules of Civil Procedure 23(e) ...........................................................................4

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

i.

CASE NO. 3:14-CV-04086-NC

1

## I.    INTRODUCTION

2

The parties' Settlement Agreement is unambiguous. It expressly states its Term may be

3

extended under only two, limited conditions: (i) if the parties agree or (ii) if the Monitor has

4

determined that Uber has not "substantially complied" with the Settlement in years two or three of

5

the Term. Plaintiffs' motion does not assert that either condition exists here. That is because neither

6

does. Nor have Plaintiffs even claimed Uber is not in substantial compliance, let alone raised it at an

7

appropriate time pursuant to the Settlement's Dispute Resolution process and proven it. The Court's

8

inquiry should end there and the Settlement should expire pursuant to its Term.

9

Notwithstanding, even if the Term's expiration did not moot Plaintiffs' purported

10

"modification" requests, the Settlement expressly states that Plaintiffs may attempt to seek such

11

modifications only if they demonstrate: (i) "good cause", (ii) a "need", (iii) the modifications relate

12

to Uber's policies and practices; and (iv) that Plaintiffs followed the Settlement's Dispute Resolution

13

process by first meeting and conferring and then, if unsuccessful, mediating with Uber, prior to

14

raising their request with this Court. Plaintiffs fail to demonstrate they meet some or all of these

15

required elements for each and every expansive obligation they now seek the Court to impose on

16

Uber that was never contemplated by the Settlement.

17

First, there is neither "good cause" nor a "need" to modify the Settlement, and Plaintiffs'

18

primary support, their "test" data, is misleading and unreliable. Second, Plaintiffs do not actually

19

seek "modifications" under any reasonable interpretation. Rather, they seek a wholesale rewrite of

20

the Settlement, adding entirely new obligations that were not bargained for as part of any settlement

21

discussions and that seek to remedy perceived issues, like the inability to determine "cancellation

22

rates" from the negotiated data, that were clear when the Agreement was executed. Furthermore,

23

Plaintiffs' requests do not relate to Uber's policies and practices, would impose additional burdens

24

on Uber without justification, and were not properly raised pursuant to the Settlement's required

25

dispute resolution process. The Court must reject Plaintiffs' improperly raised 11th hour requests to

26

rewrite the Settlement.

27

28

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

CASE NO. 3:14-CV-04086-NC

## II.   FACTUAL BACKGROUND

### A.   The Lawsuit

Plaintiffs filed this case in September 2014, seeking to hold Uber liable for discrimination they alleged occurred when some registered Riders with service animals sought rides from some registered Drivers that use the Uber Driver App. (Dkt 1.) Plaintiffs argued in their Complaints that Uber was subject to the ADA as a "place of public accommodation" (42 U.S.C. § 12182) and as a "private entity primarily engaged in the business of transporting people" (42 U.S.C. § 12184), and could be held liable for and subjected to a court-ordered injunction regarding discrimination committed by Drivers. (Dkt. 1 at ¶¶ 54-75, Dkt. 17 at ¶¶ 77-104, Dkt. 113 at ¶¶ 83-110.) Uber contested whether the ADA applied to Uber at all, and if it did, whether it violated it in any way. (Dkt. 42.) Uber also argued that any liability rested solely with Drivers, whom are not Uber employees nor agents. (Dkt. 42 at ¶¶ 2, 4, 29 and Second Affirmative Defense [denying that Uber operates a taxi service or provides services like one]; ¶¶ 5, 7, 11 and Third Affirmative Defense [denying that Uber is a transportation provider or the operator a demand-responsive system, and denying any legal duty or right to control Drivers]; ¶¶ 42-43 and Fourth Affirmative Defense [denying that Uber has engaged in discrimination].).

While this Court denied Uber's motion to dismiss, it reached no conclusions with respect to the merits of Plaintiffs' claims, finding that "that the determination of Uber's potential liability under the public accommodation provision of the ADA requires more factual development." (Dkt. 37 at p. 13.)  The Court never found Uber is a "place of public accommodation" or a "private entity primarily engaged in the business of transporting people," let alone whether—if so—Uber had committed "discrimination." At that time, these were all novel and unsettled legal issues. These issues have either been resolved in Uber's favor or remain unresolved today and are being litigated in this district and elsewhere.[1]

---

[1] *See Namisnak et al. v. Uber Technologies, Inc., et al.*, Case No. 17-cv-06124-RS (N.D. Cal. October 3, 2018) (dismissing claim that Uber owns or operates or is a "place of public accommodation," which can only be actual, physical places) (Dkt. 84 at p. 7).

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

2.

CASE NO. 3:14-CV-04086-NC

**B.    The Settlement Agreement, Which Plaintiffs Touted As A "Best Possible Result."**

In May 2015, the parties began discussing settlement, and over the next 11 months engaged in lengthy negotiations to frame an agreement that addressed both Plaintiffs' views, Uber's business model and perspectives, and the respective uncertainty and risks of the parties' legal claims and defenses. The parties finalized and entered into the Agreement in early 2016. (Declaration of Andrew M. Sprurchise ["Sprurchise Decl."], ¶ 2; Agreement [Dkt. 95-1, Exh. 1].)

In the Agreement, Uber disclaimed and denied all liability. The Agreement states that "Uber disputes Plaintiffs' allegations and denies it has violated any laws" and "Uber has denied and continues to deny any liability to Plaintiffs or the Settlement Class" and "has denied and continues to deny that it has violated any laws pertaining to access for persons with disabilities with respect to the services provided by transportation providers using the Uber App." (Agreement [Dkt. 95-1, Exh. 1] at §3.)

In the Agreement Uber agreed to take multiple actions, including:

- Publish a negotiated Service Animal Policy;

- Disseminate negotiated wording and information to new and existing Drivers through multiple channels, including the Uber Driver App[2] and email, notifying Drivers of their independent obligation to abide by the law and Uber's Service Animal Policy;

- Add language to the Technology Services Agreement Drivers accept to gain access to the Uber Driver App and Uber platform, to the effect that discrimination related to service animals is a breach of that agreement;

- Create rider-facing complaint submission forms, to enable Riders to let Uber know they believe their Driver may have denied service due to the presence of a service animal, or otherwise discriminated;

- Implement a comprehensive framework for investigating and then actioning alleged service animal denial complaints based on whether such complaints were deemed by Uber to be "knowing," "plausible," or "not plausible" pursuant to standards set forth in the Settlement. The actions Uber agreed to take included permanently terminating a Driver's access to the Uber Driver App if the Driver committed a service denial deemed by Uber "knowing" or received two "plausible" complaints;

- Establish a national database of Drivers and Riders involved in an alleged service animal denial complaint, tallying the date and location of each complaint received by Uber and the complaint outcome reached by Uber (knowing, plausible or not plausible) and Driver-facing action taken;

---

[2] The Driver-facing app will be referred to as the "Uber Driver App." The Rider-facing app will be referred as the "Uber Rider App." Collectively, for convenience, the apps are referred to as the "Uber App." Pursuant to the Agreement, Uber made changes to the apps on both sides of the network.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

3.

CASE NO. 3:14-CV-04086-NC

- Share data from the database with Plaintiffs and an independent, third-party Monitor, who was charged with recommending modifications, if any, and determining Uber's substantial compliance; and

- Pay for a "testing program" for implementation by NFB.

(Agreement [Dkt. 95-1, Exh. 1], *passim*.)

The Agreement on its face did not: (i) establish that there must be a decline or any amount of decline in the number or percentage of rides purportedly denied by a Driver due to the presence of a service animal; (ii) establish any "cancellation rate" as a metric to measure or use to guide changes; (iii) require data to calculate "cancellation rates"; or (iv) permit Plaintiffs to supervise and/or review of Uber's employee onboarding and training regarding, and/or determination and/or actioning of, alleged service animal denial complaints. Pursuant to FRCP 23(e), this Court first preliminarily and then finally approved the Settlement, and then entered Judgment terminating the case, while retaining "jurisdiction over the settlement for the duration of the settlement agreement." (Dkt. 145.) Plaintiffs declared the outcome "exceptional," and "the best possible results," and claimed they had "achieved all of their litigation objectives and more."[3] (Dkt. 119 at pp. 18, 2.)

### C.   There Is No Real Dispute That Uber Performed Its Obligations Under The Settlement, Which The Independent Third-Party Monitor Has Recognized.

At no time have Plaintiffs claimed that Uber was or is not in substantial compliance, and they do not do so in the instant motion (*see, e.g.,* Plaintiffs' Motion for Extension ["Motion"] [Dkt 205] at 25 [basing requested extension on "lack of evidence of Uber's compliance with key obligations"]). At most, Plaintiffs put forth some declarations effectively asserting they disagree with the determination Uber made to a small number of alleged service animal denial complaints and rely on those self-serving declarations to request review and supervision of Uber's internal trainings and determinations. Tellingly, nowhere, however, do Plaintiffs seek specific performance of any provision of the Agreement.

---

[3] Notably, Plaintiffs' class is comprised of "blind or visually disabled individuals nationwide who travel with the assistance of Service Animals" and who have used or attempted to use the Uber App. (Dkt. 84 at p. 3.) But the Settlement Agreement required the implementation of policies that applied to all Riders with service animals, irrespective of whether those individuals are blind or visually impaired. (Dkt. 119 at p. 13.) This is significant because the data that Uber is required to maintain and produce is broader than and does not relate only to the class Plaintiffs purport to represent: it relates to persons who travel with service animals who are not blind.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108 2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION
4.
CASE NO. 3:14-CV-04086-NC

1    The independent Monitor confirmed Uber's substantial compliance in a report on March 21,

2    2019 evaluating the first year of Settlement Agreement. (Riess Decl. [Dkt. 205-1], Exh. 4 [Dkt. 205-

3    3] ["2019 Monitor's Report"].) For example, the Monitor found that Uber complied with its

4    obligations to create and produce to Plaintiffs and the Monitor a database of service animal complaints

5    and information related to the outcome of its investigation of those complaints. (2019 Monitor's

6    Report [Dkt 205-3, Exh. 4], at ¶¶ 7-9.) The Monitor further noted that Uber investigated the complaints

7    it received and then deemed each incident reported as either "knowing" or "plausible," as carefully

8    defined in the Settlement, or "not plausible" when appropriate. (*Id.* at ¶ 12.) The Monitor further found

9    that Uber has taken the Driver account actions required under the Settlement, based upon its

10   determinations as knowing/plausible. (*Id.* at ¶14.)

11   Plaintiffs' speculation that Uber may not be designating complaints correctly is belied by the

12   fact that, since the inception of the Settlement, Uber has permanently deactivated hundreds of Driver

13   accounts based on its finding of a "knowing" denial, and has applied at least a "first strike" to the

14   accounts of thousands of Drivers that were involved in an incident deemed "plausible." (*See, e.g.,*

15   Riess Decl., Exh. 5 at Chart 1 [Dkt. 205-3]; 2019 Monitor's Report [Dkt. 205-3, Exh. 4], at ¶¶ 13-18

16   [confirming Uber's data reports show the application "first strikes" to thousands of drivers and the

17   deactivation of "hundreds" of Driver accounts].) Likewise, as Plaintiffs acknowledge, of those Drivers

18   who receive a "first strike," an extremely low number received a second complaint, and Uber

19   permanently deactivated those Driver accounts as required by the Settlement. (*See, e.g.,* Riess Decl.,

20   Exh. 5 [Dkt. 205-3] at Chart 1; 2019 Monitor's Report [Dkt. 205-3, Exh. 4] at ¶ 16 [confirming in first

21   year "less than 1%" of Drivers receive a second plausible complaint after receiving a first complaint].)

22   **III.   ARGUMENT**

23       **A.   There Is No Basis For Extending The Settlement's Term Beyond The Negotiated**
24           **Expiration Date.**

25   Plaintiffs' last minute request for the Court to extend the Settlement Term and its jurisdiction

26   must be rejected for at least three reasons. First, the Agreement specifically allows for an extension of

27   the Term under only two, limited circumstances:  (i) if the Parties agree; or (ii) *the Monitor* finds that

28

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

5.

CASE NO. 3:14-CV-04086-NC

Uber is not in substantial compliance. (Agreement [Dkt. 95-1, Exh. 1] at § 7.)[4] Nowhere in their 25-page Motion do Plaintiffs assert or even imply that either circumstance has occurred and neither has. Second, the Settlement's Dispute Resolution provision does not permit the Court to unilaterally extend the term. Even assuming it did, Plaintiffs have not exhausted the agreed-upon dispute resolution process as to substantial compliance or any extension. Third, Uber has substantially complied with the Agreement. The Settlement must therefore expire per its terms on July 16, 2020.[5]

### 1.    The Settlement Expressly Precludes Plaintiffs' Requested Term Extension.

The Agreement expressly states when its Term ends, and the only two, limited circumstances under which the Term can be extended.  Specifically, the Agreement states: "[I]f the Parties agree or the Monitor determines that there has not been substantial compliance by Uber with the terms of the Agreement for years two and/or three, the term shall extend to five years from the Effective Date (hereafter the 'Extended Agreement Term')." (Agreement [Dkt. 95-1, Exh. 1] at § 7.)

Here, Plaintiffs do not assert that Uber agreed to any Term extension.  In fact, Plaintiffs have not bothered to confer with Uber regarding any Term extension, nor mediated it, pursuant to the Agreement's Dispute Resolution provision. (Spurchise Decl., at ¶ 3.) Indeed, as stated above, Plaintiffs never claimed Uber did not substantially comply. Moreover, Plaintiffs do not assert that the Monitor found Uber failed to substantially comply with the Agreement. To the contrary, in the only report the Monitor has issued (for year 1 of the Settlement Term) she affirmatively concluded that Uber is in compliance. Although a court may have authority over enforcing a settlement, it is bound by the express terms of the settlement agreement, and may not entertain a party's argument regarding purpose or intent. *Scottish Air Int'l, Inc. v. British Calendonian Grp.*, 81 F.3d 1224, 1230-31 (2d Cir.1996). "Settlement agreements embody compromises in which each side gives up something it might have won in litigation and waives its right to litigate. The court's role is to construe a settlement agreement as written, as it would any other contract." *In re Premier Golf Properties, LP*, 564 B.R. 660, 680

---

[4] Plaintiffs tellingly omit the words "or the Monitor determines …" from their quotation of the Agreement. (*See* Motion [Dkt. 205], 25:9-11).

[5] The end of the Settlement term would moot Plaintiffs' modification requests, but it would not prevent Plaintiffs from attempting to bring new claims.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

6.

CASE NO. 3:14-CV-04086-NC

(Bankr. S.D. Cal. 2016). Here, the Agreement is explicit about the conditions under which its Term may be extended and the conditions are not met.

### 2. Uber Is Not Responsible For The Monitor Not Issuing Reports For Years 2 And 3 And Strongly Disputes Plaintiffs' Assertion.

Although it is true that the Monitor has not issued reports for years two and three of the Term, Plaintiffs suggestion that Uber is to blame is entirely inaccurate. The Monitor has substantial briefing by the Parties regarding their positions on the outcome of such reports and all information required to issue them, because—as set forth above—there is no dispute Uber has provided the Monitor with all of the data required by the Settlement Agreement. (*See, e.g.,* 2019 Monitor's Report [Dkt. 205-3, Exh. 4.] Plaintiffs' baseless assertion that Uber somehow prevented the Monitor from issuing reports revolves around a graph Uber provided to Plaintiffs and the Monitor, even though it had no obligation to do so, showing the percentage of trips that result in an alleged service animal denial complaint, out of the total number of trips enabled via the Uber platform in the United States.

An up-to-date copy of the graph is below:[6]



As shown above, the graph shows that the percentage of trips that lead to a service animal denial complaint out of all trips enabled via the Uber platform in the United States has steadily declined during the Settlement's Term. The specific percentage figures (on the Y axis) are redacted. This is because the specific total number of trips are enabled via Uber's technology in the United States is a

---

[6] This is the updated graph showing data through the end of 2019, which Uber provided to the Monitor (and Plaintiffs) on April 8, 2020. (Dkt. 205-2 at p. 4.) An earlier version was also provided to the Monitor in March 2018, and was included by the Monitor in her report. (Spurchise Decl., ¶8, fn. 2; 2019 Monitor's Report at p. 9.)

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

7.

CASE NO. 3:14-CV-04086-NC

confidential and sensitive business metric that the Settlement does not require Uber to produce to Plaintiffs at all.

If Uber revealed the percentages to the Monitor and Plaintiffs, Plaintiffs could take the total number of alleged service animal denial complaints (which they receive in the data reports Uber provides per the Agreement), and use simple math to back in to the total number of trips.

Uber first offered to share the actual percentages or trip total– subject to a modified protective order – in February 2018. Several months later, Plaintiffs agreed to enter into a modification of the protective order with an attorneys'-eyes only provision, provided it allowed certain NFB staff to also review the data. (Spurchise Decl., ¶ 8, Exh. E and F.) Uber's counsel then prepared a stipulation and draft protective order modification consistent with these discussions. (*Id.*) Then, without explanation, Plaintiffs reneged and refused to enter into the stipulation.  (*Id.*)

Uber has continued to offer to provide the Monitor and Plaintiffs with the specific percentages (i.e., the total number of denials as a percentage of nationwide trips), so long as Plaintiffs agree to reasonable confidentiality and AEO provisions. Plaintiffs have refused to do so, insisting on the right to challenge the designation of the information as "Highly Confidential," which is not an acceptable condition given the fact Uber is not even required to provide this data. (Spurchise Decl., ¶¶ 9-13.)

Moreover, contrary to Plaintiffs' assertion, while the Monitor expressed an interest in seeing the trip volume data and encouraged the parties to reach an agreement, the Monitor never told the parties issuance of her Year 2 or Year 3 reports was contingent on Uber producing unredacted trip volume data. (Spurchise Decl., ¶¶ 8-13; Declaration of Ariel F. Ruiz, ¶ 2; Declaration of Morgan T. Jackson, ¶ 2.)  Uber strongly disputes and rejects Plaintiffs' statements to the contrary. Notably, the Monitor did not issue any written request for the data at issue, even though Her Honor could do so. (*Id.*)

Further, the Monitor does not need the graph nor the unredacted numbers to determine whether Uber is in substantial compliance with the Agreement and issue the Year 2 or Year 3 reports (and did not need it for the Year 1 Report). The graph and underlying data do not relate to and will not show whether Uber has substantially complied with the Agreement; they go solely to Plaintiffs' inaccurate

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

8.

CASE NO. 3:14-CV-04086-NC

1    claim that the Agreement has not had positive impacts throughout the Agreement's Term.[7] The data

2    is therefore unnecessary for the Monitor to report on compliance. Plaintiffs' attempt to pin the timing

3    of the Monitor's Year 2 and 3 reports on Uber is a bald attempt to circumvent the clear terms of the

4    Settlement Agreement.

5           **3.     The Dispute Resolution Process Does Not Allow An Extension But Even
                     If It Did Plaintiffs Did Not Exhaust The Process.**
6

7           Plaintiffs cite the Section 10 Dispute Resolution provisions of the Settlement, noting they allow

8    disputes about substantial compliance to be raised to this Court only after both steps one and two of

9    the same process are exhausted. (*See* Motion [Dkt. 205], at 25:11-18.) The Dispute Resolution

10   provision, however, does not state that the Court can extend the Term. Instead, the Settlement

11   expressly addresses any extension in Section 7, which limits by its plain language an extension only

12   where the parties agree or the Monitor determines a lack of substantial compliance during years two

13   or three of the Agreement's Term.

14          Even setting this aside, Plaintiffs' reliance on the Dispute Resolution provision fails because

15   Plaintiffs did not follow it regarding any allegation of lack of substantial compliance or extension.

16   When Plaintiffs initiated the dispute process in 2019 and the parties proceeded to mediation in

17   December 2019, the subject of that mediation was Plaintiffs' revised, onerous data-sharing proposals

18   *only*.

19          Plaintiffs also initiated the dispute resolution process in September 2017, and identified five

20   instances where they disagreed with Uber's determination of alleged service animal denial complaints.

21   But they did not state Uber was out of substantial compliance with the Agreement, and instead sought

22   supervision of Uber's investigation and determination process, which is not provided by the

23   Agreement, in order to assess compliance. (Spurchise Decl., ¶ 4, Exh. A, pp. 9-10.) Uber met and

24   conferred with Plaintiffs, and the parties ultimately mediated the dispute. Uber agreed to provide

25   certain information requested by Plaintiffs as a measure of good faith. (Spurchise Decl., ¶¶ 4-5, Exh.

26

27

28

---

[7] Indeed, the specific percentages (which are miniscule) are not particularly relevant; the point is that the trajectory is consistently downward.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION                                9.                          CASE NO. 3:14-CV-04086-NC

B-D.) Plaintiffs did not further actually claim no substantial compliance, or seek to enforce or extend the Agreement. (Spurchise Decl., ¶ 3.)

In fact, even now, Plaintiffs do not actually claim that Uber is not in compliance -- they only vaguely claim Uber may not be in compliance, based on a few anecdotal reports where purported class members did not agree with Uber's determination of their complaints. They then posit that Uber must prove through an unspecified procedure with no home in the Agreement that Uber determined every or some large group of alleged service animal denial complaints in accordance with Plaintiffs' view. ("Uber has not submitted evidence demonstrating it is in substantial compliance with the enforcement procedures set out in the Settlement. . . ." Motion, at 2:8-10.)

As the party seeking an extension of the Agreement, if Plaintiffs had claimed Uber did not substantially comply with the Agreement, ordinary burdens of persuasion regarding non-compliance fall squarely on Plaintiffs, not Uber. *Parsons v. Ryan*, 949 F.3d 443, 471 (9th Cir. 2020) (burden on plaintiffs as moving party to prove defendants' non-compliance with settlement); *see also McDonald v. Harding*, 57 F.2d 119, 124 (9th Cir. 1932) ("the burden of proof rests with the moving party"). Plaintiffs, however, do not actually claim lack of substantial compliance or seek performance of any specific provision of the Agreement. Rather, this unwritten purported obligation for Uber to "prove" compliance is merely yet another of Plaintiffs' post-Agreement attempts to supervise Uber's investigation and determination process veiled under a different cover, a process which Plaintiffs expressly agreed was assigned to Uber alone. Even if Plaintiffs could show Uber reached an incorrect result on a handful of investigation determinations, that does not implicate substantial compliance, given that Uber investigates and determines thousands of complaints each year. (Dkt 205-3, Exh. 4 at ¶ 18.).) The total number of cases Plaintiffs' counsel has challenged (approximately two dozen), after its ongoing and extensive communications with class members and the significantly smaller number of instances where Uber voluntarily agreed to modify its determination (4) are extremely limited in number, both in terms of absolute numbers or percentages of the number of investigations conducted by Uber. (Spurchise Decl., ¶ 7.) In any event, Plaintiffs cannot now seek to extend the Term of the Agreement based on alleged lack of "compliance" when they have not asserted non-compliance, did not otherwise follow the Dispute Resolution procedures in the Agreement, and in fact do not even seek

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

10.

CASE NO. 3:14-CV-04086-NC

to enforce any specific provision of the Agreement now. If Plaintiffs truly believed Uber was not in substantial compliance (which there is no basis to believe), they should have followed the Dispute Resolution process and come to Court earlier in the Term, not on the eve of its expiry.

        **4.**     **Plaintiffs' Allegation That Uber Did Not Meet And Confer In Good Faith Is Baseless.**

Though entirely vague and unclear, the only instances where Plaintiffs arguably approach claiming a breach relates to whether Uber met and conferred with Plaintiffs in good faith. Plaintiffs' contentions are completely baseless, and though Plaintiffs' present an incomplete picture of the exchanges between the parties (*see, e.g.,* Spurchise Decl. Exh. B-D), the evidence they do submit shows that Uber fully met its obligations, as demonstrated by the extensive record of letters, phone calls, Monitor calls, reporting, and mediations. Further proof is that Uber has been receptive to Plaintiffs' proposals on numerous occasions. For example, following a first mediation Uber agreed to provide certain additional information requested by Plaintiffs. (Spurchise Decl., ¶ 5, Exh. C and D.)

Additionally, Uber also worked with Plaintiffs to create a refund request framework for riders with service animals who choose to request two seats when requesting a trip via the UberPOOL option in the Uber App.  Notably, in November 2019 and when seeking attorneys' fees, Plaintiffs acknowledged that Uber had agreed to "adoption of an UberPOOL policy concerning refunds, ongoing quarterly reporting, and some additional data sharing." (Dkt. 201, p. 6.) Plaintiffs likewise acknowledge that Uber has provided additional information regarding its investigation into specific alleged service animal denial complaints.  (Motion [Dkt. 205], at 20:25-28.) Contrary to Plaintiffs' implication, Uber met and conferred with Plaintiffs in good faith. Uber simply found in many instances that Plaintiffs sought a re-do of the Settlement. Plaintiffs could and should have raised any issues as to Uber's good faith negotiations throughout the Term far earlier than now, and would have done so, if they had merit.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

11.

CASE NO. 3:14-CV-04086-NC

**B.      Even If The Term Was Not Practically Over, Plaintiffs' "Modifications" Are Unwarranted And Inappropriate.**

**1.      The Agreement Does Not Permit The Court To Require The Modifications Sought.**

Plaintiffs' proposed changes go beyond mere "modifications" and instead would effectively re-write the Agreement. For example, the Agreement provides that Uber is to investigate each alleged service animal denial complaint and then deem it "knowing" or "plausible" using the standards set forth in the Agreement. (Agreement [Dkt. 95-1, Exh. 1], at § 5.)  These decisions (thousands each year) are done in Uber's agreed upon "sole discretion."  When the Agreement was executed, it was apparent on its face that Plaintiffs had no right or mechanism to participate in, review or supervision of these decisions. (Agreement [Dkt. 95-1, Exh. 1], at §§ 4.B, 5 and Addendum 4.)  The trust Plaintiffs placed was justified and Uber has not violated it.[8] Plaintiffs' request for the underlying details of Uber's investigations so they can review each determination would dramatically alter the business operational, time, and financial burdens[9] of the Agreement, even if Plaintiffs ultimately agreed with each of Uber's determinations. Likewise, Plaintiffs' request for additional data elevates a new concept, "cancellation rates," which Plaintiffs now say is "a key measure of access." (Dkt. 205 [Motion] at 5:14-15.) But, the Agreement makes no mention of it and when it was executed, it was readily apparent that the detailed information Uber agreed to share did not relate in any way to any evaluation of "cancellation rates." There have been no factual changes or unforeseeable events warranting the changes proposed. Indeed, Plaintiffs don't allege any in their Motion. Rather, Plaintiffs simply changed their minds about what metrics and data they now wish they had thought to attempt to negotiate into the Agreement. Plaintiffs simply seek to establish a new goal post and an entirely new data set to go with it, while disclaiming the utility of the extensive data they negotiated. Whatever jurisdiction or legal basis the Agreement gives the Court to impose a substantive modification to which

---

[8] Plaintiffs' claim that Uber has said it has "unfettered discretion" to determine service animal complaints, and "is not even trying to comply with this Settlement Agreement requirement, but rather with a far less protective measure of its own invention," (see Motion [Dkt. 205], at 21:25-27) is baseless, offensive and patently false.  Uber never said it has unfettered discretion and has never denied that it is to follow the detailed definitions and provisions of how to classify denials as "knowing" or "plausible."  Since the beginning of the Settlement, Uber has followed the guides and processes laid out in the Agreement in determining ride denial complaints and has done so in good faith. And the independent Monitor found this true in her year 1 report. (2019 Monitor's Report [Dkt. 205-3, Exh. 4].)

[9] Not just Uber's own costs. Plaintiffs would undoubtedly seek their attorneys' fees incurred in reviewing each piece of information related to all investigations they request.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION                                    12.                           CASE NO. 3:14-CV-04086-NC

1    Uber did not agree[10], Plaintiffs' requests go farther than a "modification" under any reasonable

2    interpretation of the Agreement.

3                    **2.    There Is No "Good Cause" To Modify The Agreement.**

4            The Settlement provides a limited circumstance in which Plaintiffs may attempt to seek

5    modifications to the Agreement. Specifically, the Agreement states: "Plaintiffs may request, if there

6    is good cause to believe there is need for further modifications to Uber's policies and practices, that

7    the Parties meet and confer to negotiate further modifications to Uber's policies and practices,

8    including the measures adopted in this Agreement, to more effectively address alleged Driver

9    discrimination against Riders with Service Animals." (Agreement [Dkt. 95-1, Exh. 1], at § 8.) In other

10   words, in order to attempt to seek any modification, Plaintiffs must demonstrate: (i) "good cause", (ii)

11   a "need", (iii) the modification relates to Uber's policies and practices; and (iv) that Plaintiffs followed

12   each step of the mandated Dispute Resolution process.

13           Notably, Uber never agreed that it is responsible for discrimination by the independent Drivers

14   who use Uber's technology to network with Riders. Nor did Uber agree that it would or must take any

15   steps to guarantee that such third party Drivers would provide rides to every rider with a service

16   animal. Instead, the obligations Uber undertook pursuant to the Agreement relate to (i) providing

17   information to Drivers regarding their independent obligations to follow the law and Uber's Service

18   Animal Policy, (ii) and Uber's responses to alleged discrimination that has already occurred. This

19   included:

20           ●    "ensur[ing] that Riders can more easily report denials of rides through the Rider App"
                  (Agreement [Dkt. 95-1, Exh. 1], at § 5.B.1);

21

22   ---
     [10] While the Court has jurisdiction to *enforce* the Agreement, Uber disputes that the Court has jurisdiction to *modify* the
23   Agreement's substantive obligations. Plaintiffs cite *Western Electric* and *United Shoe Manufacturing*, claiming Courts
     have wide latitude to modify "court-approved settlements." (Motion at 15:13-17.) That is not accurate nor applicable here.
24   In *United Shoe Machinery*, "the District Court for the District of Massachusetts held that appellee had violated s 2 of the
     Sherman Antitrust Act by monopolizing the manufacture of shoe machinery" and then entered a "decree [that] was shaped
25   in response to findings of monopolization of the shoe machinery market." *United States v. United Shoe Mach. Corp.*, 391
     U.S. 244, 245 (1968).  Here there was no finding of liability, and even the applicability of the ADA was disputed and
26   unresolved. Likewise, *Western Electric* addressed a request to lessen the restrictions imposed by a "consent decree." *United
     States v. W. Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995). The Judgment does not incorporate the terms of the Agreement
27   into the Judgment, the Agreement is not a consent decree, and the standard to modify a consent decree are not met. As to
     step 3 of the Dispute Resolution procedure, "parties have no power to confer jurisdiction on the district court by agreement
28   or consent." *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir.
     1988).

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION                                    13.                    CASE NO. 3:14-CV-04086-NC

- requiring "Drivers to expressly acknowledge that they have read and understood Uber's Service Animal Policy [and their] legal obligation" not to discriminate against Riders with service animals, which eliminates any type of "I did not know" argument to the extent a Driver is later deactivated following Uber's investigation and determination (*Id.* at § 4.A);

- Uber agreeing to deactivate a Driver's access to the Uber platform if "it is reasonable for Uber to conclude the Driver knowingly refused service to a Rider with a Service Animal, or if Uber receives plausible reports from Riders of more than one cancellation or refusal by such Driver alleged to be on the basis of the presence of a Rider's Service Animal" (*Id.* at § 4.B.3);

- "Uber shall collect and retain a national database of account-specific data for Drivers and Riders" related to alleged service animal denials and actions taken by Uber in response to denials (*Id.* at § 6.A).

These provisions each largely relate to effectively addressing discrimination after it allegedly occurs, not eliminating it. (2019 Monitor's Report [Dkt. 205-3, Exh. 4], at ¶24 [calling the elimination of discrimination "a goal which is not demanded by the Agreement and is not realistic for a variety of reasons."]) Through this lens, the factual data demonstrates that the agreed upon measures sufficiently address alleged discrimination by Drivers of riders who travel with service animals. Uber has investigated thousands of Rider-alleged service animal denial complaints, resulting with thousands of Drivers who have permanently lost access to their Driver accounts, and thousands more with first strikes on their accounts who have received further information from Uber about its Service Animal Policy.   Throughout the entire Term of the Settlement, the number of drivers who received a second alleged service animal denial complaint after being investigated remains incredibly low. (Dkt 205-3, Exh. 4 at ¶ 16 [finding it is "reasonable" to conclude that "the lack of repeat offenders strongly suggests" the Settlement is effective]; Riess Decl. Exh. 5 [Dkt. 205-3], at Charts 1 and 2.)

Plaintiffs, however, appear to view the Agreement through a different lens. They appear to believe the Agreement mandates total elimination, or some unwritten and unspecified measure of reduction, of alleged service animal denial complaints in either raw numbers or as a percentage of rides requested via Uber's technology. But the Agreement calls for no such things. In fact, the Agreement contemplates that raw numbers of alleged service animal denial complaints may *increase* and provides for a limited remedy should that occur; namely, a different cadence in Uber's agreed upon data reports.  (Agreement [Dkt. 95-1, Exh. 1], at § 6.B.1).[11]

[11] Plaintiffs also make much out of the Agreements recital that "the mutual goal of this agreement is to, with the

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108 2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

14.

CASE NO. 3:14-CV-04086-NC

Even viewing the Settlement through Plaintiffs' lens, however, the agreed-upon data produced by Uber demonstrates there is no "good cause to believe there is a need" for modifications, and that most of the modifications sought by Plaintiffs do not relate to Uber's policies or practices.

Uber's reported data demonstrate the total number of alleged service animal denial complaints have decreased. As Plaintiffs concede, "Uber's complaint data reports show a small decline in the number of total discrimination reports that Uber received in 2019 compared against prior years. The number of service denial complaints that Uber reported receiving in 2019 is 6.9% lower than the 5,866 complaints that it reported receiving in 2018. For 2017 [adjusting for partial year covered by data] shows an 11.3% reduction in the number of alleged service animal denial complaints that it received from February 16, through December 31, 2019 (4,825 complaints) compared against the same period in 2017 (5,429 complaints)." (Motion [Dkt. 205], at 8:1-9.)

Looking at the same quarter year over year numbers also shows a downward trend, as shown below:[12]

|    | **2017** | **2018**          | **2019**          |
|----|----------|-------------------|-------------------|
| Q1 | 1,648    | 1,321 (decrease)  | 1,290 (decrease)  |
| Q2 | 1,563    | 1,492 (decrease)  | 1,431 (decrease)  |
| Q3 | 1,391    | 1,530 (increase)  | 1,295 (decrease)  |
| Q4 | 1,575    | 1,523 (decrease)  | 1,444 (decrease)  |

(Spurchise Decl., ¶ 14.)

cooperation of both Parties, enhance Uber's policies, practices, and procedures to ensure that, to the maximum extent feasible, Plaintiffs and other blind and visually disabled individuals with service animals receive full and equal access to Uber's services."  But, "Uber's services" are its app and related customer services, like payments.  (Dkt. 42 [Answer] at ¶ 2 "Uber offers mobile software applications to riders looking for rides and independent transportation providers looking for riders.") The Agreement did provide greater access to Uber's technology, including in-app and online accessible complaint forms. "Uber's services" do not include transportation, which is provided by independent third parties. Plaintiffs certainly argued otherwise in the litigation, but that issue was hotly disputed in the litigation, and the Parties settled without resolving it.

[12] Many companies consider data (such as trips, revenue, etc.) on a year-over-year basis, such that a given time period in one year is compared to the same time period in the prior year (e.g., compare summer 2018 to summer 2017, instead of comparing summer 2018 to spring 2018) to adjust for seasonal variations.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

15.

CASE NO. 3:14-CV-04086-NC

1

Second, as reflected in the above chart (Section III.A.2), Uber's data demonstrate that the

2

percentage of trip requests with a service animal denial complaint out of the total number of trips

3

enabled via Uber's technology has decreased during the Settlement Term. Taken together, the charts

4

demonstrate that during the Term there has been a significant reduction in alleged Driver

5

discrimination against Riders with Service Animals.

6

### 3.     Plaintiffs' Anecdotal Evidence And Supposed Testing Data Is Unreliable And Inadmissible.

7

First, Plaintiffs attempt to evade the factual data they negotiated into the Agreement by

8

speculating that Riders who travel with service animals either stopped reporting denials, or simply

9

stopped using the Uber App. (Dkt. 205 [Motion], 9:8-10.) The alternative explanations posited by

10

Plaintiffs, however, are based on supposition and anecdotal declarations[13] that cannot establish a trend.

11

Plaintiffs' speculation that Riders have stopped submitting complaints is ironic, given Plaintiffs

12

negotiated easily accessible in-app and online complaint forms as a significant part of Uber's

13

obligations under the Settlement. It is also belied by Uber's comprehensive data showing that Riders

14

continue to submit complaints. Plaintiffs' contention that Riders with service animals are not

15

requesting trips on Uber's platform is likewise totally unsupported. Of course, Plaintiffs would be in

16

an advantageous position to determine if either of these contentions had an evidentiary basis. They,

17

not Uber, represent the class: they could have retained a survey expert and surveyed their members

18

and purported class members (perhaps using the same outlets used for class notice) to ask registered

19

riders with service animals these questions, and submitted substantiated data showing nationwide

20

trends, rather than hand-picked declarations. Plaintiffs' choice of anecdotes and speculation instead of

21

reliable data do not demonstrate either a "good cause" or a "need" to modify the parties' carefully

22

negotiated Settlement Agreement.

23

Plaintiffs also attempt to evade the facts shown by the Uber-provided data they negotiated for

24

in the Agreement with their own so-called "testing" data.[14] Plaintiffs explained in part how their "test"

25

---

26

[13] For example, Plaintiffs cite the Declaration of Erica Rodman who states that it is difficult to report service denials because she feels the need to vigilantly capture screenshots from her phone. As Plaintiffs should know, their declarant is

27

mistaken. Uber can access all data related to a trip request and any cancellations, as well as additional data. Riders do not need to capture any screenshots of anything in order to initiate or facilitate Uber's investigation.

28

[14] Pursuant to the Agreement, Uber pays NFB $75,000.00 per year to fund NFB's testing program, the results of which were hidden from Uber until the eve of the Term's expiry, even though Uber first requested information about it in

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

16.

CASE NO. 3:14-CV-04086-NC

was conducted in an October 2019 letter. (Dkt. 205-3 at Exhibit 18.) They explained that "instructions" to "testers" are publicly available on NFB's website.[15] As can be seen, the "testers" could be any Uber Rider with a service animal or who travels with someone who does, and the "instructions" are in essence to complete the online questionnaire as often as possible, but at least monthly, and "we welcome completed surveys on both positive and negative rideshare experiences." Plaintiffs' statistical expert has not asserted that Plaintiffs' testing program is statistically valid, but an expert is not required to see that it is fatally flawed. In fact, Plaintiffs' assertion of their flawed test results as their lead-off arguments on "cancellation rates" and the need for modifications (Motion [Dkt. 205], at 4:4-6:10) is misleading and improper for the following reasons:

Failure to capture all requests, completed trips, driver cancels/denials: "Testers" do not have to report to NFB all of the results of their trip requests. While Plaintiffs' assert their "test" can demonstrate cancellation rates, any cancellation rate study would *require* all testers to count all *of* their requests, including all their successful rides, and all their alleged denials.  Plaintiffs gloss over this, saying only that testers "can" report both successful and unsuccessful trip requests, see Motion at 4:7-8, but not that every tester actually did so, let alone that Plaintiffs verified it.  In any credible test, testers would be required to submit the outcome of each and every request, NFB would ensure completeness, and then verify the self-reported results. Obviously, Riders may be motivated to submit a survey only in the event of a purported denial, thus skewing the results. In fact, Plaintiffs have acknowledged their testing data "***is not, and cannot be, sufficient***" to draw any valid conclusions about cancellation rates, see Riess Decl., Exh. 18 [Dkt. 205-3], at p. 4 (emphasis added), even though they use it for that purpose before this Court. This begs the question why Plaintiffs did not use their Uber-funded testing program to perform an actual test of cancellation rates, including using a non-service animal-using control group, if they really wanted to understand comparative cancellation rates. But, they didn't.

No Validation: there is no verification that the "testers" communicated to their Driver that they

---

March 2018, NFB's testing program came up during the parties' meet and confer process, and NFB makes their test results their lead-off point. (Spurchise Decl., ¶ 15.)

[15] The website provided was https://www.nfb.org/programs-services/legal-program/uber-and-lyft-survey/uber-and-lyft-information

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION                                17.                        CASE NO. 3:14-CV-04086-NC

had an animal and it was a service animal, or how they did so, or the truth of the data they self-reported online. It is not clear that NFB even verifies the people who submit the online even have a service animal or were with someone who did, or even requested a trip using the Uber Rider App. The evidence indicates that NFB does not train "testers" on how to conduct the tests in a uniform way. Indeed, NFB's results include about 180 results where the tester reported that their ride was denied, but that they did not alert the Driver they had a service animal.  There is no way of knowing in those instances whether, had the Driver had been informed that the animal was a service animal, they would have accepted the ride. The "tests" are not meaningful data in this context and artificially inflate the already inflated number of denials.

"Super Tester" Distortion: Plaintiffs disclosed they had 392 testers, and 3,115 "tests," but they hid the number of tests performed by each person.  This allows the data collected, already incomplete, to be further skewed by a handful of people who submit a disproportionate share of the online forms. Indeed, using the location of the tests as a proxy for the identity of the tester, it appears a handful of "testers" account for a disproportionate number of the online forms, making whatever inaccuracies, biases or testing errors those people made even further invalidate the results.

Misleading Geographic Distribution: Uber has filtered the data provided by Plaintiffs and determined that over 1,000 of the reported ride requests occurred in Montana and North Dakota, whereas about *15* of the tests come from New York City. But New York City accounts for a very significant percentage of the total trips enabled via Uber's technology, whereas Montana and North Dakota account for less than 1%. Despite this North Dakota and Montana somehow account for almost 30% of the results logged by Plaintiffs.

Inclusion of Non-Responsive "Tests": As stated above, the data provided by Plaintiffs includes 2,444 online forms where a Rider reported to NFB they did *not* inform the Driver that their animal was a service animal.[16]

---

[16] The Declaration of Jack Gleiberman notably does not state that this issue was addressed. (Dkt. 205-30, at ¶ 5.)

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

18.

CASE NO. 3:14-CV-04086-NC

**4.      Plaintiffs' Requested Modifications Are Improper And Infeasible.**

**a.      Plaintiffs' data-sharing proposal is flawed in numerous ways, burdensome, and has no guarantee of success.**

As set forth above, there is no basis to extend the term of the Agreement, making modifications moot.  And, setting that aside, there is no good cause or need to make modifications to any of Uber's policies or practices. However, it is worth noting however that there are serious flaws with Plaintiffs' specific requests.

First, Plaintiffs' request for trip history data raises significant privacy concerns. It would require Uber to hand over the trip histories of 24,000 Riders, and all without their consent.  This data is not anonymous simply because it does not have the Riders' names; rather this data is highly personal and can be easily "re-identified" to a specific individual, even where that individual's name or other identifying information is not provided.  For example, a set of trips all beginning in front of one house at the same time of day, can be easily linked to a person that lives in that house with publicly-available information; but the data and the "unique identifier" Plaintiffs request could also reveal where that individual starts other trips -- potentially at the location of a medical facility, romantic tryst, Planned Parenthood, a place of worship, etc. Meanwhile Plaintiffs do not bother to claim in their motion they have the technical ability to safeguard this highly sensitive data.

Simply reducing the granularity of the pick-up location, such as to zip code, will not necessarily "anonymize" the data and will affect the results and data validity.[17] For example, to generate reliable and useful random rider samples, Uber would have to first determine trends in the samples of riders who are blind identified by Plaintiffs (to the extent they can actually produce samples), in terms of regions, request times, pickup locations, etc., and then somehow try to match those trends in the "random" samples Uber would have to generate. This is the case because ride cancellations at a New York City street address in the late evening cannot validly be compared to cancellations at a suburban shopping mall in the afternoon, or cancellations at a rural location in the early morning. The multiple variables means that simply reducing the granularity of pick up location, for example to zip code, will

---

[17] Further, Plaintiffs have not exactly been protective of the data provided by Uber pursuant to this Agreement. Plaintiffs' papers include extensive data from Uber's quarterly reports, as well as documents Plaintiffs' themselves labeled privileged mediation communications. (*See, e.g.,* Motion [Dkt. 205], at 4-7; Riess Decl., Exh. 3 [Dkt. 205-3] .) Uber's reluctance to share more data is plainly justified.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

19.

CASE NO. 3:14-CV-04086-NC

1    not work because it would not allow valid comparisons across samples. Plaintiffs have not responded

2    substantively to these concerns.  (Spurchise Decl., ¶ 16.)

3         Further, the burden imposed would be immense and far beyond that inherent in collecting data

4    on complaints and investigation results. In a nutshell, Plaintiffs' proposal would require Uber to

5    generate 12 separate "random" samples of riders that were similar to the samples Plaintiffs provide (if

6    they are able to do so), and then gather their complete trip histories, as well as records of all of their

7    calls and text messages with Drivers. Uber would then be required to do the same as to the following

8    three samples of riders provided by Plaintiffs: (i) blind riders who travel with service animals (i.e., the

9    class that Plaintiffs represent); (ii) blind riders who travel with white canes; and (iii) riders who have

10   complained to Uber about service denial due to service animals. Uber would then be required to

11   generate cancellation data spanning several years. These significant undertakings would require Uber

12   to divert its employees from their existing duties to perform these entirely ancillary tasks, which were

13   never agreed to, in addition to the significant burdens already imposed by the Agreement. And of

14   course Plaintiffs will try to collect fees for their experts and lawyers to pore over the data.

15         Underscoring all of this remains the facts that (i) Plaintiffs only a few years ago asked for and

16   obtained an extensive data sharing proposal, which they then dismissed as irrelevant; (ii) Uber paid

17   NFB for a testing program and NFB had 3.5 years to do testing. It could have, as explained above,

18   done an actual test with uniform procedures testing the cancellation rate for riders with service animals

19   and riders without, to measure those rates over the course of the Agreement's term and compare them

20   to each other and over time.  Instead, it set up an online form and then attempted to re-write the

21   Agreement at the last minute.

22              **b.    Plaintiffs' Speculation That Some Drivers May Not Adequately
                        Understand English Does Not Warrant Translations.**
23

24        Plaintiffs request that Uber make its service animal policy and other Driver informational

25   materials available to Drivers in numerous other languages spoken by Drivers with limited English

26   proficiency. Plaintiffs argue that this is necessary based on anecdotal reports that some Riders believe

27   that English proficiency is an issue, but this is not based on any factual changes during the Term and

28   was known or at least foreseeable when the Agreement was negotiated and signed.

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

20.

CASE NO. 3:14-CV-04086-NC

First, Plaintiffs have made no effort whatsoever to submit this requested modification to a mediation as required by Section 10 of the Agreement. (Spurchise Decl., ¶ 17.) The parties attended mediation in December, but there were no communications regarding translation of documents leading up to that mediation. In other words, Plaintiffs skipped step one of the agreed upon Dispute Resolution Process.  Indeed, the only proposal about which Plaintiffs met and conferred prior to mediation was their data-sharing proposal. Thus, the mediation in December 2019 was necessarily limited solely to Plaintiffs' data-sharing proposal. (*Id.*; *see also* Dkt. 205-3, Exh. 16 [initiating Dispute Resolution process with respect to data-sharing].)

Second, Drivers have a legal duty to review and understand the terms of any contract into which they enter and to follow the law, regardless of what Uber tells them, and regardless of their proficiency in the language in which the contract is presented. *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36 (E.D.N.Y. 2017) (enforcing arbitration agreements provided solely in English notwithstanding Plaintiffs' limited English proficiency); *see also Mohamed v. Uber Techs., Inc.*, 109 F.Supp.3d 1185, 1197 (N.D. Cal. 2015), *rev'd in part on other grounds*, 848 F. 3d 1201 (9th Cir. 2016) (rejecting plaintiff's argument that he could not legally assent to the contract because he did not sufficiently understand English, and explaining that a "party who agrees to terms in writing without understanding or investigating those terms does so at his own peril").

Third, if Uber translated Driver-facing Service Animal materials but not every other Driver-facing communication (Technology Services Agreements and Addenda, Community Guidelines, its Zero Tolerance Policy, its Non-Discrimination Policy, etc.), other parties in other contexts would use that against Uber. Thus Plaintiffs' unjustified request may in effect necessitate translating everything Uber makes available.

Plaintiffs' request also imposes the significant burden of identifying which Drivers speak which languages and then accurately targeting them across a range of platforms, such as in-app, web, and emails, let alone service animal denial investigation communications.  Plaintiffs' request is all the more inappropriate because it has been prompted by mere conjecture that translating these documents will decrease ride denials due to service animals. In contrast, Uber's data showing the extreme rarity

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION

21.

CASE NO. 3:14-CV-04086-NC

1  of Drivers getting second alleged complaints suggests—in a more statistically meaningful way—that

2  English proficiency is *not* a material factor in denials of rides to individuals with service animals.

   **c.      Plaintiffs' Request For Supervision of Uber's Internal Training Is Unjustified.**

5      Plaintiffs also ask the Court to rewrite the Agreement to provide Plaintiffs supervision over

6  Uber's internal trainings and operations, which they euphemize as "further transparency" into

7  customer service staff trainings "information demonstrating how it investigates and makes

8  determinations regarding those complaints." (Motion [Dkt. 205], at 21:28-22:2.) Plaintiffs have not

9  exhausted the dispute resolution process with respect to this issue, having made a related request in

10  mediation in October 2017, but then dropping it.  To the extent this request remained an issue,

11  Plaintiffs should have either requested Court intervention years ago, or restarted the Dispute

12  Resolution process.  Second, as part of the Settlement, the Parties already agreed to written guidelines

13  for the staff members that investigate and determine service animal denial complaints which appear

14  as Addendum 2 to the Agreement. (Agreement [Dkt. 95-1, Exh. 1], at Addendum 2.) The Parties

15  engaged in lengthy and meticulous negotiations regarding the content of the guidelines, so this is

16  another example of Plaintiffs seeking to rewrite specific terms that were already negotiated.

17  **IV.    CONCLUSION**

18      There is no basis to extend beyond the negotiated termination date. For that reason, the

19  Agreement should expire per its terms and Plaintiffs' requested modifications are moot. Setting that

20  apart, Plaintiffs' requests are unwarranted and go far beyond what the parties and the Agreement

21  contemplated.

22  Dated:       July 1, 2020

                                                  */s/Andrew M. Spurchise*_____
                                                  ANDREW M. SPURCHISE
                                                  LITTLER MENDELSON, P.C.
                                                  Attorneys for Defendant

26  4812-0335-7121.9 073208.1034

Littler Mendelson, P.C.
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR EXTENSION OF COURT
JURISDICTION                                      22.                    CASE NO. 3:14-CV-04086-NC