STUART SEABORN – Cal. Bar No. 198590
MELISSA RIESS – Cal. Bar No. 295959
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Telephone:  (510) 665-8644
Facsimile:  (510) 665-8511
TTY:  (510) 665-8716
Email:  sseaborn@dralegal.org
        mriess@dralegal.org

TIMOTHY ELDER – Cal. Bar No. 277152
TRE LEGAL PRACTICE
4226 Castanos Street
Fremont, California 94536
Telephone:  (410) 415-3493
Facsimile:  (888) 718-0617
Email:  telder@trelegal.com

MICHAEL W. BIEN – Cal. Bar No. 096891
ERNEST GALVAN – Cal. Bar No. 196065
MICHAEL S. NUNEZ – Cal. Bar No. 280535
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:  mbien@rbgg.com
        egalvan@rbgg.com
        mnunez@rbgg.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, MICHAEL HINGSON, and MICHAEL PEDERSON,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | **Case No. 3:14-cv-04086-NC**<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR EXTENSION OF THE COURT'S JURISDICTION AND MODIFICATION OF POLICIES, PRACTICES, AND PROCEDURES PURSUANT TO SECTION 8**<br><br>Judge:   Hon. Magistrate Nathanael Cousins |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................. 1

II. ARGUMENT .................................................................................................................... 1

    A.   The Court Has Broad Authority to Order Additional Relief. ................................ 1

        1.   The lack of a second or third year compliance report justifies extension of the settlement term. ........................................ 2

    B.   Plaintiffs' Modifications are Necessary and Proper. ............................................ 5

        1.   The Settlement explicitly provides for modification of policies and practices. ................................................................. 5

        2.   Uber's attempts to evade good cause are meritless. ................................. 5

        3.   Uber's attack on the NFB's testing data is meritless. ............................... 7

    C.   Plaintiffs' Proposed Modifications are Reasonable and Appropriate. ................................................................................................ 10

        1.   Uber's attack on Plaintiffs' requested data fails ..................................... 10

        2.   Ordering Uber to translate driver materials is a reasonable and appropriate measure to improve access for the Class despite Uber's objections. ................................................................. 11

        3.   The Court should reject Uber's specious attack on Plaintiffs' request for transparency regarding enforcement of the Service Animal Policy. ............................................................. 14

III. CONCLUSION ............................................................................................................... 15

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

# TABLE OF AUTHORITIES

**Cases**

*Coates v. Johnson & Johnson*,
  756 F.2d 524, 533 (7th Cir. 1985) .......................................................................................... 8

*Crawford v. Uber Technologies., Inc.*,
  No. 17-cv-02664, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ............................................ 6

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324, 339 (1977) ........................................................................................................ 8

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ................................................................................................................. 1

*Morongo Band of Mission Indians v. California State Bd. Of Equalization*,
  858 F.2d 1376 (9th Cir. 1988) ................................................................................................. 2

*Namisnak v. Uber Technologies, Inc.*,
  No. 17-cv-06124-RS, 2020 WL 1283484 (N.D. Cal. Mar. 12, 2020) .................................... 6

*Ramos v. Uber Techs., Inc.*,
  2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ........................................................................ 6

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992) ............................................................................................................ 2, 3

*Shanghai Automation Instrument Co. v. Kuei*,
  194 F. Supp. 2d 995 (N.D. Cal. 2001) .................................................................................... 4

*Smith v. CRST Van Expedited, Inc.*,
  No. 10–CV–1116, 2014 WL 1744135 (S.D. Cal. Apr. 30, 2014) ..................................... 4, 15

*Spallone v. United States*, 493 U.S. 265 (1990) .......................................................................... 2

**Regulations**

49 C.F.R. § 37.167(d) .................................................................................................................. 9

**Rules**

Fed. R. Evid.,
  Rule 106 ................................................................................................................................... 9

**Other Authorities**

Transportation for Individuals With Disabilities,
  56 Fed. Reg. 45584 (1991) ...................................................................................................... 9

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## I. INTRODUCTION

Discrimination against Uber riders who try to use Uber with their service animals is ongoing, Uber continues to receive hundreds of reports of service denials each month, and the NFB testing program has documented hundreds of instances of service denials. Uber does not dispute any of these facts, nor does it dispute that it could implement the requested relief.

Instead, Uber disputes the Court's authority to grant the requested relief, but offers no authority supporting its position that the Court should do nothing. Uber disputes that Plaintiffs have shown "good cause" for additional relief but offers no support from the Settlement or elsewhere for its argument that ongoing widespread discrimination is not good cause.

Uber disputes the Court's power to extend the Settlement's term but ignores that the Settlement gives the Court authority to resolve disputes over whether to extend the term. Court involvement is appropriate here where the Monitor has not reported on Uber's compliance in the second and third year of the Settlement's term. Uber objects that the other requested relief is burdensome, untimely, and procedurally unripe. However, Plaintiffs corresponded and conferred with Uber about all the requested relief before filing this motion, and Uber offers no support for its conclusory assertions of burden.

## II. ARGUMENT

### A. The Court Has Broad Authority to Order Additional Relief.

The Court's jurisdiction over the Settlement Agreement here comes from its Order Granting Final Approval (ECF 139 at 2 ("The Court retains jurisdiction over the settlement for the duration of the settlement agreement")) and Order dismissing the case (ECF 145 at 2 (same)). In both Orders, the Court cited *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994). In *Kokkonen*, the Supreme Court held that a court has jurisdiction to enforce a settlement agreement where "the parties' obligation to comply with the terms of the settlement agreement [have] been made part of the order of dismissal" including through a "provision 'retaining jurisdiction' over the settlement agreement." *Id*. at 381. In such an instance, "a breach of the agreement would be a violation of the order," *id.*, and courts may exercise "broad equitable powers" when enforcing compliance with their decrees, particularly when it is necessary to

remedy past discrimination. *Spallone v. United States*, 493 U.S. 265, 276 (1990); *see also Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 n. 6 (1992) (court's power to modify "is long-established, broad, and flexible").

Uber's argument about parties attempting to "confer jurisdiction" is a non-sequitur. Uber's Opposition, ECF 210 at 16, fn.10 (*citing Morongo Band of Mission Indians v. California State Bd. Of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988)).  The case is within this Court's federal question jurisdiction under the ADA, and the Court expressly retained jurisdiction under *Kokkonen.*  Uber has identified no case law demonstrating that the court lacks jurisdiction over the relief Plaintiffs seek.

The relief that Plaintiffs seek was provided for in the Settlement Agreement for precisely this circumstance—where relief is necessary because of ongoing and pervasive discrimination against Uber riders with service animals. Settlement, ECF 95-1 at 19-20 (Section 8) and 22-23 (Section 10). Further, to the extent that modifications to Uber's policies, practices and procedures are warranted and additional time is required in order to effectuate the settlement's purpose of addressing service animal discrimination, Plaintiffs have requested that relief from the court.

Uber asserts that a court "may not entertain a party's argument regarding purpose or intent" of a settlement agreement, Uber's Opposition, ECF 210 at 9, but neither of the cases it cites supports this proposition. To the contrary, courts routinely require further action by parties to consent decrees and settlement agreements not originally contemplated in order to effectuate settlement goals. Ordering such relief is well within the court's authority here. *See Spallone*, 493 U.S. at 276.

    1.    <u>The lack of a second or third year compliance determination justifies extension of the settlement term.</u>

Courts have found modification appropriate where unforeseen circumstances or obstacles make a decree or agreement term unworkable. *See Rufo*, 502 U.S. at 384. Here, the Settlement requires the Monitor to issue reports determining whether Uber has substantially complied with the Settlement's terms during years two and three of the Settlement. *See* Settlement Agreement,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

ECF 95-1 at 19 (Section 8.A) ("The Monitor will report to the Parties within two months after the end of each year during the Agreement Term whether Uber has substantially complied with its obligations under the Agreement during the prior year.") In these reports, the Monitor may propose modifications to the policies, practices, and procedures required by the Settlement. *Id.* If the Monitor determines there has not been substantial compliance during years to and/or three, the Settlement term is to be extended. Settlement Agreement, ECF 95-1, at 19 (Section 7).

However, by providing in Section 7 that "any disputes concerning substantial compliance shall be resolved through the dispute resolution process," the Settlement also provides the Court the authority to resolve disputes over whether the Settlement's term should be extended by giving the Court the power to have the final word on compliance in the second and third year of the Settlement's term, a trigger for extending the term. *Id.*  Such a dispute exists now where the Monitor has not issued a report regarding Uber's compliance during years two and three of the Settlement term, although the parties have briefed Uber's compliance during these years, and have held multiple telephone conferences with the Monitor. Uber disclaims responsibility for the delay in the reports at great length, but, regardless of the reason, the parties are without a determination from their mutually selected neutral party regarding whether Uber has substantially complied with the Settlement's terms. With one week left in the Settlement Term, even if the Monitor does issue her year two and three reports before the Settlement expires, neither of the parties would be able to use the dispute resolution process to address any of the Monitor's findings regarding substantial compliance or the need for an extension to the term before the court's jurisdiction expires. In effect, without an extension to the court's jurisdiction, the delay in these reports has eliminated the primary tool the settlement had contemplated to assesses its effectiveness and Uber's compliance, along with any meaningful dispute resolution tied to that tool.

Uber's argument that the Settlement cannot be extended because Plaintiffs have not satisfied their "burden of persuasion regarding non-compliance" is a red herring. Uber's Opp., ECF 210 at 13. Plaintiffs' request for an extension of the Settlement Term is based on the fact that the Monitor has not issued a year two or three compliance report. Furthermore, Plaintiffs

have submitted a substantial body of evidence demonstrating that in at least some instances, Uber appears not to be enforcing the Service Animal Policy and consistently complying with the Settlement. *See, e.g.*, Declaration of Marianne Denning, ECF 205-11 at ¶ 4; Declaration of Erica Rodman, ECF 205-20 at ¶¶ 5-6; Declaration of Stephanie Valdez, ECF 205-25 at ¶¶ 4-5. Throughout the monitoring process Plaintiffs have raised concerns regarding the extent to which incidents such as these reflect widespread non-compliance and have requested additional information regarding this issue. Indeed, they first raised this issue with Uber through dispute resolution in 2017. Uber has refused to provide meaningful information in response to Plaintiffs' requests to date, which is why the request is part of the relief sought here by Plaintiffs through their motion. *See, e.g.*, Exhibits 2, 3, 9, and 10 to Riess Decl., ECF 205-3 at 2-33, 111-131. Although generally a moving party has the burden of proof, this burden can be shifted where another party has superior or—as here—exclusive access to relevant evidence. *See, e.g., Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1004 (N.D. Cal. 2001) (concluding, where plaintiff lacked access to defendant's financial records, "the burden should shift to defendant" to prove related fact); *see also Smith v. CRST Van Expedited, Inc.*, 10–CV–1116, 2014 WL 1744135 at *3-5 (S.D. Cal. Apr. 30, 2014) (on motion to enforce class settlement, court ordered defendants to produce documentation demonstrating that they had implemented certain settlement provisions where plaintiffs submitted evidence indicating non-compliance).

At the very least, the court must extend the settlement term to provide the parties with the opportunity to review the monitor's findings regarding Uber's compliance with the settlement, and to make use of the dispute resolution procedures set forth in the agreement. The lack of year two and year three compliance reports are a circumstance that was unforeseen at the time the settlement was adopted by the parties and entered by the court, and it is appropriate for the court to fashion reasonable and limited relief in response.

### B. Plaintiffs' Modifications are Necessary and Proper.

#### 1. The Settlement explicitly provides the Court authority to order additional relief.

The Settlement explicitly includes a process for modifying Uber's policies and practices in Section 8 if "there is good cause to believe there is need for further modifications to Uber's policies and practices . . . to more effectively address alleged Driver discrimination against Riders with Service Animals Settlement." ECF 95-1 at 20 (Section 8.B). Uber argues that the Court does not have the authority to order the requested relief, but Uber points to no language in the Settlement or other relevant authority in support. Uber's Op., ECF No. 210 at 15-16.

#### 2. Uber's attempts to evade good cause are meritless.

Uber incorrectly argues that the meaning of "good cause" in Section 8 has nothing to do with the amount of ongoing service-animal-related discrimination because Uber did not commit to reduce discrimination. Uber's Opp., ECF 210 at 16. However, Section 8 makes clear that "good cause" is based on whether "further modifications to Uber's policies and practices" are needed "to more effectively address alleged Driver discrimination against Riders with Service Animals." Settlement Agreement, ECF 95-1 at 20 (§ 8(b)). It is difficult to conceive of a metric more central than levels of ongoing service animal discrimination to the question of whether additional relief is needed "to more effectively address alleged driver discrimination against service animals."

That "good cause" in Section 8(b) is based on whether service-animal-related discrimination persists is also clear from the Settlement's express goal to "enhance Uber's policies, practices, and procedures to ensure that, to the maximum extent feasible, Plaintiffs and other blind and visually disabled individuals with service animals receive full and equal access to Uber's services." Settlement Agreement, ECF 95-1 at 4. People with disabilities do not receive "full and equal access" to services when they face discrimination, so the Settlement's goal is to modify Uber's policies and practices to minimize discrimination to the maximum extent feasible. The Settlement is a process-based agreement that mandates that, through Section 8, the parties *strive* to minimize service-animal-related discrimination. Because all available evidence shows

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

that discrimination remains widespread, negotiating and implementing additional relief to further reduce such discrimination is appropriate.

Uber also argues that the Settlement's goal of equal access does not apply to service-animal-related discrimination because it does not view itself as providing transportation services. Uber's Opp., ECF 210 at 17 n. 11. Uber instead would rewrite the history of the case so that it was about blind users being able to access Uber's mobile phone app, even if the users were left on the curb with no ride after accessing it. This is absurd. The lawsuit and the Settlement Agreement are plainly about transportation. Joint. Mot. for Prelim. Approval of Class Settlement and Related Mots. at 8 (Apr. 16, 2016), ECF 84 ("[t]his lawsuit and the proposed class settlement agreement address[es] Plaintiffs' allegations of discrimination against blind individuals who travel with service animals in the provision of transportation arranged through the Uber mobile software application.").

Furthermore, courts have rejected Uber's arguments that it is not a transportation provider under the ADA. *Crawford v. Uber Technologies., Inc.*, No. 17-cv-02664, 2018 WL 1116725, at *3-4 (N.D. Cal. Mar. 1, 2018); *Ramos v. Uber Techs., Inc.*, 2015 WL 758087 at *10 (W.D. Tex. Feb. 20, 2015); *see also Namisnak v. Uber Technologies, Inc.*, No. 17-cv-06124-RS, 2020 WL 1283484 (N.D. Cal. Mar. 12, 2020) ("Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system.'" (emphasis in original)).

Uber also attempts to read into Section 8(b) several limitations that do not exist. Uber suggests that the Settlement somehow limits the additional relief available under Section 8(b) to only small changes or to changes that were inconceivable at the time that the Settlement was executed. Uber's Opp., ECF 210 at 4. And Uber suggests that additional relief is not appropriate despite ongoing discrimination because, in its view, the Settlement "largely relate[s] to effectively addressing discrimination after it allegedly occurs." Uber's Opp., ECF 210 at 17.

These supposed limitations appear nowhere in the Settlement. Reading Section 8(b) and the Settlement's goals together confirms that the only two limits to relief under Section 8(b) are feasibility and relevance to service animal access. Settlement Agreement, ECF 95-1 at 4. In

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

addition, many Settlement provisions are designed to prevent discrimination despite Uber's contrary assertion. Settlement Agreement, ECF 95-1 at 8-11 (§§ 4(a)-(b)) and 11-12(5(a)) (educating new drivers about their obligations to transport riders with service animals, periodically reminding existing drivers about those obligations, and barring drivers who discriminate thereby preventing future discrimination).

Additionally, Uber's assertions about its termination of drivers who committed discrimination and the share of drivers who repeatedly discriminate is similarly irrelevant to whether "good cause" for additional relief exists. Neither assertion negates the fact that all available evidence indicates that service-animal-related discrimination remains widespread. Uber's Opp., ECF 210 at 17. Nor are small declines in reported instances of discrimination relevant where Uber's data show that service-animal-discrimination remains commonplace and widespread. *Id*. at 18.

Uber's vague and unsupported "graph" is also irrelevant to whether good cause exists and should be disregarded. *Id*. at 10, 19. The "graph" is merely a curve without numbers that lacks a scale on the vertical access and for which Uber provided no evidentiary support. *Id*. at 10. Even if the chart showed that reports of service-animal-related discrimination were declining compared to total trips provided as Uber claims, this irrelevant comparison reveals nothing about "good cause" or the Settlement's efficacy. Uber does not dispute that most Uber trips are provided to people who do not have service animals. *Compare* Pls.' Mot., ECF 205 at 17, *with* Uber's Opp., ECF 210 at 16-19. Thus, comparing complaints against total trips is an apples to oranges comparison that does not reflect the level of discrimination experienced by riders with service animals.

In sum, Uber's arguments about "good cause" amount to an effort to erase section 8(b) from the Settlement. Yet, Uber fails to refute what is most critical: service-animal discrimination continues to be widespread.

3.  <u>Uber's attack on the NFB's testing data is meritless.</u>

Uber challenges Plaintiffs' evidence and testing data as unreliable and inadmissible. Uber's Opp., ECF 210 at 19-22. The anecdotal class member declarations are probative evidence

of the impact of discrimination on people's lives—hindering their ability to participate in work and education, and thus impeding the central purpose of the ADA to ensure that persons with disabilities can live, participate and contribute to the society and the economy. "Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other." *Coates v. Johnson & Johnson*, 756 F.2d 524, 533 (7th Cir. 1985) (Affirming trial judge's reliance on non-statistical anecdotal evidence of discrimination where competing expert statistical analysis was not helpful); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (noting that "individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life"). NFB's testing program, required as part of the Settlement, is likewise probative evidence of class experiences. The testing program launched in May of 2017. Elder Declaration ¶ 8, ECF No. 185-2. It is administered by NFB and not by Class Counsel. Yingling Declaration ¶¶ 7, 12, ECF No. 190-5. Its design incorporates "an incentive plan that was designed to maximize participation from riders with service animals while still controlling for quality and minimum samples in targeted geographic regions." *Id*. ¶ 3. NFB affiliates throughout the country decide the best mechanism to meet their testing goals and how to encourage riders in their region to submit testing reports. *Id*. ¶¶ 4-6. Significant NFB resources were dedicated in the first year to building a system that "would produce a useful number of test reports and generate useful settlement compliance and efficacy data." *Id*. 2. Testers submit reports of both successful rides and rides in which discrimination or ride denials occur, and reports of denials are followed-up as appropriate "to measure settlement compliance or identify new or emerging settlement concerns." Elder Decl. ¶ 8, ECF No. 185-2. Importantly, "NFB testing data is compared to data reported by Uber to Class Counsel to look for trends and spot check the accuracy or thoroughness of Uber's data productions." *Id*. The NFB testing data, however imperfect in Uber's eyes, is nonetheless probative, admissible evidence of the ongoing discrimination experienced by the class.

Additionally, there is no merit to Uber's challenge to NFB's approach to the number of tests per tester ("super tester distortion") and the number of tests per geographic region. Uber's Opp., ECF 210 at 21). Of the 3,750 tests, 448 unique testers submitted reports. Declaration of

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Kristopher Nelson in Support of Plaintiffs' Reply, ¶¶ 3-5. NFB's system allowed for testers to submit reports of both successful rides and rides in which they experienced denials or discrimination, and as such some testers and affiliates chose to submit reports of most or all rides as the best mechanisms of meeting testing goals. Yingling Decl. ¶¶ 4-6, ECF No. 190-5. Out of the 448 testers who submitted reports, only eight submitted more than 100 reports. Nelson Decl., ¶ 5. In North Dakota, two testers submitted a combined total of 308 reports, of which only four involved ride denials; in Montana, two testers submitted 710 combined reports, of which only one involved a denial. Nelson Reply Decl., ¶ 6. As the NFB data has been used to look at trends over time in comparison with Uber's data, there is nothing untoward in this approach. Removing these Montana and North Dakota super testers from the data raises the percentage of tests that resulted in a service denial. No doubt Uber would have complained about the unflattering impact that their absence would cause if NFB had removed those super testers.

Further, NFB lacks access to Uber's data on the geographic distribution of its rides; NFB has only the geographic distribution of reported ride denials and discrimination that Uber reports per quarter and some publicly available information from SEC filings. As such, there was no realistic way for NFB to refine its study on the basis of facts such as Uber's revelation now that "Montana and North Dakota account for less than 1%" of Uber's total trips. Uber's Opp., ECF 210 at 21. NFB instead prioritized gathering as many reports of rides—successful and otherwise—as possible and limiting its analysis to trends over time in comparisons with limited data provided by Uber.

Moreover, Class Counsel sought additional information from Uber in order to allow an expert to improve the data available to generate rigorous insights into, for example, trip cancellation rates. *See* Letter from Timothy Elder at 4 (October 29, 2019), ECF 205-3 at 134-138. Uber prefers to keep its data secret, doling it out in only the self-serving, miniscule, and out of context doses it selects for rhetorical purposes, such as the meaningless curve in its brief, and snippets of Montana and North Dakota. Uber cannot have it both ways—it cannot rely on a self-selected pinhole view of its data while keeping the full context secret. Fed. R. Evid., Rule 106. Uber refuses to provide the kind of objective data that would resolve the complaints it has with

1   the NFB testing program.

2       Finally, Uber's attempt to challenge as "non-responsive" tests in which the rider did not
3   alert the driver that the animal was a service animal (Uber's Opp., ECF 210 at 21) underscores
4   its fundamental lack of understanding of the Americans with Disabilities Act, which does not
5   require riders to notify drivers in advance that they have a service animal. 49 C.F.R. § 37.167(d);
6   Transportation for Individuals With Disabilities, 56 Fed. Reg. 45584, 45755 (1991) ("Service
7   animals shall always be permitted to accompany their users in any private or public
8   transportation vehicle or facility.") Thus discrimination under the law can occur even when
9   riders "did not inform the Driver that their animal was a service animal." NFB's data collection
10  reflects this legal reality.

11      This criticism also reflects Uber's lack of understanding of the problems that numerous
12  class members report and may well help explain why this form of discrimination has become so
13  rampant. As reflected in many of the 27 Declarations attached to Plaintiffs' Motion, many ride
14  denials occur without communications between riders and drivers. *See, e.g.,* Declaration of John
15  Albarran, ECF 205-5 at ¶ 3; Declaration of Jessica Beecham, ECF 205-6 at ¶ 5; Declaration of
16  Marianne Denning, ECF 205-11 at ¶¶ 3-4. The NFB testing program is designed to—and
17  actually does—collect reports of both successful, discrimination-free rides and discriminatory
18  ride denials. As such, the testing program is working as designed when it collects reports of rides
19  in which riders did not inform drivers that their animal was a service animal.

20      **C.**    **Plaintiffs' Proposed Modifications are Reasonable and Appropriate.**

21      1.    <u>Uber's attack on Plaintiffs' requested data fails</u>

22  Uber objects to Plaintiffs' data request based on privacy grounds. Uber's Opp., ECF 210
23  at 22. However, Uber fails to explain why reducing the granularity of the requested data would
24  be insufficient to protect privacy. *Id.* Uber also offers no evidentiary support for its conclusory
25  assertion that using zip codes for location would generate invalid research results. *Id.* 22-23.
26  Uber also unpersuasively objects to producing trip history data based on "immense"
27  burden. Uber simply recites the tasks needed to gather the data and asserts vaguely that
28  collecting it will take employee time without offering any specific evidence, such as an estimate

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

of the time or number of employees, necessary to show that the burden would be so large as to be infeasible or impractical given Uber's size and resources. Uber's Opp., ECF 210 at 23; Company Info, Uber Newsroom, https://www.uber.com/newsroom/company-info/ (last visited Jul. 8, 2020) (reporting "over 22,000 employees at Uber" in December 2018). That Uber elsewhere boasts about its ability to "analyze historic data about [its] services and develop new features to improve them" suggests that producing Plaintiffs' requested data is feasible. Nikhil Joshi and Viv Keswani, Uber's Data Platform in 2019: Transforming Information to Intelligence, Uber Engineering Blog (Dec. 17, 2019) https://eng.uber.com/uber-data-platform-2019/.[1]

Uber's other objections to the data request lack merit. Uber's Opp., ECF 210 at 23. That the trip history analysis relies on data different from that Uber already provides under the Settlement, that the Settlement does not discuss cancellation rates, and that Plaintiffs may seek to recover reasonable attorneys' fees for their time reviewing the data are all irrelevant to whether conducting the trip history analysis is an appropriate step toward improving access for the class. Section 8's express purpose is to allow for additional relief not already adopted by the Settlement, and by describing modifications to policies and practices that the Settlement adopts as a subset of available relief, Section 8(b) makes clear that additional relief is not limited only to changing policies and practices expressly enumerated in the Settlement. Plaintiffs' entitlement to reasonable attorneys' fees for analyzing the requested trip history data is a question separate from whether granting the requested data takes an appropriate step toward improving access for the class.

2. Ordering Uber to translate driver materials is a reasonable and appropriate measure to improve access for the Class despite Uber's objections.

Uber argues that Plaintiffs' request to translate driver materials is not ripe because the parties did not address it at a mediation or correspond about it. Uber's Opp., ECF 210 at 24. However, through submissions to the Monitor, Plaintiffs notified Uber that they sought this relief

---

[1] To date Uber has declined Plaintiffs' invitations to negotiate the precise details of the trip history provided to account for any feasibility or legitimate burden issues. Instead, Uber's so-called good faith participation in negotiations over the data request has consisted of Uber producing lists of reasons why it was unwilling to produce any trip history data. *See, e.g.,* Exhibits 13 and 17 to Declaration of Melissa Riess, ECF 205-1.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

on July 31, 2019 and again addressed the issue on August 23, 2019. Declaration of Melissa Riess in Support of Plaintiffs' Reply, ¶ 3 and Exhibit A. Uber responded in writing in October 2019 urging that translating materials was not necessary, and the parties met and conferred about this relief on a call with the Monitor on November 4, 2019 where Uber reiterated its opposition to translating driver materials. *Id.* ¶ 4. In total, these communications more than satisfied the purpose of Step 1 of the dispute resolution process to meet and confer about the disputed relief. Agreement §10. Plaintiffs then raised the translation of driver materials at the December 17, 2020 mediation, but Uber was unwilling to discuss any relief other than that identified in the written mediation request, which included only the trip history data request. Riess Reply Dec. ¶ 5. However, the Settlement does not limit mediations to addressing only Settlement disputes that are formally raised in a written request for mediation, *See* Settlement, ECF 95-1 at 22 (§ 10, step 2 requiring only that disputes "be submitted to mediation at JAMS"), and because the parties already knew their respective positions concerning translation of driver materials, inclusion of this issue in the written mediation request would have made little difference to the parties' ability to address it at the mediation. The Court should decline Uber's invitation to erect formalistic barriers to this relief for the class. Uber's Opp., ECF 210 at 24.

Uber also incorrectly argues that translating driver materials is inappropriate because drivers must comply with their contractual obligations. Whether relief is appropriate under section 8 turns on whether it is feasible and will improve, or will likely improve, access for riders with service animals. Settlement, ECF 95-1 at 20 (Section 8.B). Drivers' contractual obligations are relevant only to the extent that they would constitute a barrier to additional relief under Section 8, and Uber has not asserted that Uber's contracts with drivers prevent Uber from translating driver materials. Uber's Opp., ECF 210 at 24.

Uber's other objections to translating driver materials lack merit. Business decisions that Uber may make regarding translating other driver materials are irrelevant to whether translating service-animal-related materials is a feasible means of improving access for the class. *Id*. Uber also objects based on burden. *Id*. However, Plaintiffs identified a reasonable means of identifying languages commonly spoken by drivers with limited English, and Uber could simply

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  add links into the Service Animal Policy, quarterly emails, and interactive popup to versions of
2  those documents translated into other languages.[2]  Pls.' Mot., ECF 205 at 24.  Uber fails to
3  explain why, or offer any evidence showing that, these facially reasonable activities would be
4  unduly burdensome for Uber.  Uber's Opp., ECF 210 at 24.

5  Uber also objects because Plaintiffs have not proven that translating driver materials will
6  reduce discrimination.  *Id.*.  However, it is common sense that providing drivers with greater
7  access to information about their obligations to transport service animals will improve access for
8  the class.  Furthermore, Section 8 imposes no such evidentiary burden, and adopting such a
9  requirement would be illogical given that Uber is a first-of-its-kind transportation service so, in
10 many cases, evidence of efficacy will not exist for relief that Uber has not yet implemented.

11 Uber's objection that translating driver materials is unnecessary because it views
12 language barriers as a small access problem for the class is both unsupported and irrelevant.
13 Section 8 does not bar relief that would address a specific problem experienced by only some
14 class members.  In addition, by asserting that Uber would need to "identify[] which drivers speak
15 which languages," Uber appears to acknowledge that it does not know how many drivers have
16 limited English proficiency and consequently the scope of the problem that translations would
17 address.  Uber's Opp., ECF 210 at 25.  That a small share of drivers receive second
18 discrimination complaints does not establish the degree to which limited driver English
19 proficiency impedes access for the class because there are many possible reasons why only a
20 small share of drivers receive second discrimination complaints, such as the relative rarity of a
21 driver being paired with a rider with a service animal on two different occasions.  *Id.*; *compare*
22 Preliminary Approval Mot., ECF 84 at 22 (the class has only "hundreds or thousands") *with*
23 Company Info, Uber Newsroom, https://www.uber.com/newsroom/company-info/ (last visited
24 Jul. 8 , 2020) (reporting that in December 2018 Uber provided fourteen million trips a day).

---

[2] It is not necessary to target distribution of translated versions of driver materials to drivers with limited English.  When Uber makes the interactive popup, Service Animal policy, and reminder emails available to drivers, it need only make clear that versions of these documents are available in other languages.

       3.      <u>The Court should reject Uber's specious attack on Plaintiffs' request for transparency regarding enforcement of the Service Animal Policy.</u>

Uber incorrectly states that Plaintiffs' request for transparency is a request to rewrite the guidelines in Addendum 2 of the Settlement. Uber's Opp., ECF 210 at 25. As requested at the October 2017 mediation, Plaintiffs request only that the Court order Uber to (1) share any materials that Uber uses to train employees on how to investigate and respond to service-animal-related discrimination complaints, (2) allow Plaintiffs to observe one such training session, and (3) provide Plaintiffs with additional information regarding a sample of service-animal-related discrimination complaints, including a summary of each complaint, information gathered through investigation of the complaint, and the rationale for Uber's designation of the complaint as either knowing, plausible, or not plausible as provided for in the Settlement. *See* Pls.' Mot., ECF 205 at 25-27. Such a request is entirely reasonable and within the scope of a settlement enforcement proceeding. Indeed, other courts have ordered a defendant party to a class settlement to produce additional information demonstrating compliance where plaintiffs have produced class member declarations indicating noncompliance. *See Smith v. CRST Van Expedited, Inc.*, 10–CV–1116, 2014 WL 1744135, at *3 (S.D. Cal. Apr. 30, 2014).

Plaintiffs' request for greater transparency is also ripe for Court review despite Uber's objections. Uber acknowledges that the parties addressed this issue at a mediation but argues without support that Plaintiffs' request for relief from the Court is untimely. Uber's Opp., ECF 210 at 25. However, the Settlement provides no deadline to advance a dispute from mediation to the Court. Settlement Agreement, ECF 95-1 at 22-23 (§10). Nor did Plaintiffs notify Uber that they had dropped their request for additional transparency concerning application of Uber's Service Animal Policy as Uber suggests. Uber's Opp., ECF 210 at 25. To the contrary, after the October 2017 mediation, Plaintiffs continued to request additional information and transparency regarding Uber's application of the required Service Animal Policy enforcement practices. *See, e.g.*, Exhibits 9 and 10 to Riess Decl. (ECF 205-3 at 110-127) (letters from Plaintiffs to Uber's Counsel dated January 29, 2018 and April 16, 2018, respectively, requesting more transparency on Uber's application of Service Animal Policy enforcement practices).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Uber argues that Plaintiffs do not have the right to participate in Uber's Service Animal Policy enforcement decisions, Uber's Opp., ECF 210 at 15, but Plaintiffs have the right and duty to monitor Uber's compliance with all Settlement requirements, including these required enforcement practices. *See* Amended Order Granting in Part Pls.' Mot. for Atty.'s Fees and Costs; Den. Admin. Mot. to Seal Re Dkt. Nos. 185, 189 (Nov. 8, 2019), ECF No. 203 (explaining that Plaintiffs' counsel are not "required to sit on their hands and rubber-stamp Uber's efforts" and describing several monitoring tasks not required by Settlement as "well within the scope of monitoring compliance with a discrimination-related settlement").

### III. CONCLUSION

For the reasons discussed above, Plaintiffs request that the Court extend the Settlement's term by 18 months to January 16, 2022 and order Uber to produce the requested trip history data, translate driver materials, and provide greater transparency concerning Uber's enforcement of its Service Animal Policy.

DATED: July 8, 2020                                    Respectfully submitted,

                                                       DISABILITY RIGHTS ADVOCATES


                                                       */s/ Melissa Riess*
                                                       Melissa Riess
                                                       Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*NFB, et al. v. Uber Techs. Inc.*, **Case No. 3:14-cv-04086-NC**
**Plaintiffs' Reply ISO Motion for Extension of the Court's Jurisdiction and Modifications of Policies**    **15**